**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ERUBY ABREGO, | ) | |
| | ) | |
| *Plaintiff*, | ) | Case No. |
| | ) | |
| *v.* | ) | |
| | ) | |
| REYNALDO GUEVARA, GERI LYNN | ) | |
| YANOW, as special administrator of the | ) | |
| ESTATE OF ERNEST HALVORSEN, | ) | |
| ANTHONY WOJCIK, DANIEL ENGEL, | ) | |
| JEROME BOGUCKI, RAY SCHALK, | ) | |
| FRANK CAPPITELLI, the CITY OF | ) | |
| CHICAGO, ANDREANA TURANO | ) | |
| MICHIELS, and COOK COUNTY. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| *Defendants*. | ) | |

**COMPLAINT**

NOW COMES Plaintiff, ERUBY ABREGO, by his attorneys LOEVY & LOEVY, and

complaining of Defendants JEROME BOUGUCKI, FRANK CAPITELLI, DANIEL ENGEL,

REYNALDO GUEVARA, GERI LYNN YANOW, as special administrator of the ESTATE OF

ERNEST HALVORSEN, ANTHONY WOJCIK, RAY SCHALK, the CITY OF CHICAGO,

ANDREANA TURANO MICHIELS, and COOK COUNTY, states as follows:

**INTRODUCTION**

1. Plaintiff Eruby Abrego was wrongly convicted of the 1999 murder of Jose Garcia

and aggravated battery of Julio Lugo. He spent more than two decades in prison for a crime that

he did not commit.

2. Plaintiff had nothing to do with the murder. Not one piece of physical evidence

connected Plaintiff to the Garcia and Lugo shooting.

3.      Instead, Plaintiff's arrest, prosecution, and conviction were based on false evidence knowingly manufactured by notorious Chicago Police Detectives Anthony Wojcik, Jerome Bogucki, Reynaldo Guevara and Ernest Halvorsen, in concert with the other named Defendants.

4.      Among that fabricated evidence were three supposed eyewitness identifications implicating Plaintiff in the crime. Defendants indicated to the eyewitnesses that they should identify Plaintiff as the perpetrator.

5.      In addition, to wrongly convict Plaintiff, Defendants obtained and relied on a fabricated, involuntary, and false confession they extracted from Plaintiff after a physically and psychologically abusive interrogation, during which Defendant Wojcik beat Plaintiff

6.      Defendants obtained and relied upon additional fabricated, involuntary, and false "statements" of others extracted by force, threats, and false promises as well.

7.      Finally, throughout the criminal proceedings, Defendants suppressed exculpatory information, including the fact that they knew that someone other than Plaintiff had committed the crime.

8.      On July 20, 2022, after spending 23 years incarcerated for a crime he had not committed, Plaintiff's wrongful conviction was vacated, the charges were dismissed, and he was finally set free.

9.      Defendants' misconduct resulting in Plaintiff's wrongful conviction was just part of a now well-known pattern of illegal activity perpetrated by Defendants Wojcik, Bogucki, Guevara, and the other Defendants.

10. Plaintiff is one of at least 39 men and women exonerated after being convicted on murder charges arising in corrupt homicide investigations conducted by Defendant Guevara and his fellow Area Five detectives and supervisors.

11. The Illinois Appellate Court has called Defendant Guevara "a malignant blight on the Chicago Police Department and the judicial system."

12. Cook County courts have found that Defendant Guevara "engaged in a pattern and practice of intimidating, threatening, and influencing witnesses in prior homicide investigations," and that Defendant Guevara had told "bald-faced lies" during court testimony and had "eliminated any possibility of [] being considered a credible witness in any proceeding."

13. In court proceedings, Defendants Guevara, his partner Halvorsen, and their associates have pleaded their Fifth Amendment right not to incriminate themselves in response to questions about their misconduct as police officers, and Defendant Guevara has specifically pleaded his Fifth Amendment right not to incriminate himself on multiple occasions in response to questions about his misconduct as a police officer, including during the investigation that caused Plaintiff's wrongful conviction.

14. A month after Plaintiff's exoneration, on August 9, 2022, having concluded that convictions obtained by Defendant Guevara cannot stand consistent with due process, Illinois state prosecutors moved to vacate the convictions of eight additional victims of Defendant Guevara in an unprecedented mass exoneration of murder convictions.

15. Plaintiff was a son and a brother when he was targeted and torn from his family, framed for a crime he did not commit by Defendants.

3

16.     Plaintiff now seeks justice for the harm that the Defendants have caused and redress for the incalculable loss of liberty and the terrible hardship that Plaintiff has endured and continues to suffer as a result of the Defendants' misconduct.

## JURISDICTION AND VENUE

17.     This action is brought pursuant to 42 U.S.C. § 1983 and Illinois law to redress the Defendants' tortious conduct and their deprivation of Plaintiff's rights secured by the U.S. Constitution.

18.     This Court has jurisdiction of Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction of his state-law claims pursuant to 28 U.S.C. § 1367.

19.     Venue is proper under 28 U.S.C. § 1391(b). Plaintiff resides in this judicial district. The events and omissions giving rise to Plaintiff's claims occurred within this judicial district, including the investigation, prosecution, and trial resulting in Plaintiff's conviction.

## PARTIES

20.     Plaintiff Eruby Abrego spent 23 years in prison for a murder and shooting he did not commit.

21.     At all times relevant to the events described in this complaint, Defendants Jerome Bogucki, Frank Cappitelli, Daniel Engel, Reynaldo Guevara, Ernest Halvorsen, Anthony Wojcik, Ray Schalk and other unknown law enforcement officers were police officers in the Chicago Police Department acting under color of law and within the scope of their employment for the City of Chicago. These Defendants are referred to collectively as the "Police Officer Defendants" throughout this Complaint.

22.     Geri Lynn Yanow, the Special Representative for Ernest Halvorsen, deceased, is named as a Defendant in her capacity as Special Representative of Ernest Halvorsen, as successor in interest and to defend this action on behalf of Defendant Ernest Halvorsen.

4

23.     At all times relevant to the events described in this complaint, Defendants Frank Cappitelli, and other unknown law enforcement officers supervised the Police Officer Defendants. These Defendants participated in the misconduct alleged in this complaint and also facilitated, condoned, approved, and turned a blind eye to the misconduct of the Defendants whom they supervised.

24.     At all relevant times, Defendant Andreana Turano Michiels, was an Assistant Cook County State's Attorney. She conspired with the Police Officer Defendants, prior to the existence of probable cause to believe Plaintiff had committed a crime, and while acting in an investigatory capacity. She is referred to as the "Prosecutor Defendant" throughout this Complaint.

25.     The City of Chicago is an Illinois municipal corporation that is or was the employer of the above-named Police Officer Defendants. Each of the individual Defendants named in this complaint acted at all relevant times as agents or employees of the City of Chicago. The City of Chicago is liable for all torts committed by the Police Officer Defendants pursuant to the doctrine of *respondeat superior*. Additionally, the City of Chicago is responsible for the policies and practices of the Chicago Police Department.

26.     Defendant Cook County is a governmental entity within the State of Illinois, which consists in part of its Cook County State's Attorney's Office and was at all relevant times the employer of the Prosecutor Defendant. Defendant Cook County is a necessary party to this lawsuit.

27.     Each and every individual Defendant, known and unknown, acted under color of law and within the scope of his or her employment at all times relevant to this lawsuit. Each of the individual Defendants is sued in his or her individual capacity unless otherwise noted.

## FACTS

### The Crime

28.     On the evening of May 22, 1999, Jose Garcia and Ramon Torres (Jose's nephew) were sitting in a parked car near the intersection of Belmont and Monticello in Chicago.

29.     Garcia and Torres were talking to Julio Lugo, and his 10-year-old cousin Isidro Quinones, who were standing next to the parked car.

30.     While they were talking, a dark-skinned Latino male wearing a sweatshirt with a hood pulled over his head shouted gang slogans from across the street and opened fire with a handgun.

31.     Garcia, who was sitting in the passenger seat, was struck in the head.

32.     Torres, who was sitting in the driver seat, ducked down and drove away from the scene.

33.     Lugo shielded his young nephew Quinones. Quinones was uninjured. Lugo, however, was hit once in the shoulder and once in the buttock.

34.     Torres drove several blocks before pulling over on Milwaukee Avenue, just north of Belmont.

35.     Garcia died from the gunshot wound before an ambulance arrived.

36.     Lugo was taken from the scene to the hospital and discharged several days later.

### Defendants Arrest Juan Parra and Fabricate A Statement From Him

37.     Lugo was a member of the Latin Kings street gang.

38.     The shooter was suspected to be a member of the rival Orchestra Albany gang because, prior to opening fire, he yelled slogans such as "OA love" and "King killer."

6

39.     Defendants learned that, just before the shooting, Lugo and Quinones had been riding in a car with Fred Marrero, another Latin King. The three Latin Kings had been confronted by several members the rival Orchestra Albany gang, who were riding in a gold-colored Chevy Caprice. The OAs pulled over, shouted gang slogans, and threw bottles at the Latin Kings' car.

40.     Operating on the theory that the OAs involved in this bottle-throwing incident may also have been responsible for the shooting, Defendants worked to identify those OAs.

41.     Defendants searched the area for a gold-colored Chevy Caprice, and they found one that they learned belonged to Juan Parra, who they believed was an OA gang member.

42.     Detectives Guevara and Halvorsen created a photo array including Juan Parra and showed it to Torres and Lugo.

43.     According to Defendants' reports, neither of them identified anyone in this array.

44.     Despite having no evidence to arrest him, Defendants arrested Parra and brought him to Area 5 around 1:30 a.m.

45.     Defendants interrogated Parra, held him overnight, and polygraphed him. Defendants told Para he "failed" the polygraph, when they knew, in fact, he could have never passed because the polygraph was a mechanism for generating false evidence as a poly to obtain an involuntary inculpatory statement.

46.     After being held overnight, Defendants fabricated a statement that they attributed to Parra and forced him to adopt it.

47.     The coerced and manufactured statement falsely implicated Plaintiff in the murder of Garcia and shooting of Lugo.

48.     According to Defendants, Parra gave a statement that he, "Sef," "PeeWee," and "Cain" drove into Latin King territory, encountered a car containing Latin Kings, and got out of their car to pursue the Latin Kings, who got away. PeeWee and Cain then returned to Parra's car, but Sef did not. Parra pulled into an alley and waited. He heard several shots and saw Sef running back to the car holding a handgun.

49.     According to Defendants, Parra identified Sef as Plaintiff, Eruby Abrego, and Cain as Jeremiah Cain. According to Defendants, they then consulted a CPD database of known gang members and learned that Nicasio Santiago was known as PeeWee.

50.     Defendants suppressed that they obtained Parra's false statement by coercion, they suppressed all of the circumstances of Parra's statement, and they suppressed that they had fabricated that statement. Defendants also suppressed the CPD "database" they claim to have consulted to identify PeeWee.

**Defendants Arrest Jeremiah Cain and Obtain A Statement From Him By Force**

51.     Next, Defendants arrested Jeremiah Cain.

52.     Defendants found a handgun in his bedroom.

53.     Later, Defendants confirmed that this was the weapon used in the shootings.

54.     Defendants questioned Cain, who provided a story that contradicted the story that they claimed they had learned from Parra. That story did not implicate Plaintiff in the murder of Garcia and shooting of Lugo, or Cain for that matter. At most, the statement Defendants' attributed to Cain said he was given a handgun after the shooting, for which he was not present or aware of beforehand.

55.     Defendants knew that both statements they had "obtained" could not be true. Rather than honestly continuing their investigation to find the truth, Defendants doubled down on trying to implicate Plaintiff in the shooting.

56.     For example, because Cain's version of events did not match what Parra had said, Defendants obtained a new statement from Cain by force.

57.     They interrogated Cain, physically abused him, beat him, told him what to say, and fed him the story they attributed to Parra, so that the statement they would have Cain sign would better match the story they had fabricated from Parra.

58.     As a result of this misconduct, Plaintiff now emerged in the story attributed to Cain. Instead, Defendants documents assert that Cain now described a meeting in Koz Park with Plaintiff, Santiago, and Parra. In the new version of events, Cain got the handgun and gave it to Plaintiff, and Plaintiff now went to find the Latin Kings' car while the others waited in an alley. In this new version of events, Cain heard several gunshots, after which Plaintiff returned to the car and gave the handgun back to Cain.

59.     Defendants forced Cain to give this false statement they had fabricated to a court reporter.

60.     Defendants suppressed that they obtained the false statement attributed to Cain by force, they suppressed the totality of the circumstances of Cain's statement, and they suppressed that they had fabricated that statement.

**Defendants Arrest Plaintiff and Santiago**

61.     Two days after the shooting, on Wednesday, March 24, 1999, Defendants arrested Plaintiff and Santiago.

62.     They arrived at Plaintiff's sister's home without a warrant, broke down the door, and entered with guns drawn, forcing everyone in the house onto their knees.

63.     Defendants asked Plaintiff to identify himself, which he did.

64.     Defendants told Plaintiff, "You know what you did." Plaintiff responded that he did not know what they were talking about.

65.     In response, Defendant Wojcik hit Plaintiff twice in the face.

66.     Plaintiff was taken to Area Five.

67.     Nicasio Santiago was also in the home.

68.     Defendants arrested him as well, and they took him to Area Five.

**Defendants Torture Plaintiff and Obtain A False Confession**

69.     At Area Five, Defendants placed Plaintiff in a small interrogation room.

70.     They chained him to the wall.

71.     Defendants left Plaintiff in the room alone for an hour and a half. They did not give him food or water. They did not let him use the restroom. They did not read him his rights. They did not provide him the opportunity to talk with an attorney, even after he asked for an attorney.

72.     When Defendants returned to the interrogation room, they asked Plaintiff whether he had been involved in the shooting, and he told them truthfully that he had nothing to do with the crime.

73.     Throughout the early stages of the interrogation, Plaintiff continually maintained his innocence and told them he knew nothing about the shooting.

74.     Defendants refused to accept the truth of Plaintiff's innocence.

10

75.     Defendants instead initiated a coercive interrogation of Plaintiff, during which Plaintiff was physically and psychologically abused and mistreated.

76.     For example, Defendants demanded that Plaintiff confess to the crime.

77.     When Plaintiff denied any involvement, Defendant Wojcik began to beat Plaintiff. He punched Plaintiff in the ribs, back, and chest. Defendant Wojcik hit Plaintiff approximately 20-25 times. Then he left the room.

78.     Defendants left Plaintiff in the interrogation room alone, chained to the wall, for a few more hours. Again, they did not give him food or water. They did not let him use the restroom. They did not read him his rights. They did not provide him the opportunity to talk with an attorney, even after he asked for an attorney.

79.     When Defendants returned to the room, they told Plaintiff he was going to rot in jail, telling him falsely that other witnesses had implicated him. Defendants showed Plaintiff statements purportedly provided by Cain and Para. Then they left the room again.

80.     When Defendants returned, they took Plaintiff and placed him in a lineup. After the lineup, he was returned to the interrogation room.

81.     Plaintiff was left in the interrogation room alone overnight. He was chained to the wall the entire time. Again, Defendants did not give him food. They did not let him use the restroom. They did not read him his rights. They did not provide him the opportunity to talk with an attorney, even after he asked for an attorney.

82.     During the night, Plaintiff cried out because he needed to use the bathroom. Defendants did not remove the restraints or allow him to leave the interrogation room. Plaintiff was forced to urinate in the interrogation room.

83.     When Defendant Wojcik returned to the interrogation room, he saw the urine and got angry at Plaintiff.

84.     Defendant Wojcik hit Plaintiff approximately 20 times again, while Plaintiff was chained to the wall. Defendant Wojcik then left the room again.

85.     Plaintiff was in pain through the night.

86.     In the early morning hours of Friday, March 26, Defendants returned once more.

87.     At that point, Plaintiff had not eaten since his arrest days earlier. He was in pain. He felt like he had to vomit.

88.     Plaintiff told Defendants he needed medical attention.

89.     Defendants took Plaintiff to the bathroom. Plaintiff threw up, and his vomit was bloody. Plaintiff showed Defendants that there was blood in his vomit, and he asked them to take him to the hospital.

90.     Defendants told him words to the effect of, "just tell me what I want to hear, and I'll take you wherever you want to go."

91.     Plaintiff felt increasingly helpless and alone after numerous rounds of threats and violence against him perpetrated by Defendants.

92.     In fear for his life and further torture and abuse from Defendants, Plaintiff's will was overborne and Plaintiff agreed to provide a statement, in which he confessed to committing the shooting.

93.     At the time that he adopted Defendants' false statement, it was obvious that Plaintiff had been severely abused by police. There were bruises showing on his body. His underwear was soiled because he had urinated on himself while detained at night. There were visible cuts on his chest. He reported throwing up blood.

12

94.     The statement simply repeated what Defendants told him to say—*i.e.*, going along with the false statements they had manufactured from others.

95.     In fact, the transcript of the final version of the statement Defendants fabricated and attributed to Plaintiff consists largely of Defendant Turano Michiels reciting Defendants' version of events and asking Plaintiff to confirm that version of events.

96.     Defendant Turano Michiels was present while Plaintiff's interrogation was ongoing and participated personally in fabricating the false incriminating statement that Plaintiff was forced to sign.

97.     The statement was false. It was obviously false on its face. It was manufactured by Defendants. And Plaintiff only adopted it as his own because Defendants tortured him.

98.     Plaintiff's statement coerced by violence and psychological coercion, was manufactured by Defendants, and was used to prosecute and convict Plaintiff of a crime he did not commit.

**Defendants Concoct False Witness Misidentifications and False Witness Statements**

99.     The Police Officer Defendants' efforts to frame Plaintiff did not stop there. These Defendants also concocted eyewitness identifications implicating Plaintiff in the crime.

100.     Defendants also obtained false identifications of Plaintiff using suggestive identification procedures.

101.     The witnesses to the crime described a perpetrator of a different height, weight, and skin complexion than Plaintiff.

102.     Witnesses described the shooter as a "black Hispanic" and between 5'7" and 6' in height.

103.     Plaintiff, however, was light-skinned and very short—between 5'3"-5'5".

104.    Defendants knew that Plaintiff was not the real killer, and they knew that Plaintiff did not match the description of the real killer.

105.    But Defendants nonetheless instructed the victim Julio Lugo and eyewitnesses Ramon Torres and Isidro Quinones to misidentify Plaintiff as the shooter.

106.    Defendants put together a highly suggestive lineup, which consisted almost entirely of their suspects in the crime, including Plaintiff.

107.    After viewing this suggestive lineup, Quinones and Torres both misidentified Plaintiff as the shooter, according to Defendants' reports.

108.    However, Defendants told Quinones and Torres that they should identify Plaintiff in the lineup.

109.    Defendants showed Lugo a different lineup after being released from the hospital three days after the shooting.

110.    Lugo did not make any identification of Plaintiff in the lineup.

111.    Lugo did not make any identification because he never saw the shooter clearly and had no idea who committed the crime.

112.    However, by the time of trial, Defendants had convinced Lugo to identify Plaintiff.

113.    Defendants told Lugo that Plaintiff had committed the crime, that they had the guy who did it, that he had confessed, and that the guy was Plaintiff.

114.    Julio Lugo, Ramon Torres, and Isidro Quinones went on to misidentify Plaintiff as the shooter at trial.

115. Lugo has said that he identified Plaintiff as the shooter because "the police came and said 'this guy did it,'" and they said "'we got the guy, it's this guy.'" Lugo "just went by what the police said." He said, "I really don't know who did it."

116. Similarly, Torres has explained that "the kid, Abrego, didn't do it," that the police told him to identify and implicate Plaintiff, and "the real guy is still out there."

**Plaintiff's Wrongful Conviction and Imprisonment**

117. As a result of Defendants' misconduct, in September 2004, Plaintiff was tried in and convicted in the Circuit Court of Cook County of first-degree murder and aggravated battery with a firearm.

118. The State's case hinged upon the false confession they had extracted from Plaintiff by force, the fabricated statements of third parties, and the misidentifications of Julio Lugo, Ramon Torres, and Isidro Quinones, which had been manufactured by Defendants.

119. There was no physical evidence of any kind linking Plaintiff to the crime. In fact, Plaintiff was excluded as the person who had left a fingerprint on the gun used in the shooting.

120. Plaintiff testified in his own defense at trial, saying that he was not involved in the shooting. He testified about the torture that he had endured.

121. The State mocked Plaintiff's defense during closing arguments in the criminal trial, calling it "the biggest frameup, the big conspiracy to get Eruby Abrego," and telling the jury that Plaintiff's testimony was "hogwash" and "should insult you." In fact, what Plaintiff said Defendants had done to him was true.

122. Without the false confession and the fabricated witness statements and identifications, Plaintiff would never have been convicted.

123.     Nonetheless, Plaintiff was found guilty of first-degree murder was sentenced to 90 years in prison.

124.     Because of the Defendants' misconduct, Plaintiff's opportunity to know his family and make a life with them was taken away. He lost decades of time where he was not with his family. Plaintiff's relationships with his family were extraordinarily harmed.

125.     Plaintiff was stripped of his young adulthood and deprived of opportunities to gain an education, to engage in meaningful labor, to develop skills and a career, and to pursue his interests and passions. Plaintiff has been deprived of all of the basic pleasures of human experience, which all free people enjoy as a matter of right, including the freedom to live one's life as an autonomous human being.

126.     Plaintiff never knew whether the truth would come out or whether he would ever be exonerated.

127.     Plaintiff spent 23 years in prison before being released.

128.     In addition to the severe trauma of wrongful imprisonment and Plaintiff's loss of liberty, the Defendants' misconduct continues to cause Plaintiff extreme physical and psychological pain and suffering, humiliation, constant fear, anxiety, deep depression, despair, rage, and other physical and psychological effects.

**Plaintiff's Exoneration**

129.     For decades, Plaintiff maintained his innocence and fought consistently for his freedom.

130.     In July 2022, the Cook County Circuit Court vacated Plaintiff's conviction. The State entered a motion of *nolle prosequi* on the remaining count against Plaintiff and dismissed all charges against him.

131.    At the time of his exoneration, Plaintiff had been fighting the false charges against

him for approximately half of his life.

### Chicago's Policy and Practice of Wrongly Convicting
### Innocent Persons in Violation of the Constitution

132.    The City of Chicago and the Chicago Police Department are responsible, by

virtue of their official policies, for inflicting miscarriages of justice in scores of criminal cases

like the one endured by Plaintiff.

133.    Since the 1980s, no fewer than 100 cases have come to light in which Chicago

police officers fabricated false evidence and/or suppressed exculpatory evidence in order to

cause the convictions of innocent persons for serious crimes they did not commit.

134.    These cases include many in which Chicago police officers used the same tactics

that Defendants employed against Plaintiff in this case, including but not limited to fabricating

evidence, concealing exculpatory evidence, coercing confessions and statements through

physical and psychological abuse, manipulating witnesses in order to influence eyewitness

identifications and testimony, and using other tactics to secure the arrest, prosecution, and

conviction of a person without probable cause and without regard for the person's actual guilt or

innocence.

135.    At all relevant times, members of the Chicago Police Department, including the

Defendants in this action, routinely fabricated and manipulated identification procedures to

procure suspect identifications that they knew to be inaccurate.

136.    At all relevant times, members of the Chicago Police Department, including the

Defendants in this action, systematically suppressed exculpatory and/or impeaching material by

intentionally secreting discoverable reports, memos, and other information. This concealed

material was kept in files that were maintained only at the Chicago Police Department and never

disclosed to the participants of the criminal justice system. As a matter of widespread custom and practice, these clandestine files were withheld from the State's Attorney's Office and from criminal defendants, and they were routinely destroyed or hidden at the close of the investigation rather than being preserved as part of the official file.

137.    Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including the named Defendants, concealed exculpatory evidence from Plaintiff.

138.    The existence of this policy and practice of suppressing exculpatory and/or impeaching material in clandestine files was established and corroborated in the cases of, *inter alia*, *Rivera v. Guevara*, No. 12 C 4428 (N.D. Ill.), *Fields v. City of Chicago*, No. 10 C 1168 (N.D. Ill.), and *Jones v. City of Chicago*, No. 87 C 2536 (N.D. Ill.).

139.    The policies and practices of file suppression at issue in *Fields* applied throughout the timeframe from the 1980s through the 2000s, including at the time of the investigation at issue here.

140.    In addition, a set of clandestine files related to Area Five homicides—the same Detective Division involved in this case—was found in the case of *Rivera v. Guevara*, No. 12 C 4428 (N.D. Ill.). Those files, for a period in the 1980s and 1990s, contained exculpatory and impeaching evidence not turned over to criminal defendants.

141.    The policy and practice of suppressing exculpatory and/or impeaching material evidence was alive and well at all relevant times, including at the Area Five Detective Division during the investigation at issue here.

142.    In addition, the City of Chicago and the Chicago Police Department routinely used illegal tactics, including torture, physical coercion, and psychological coercion, to extract

18

involuntary and false confessions and statements from suspects and witnesses. There are well over 250 documented cases of Chicago Police officers using torture and coercion to illegally obtain confessions in homicide cases. The City had notice of this widespread practice of procuring false and coerced confessions long before the events at issue in this case.

143.    Moreover, the City of Chicago and the Chicago Police Department routinely failed to investigate cases in which Chicago police detectives recommended charging an innocent person with a serious crime, and no Chicago police officer has ever been disciplined as a result of his misconduct in any of those cases.

144.    Prior to and during the period in which Plaintiff was falsely charged and convicted, the City of Chicago also operated a dysfunctional disciplinary system for Chicago police officers accused of serious misconduct. The City almost never imposed significant discipline against police officers accused of violating the civil and constitutional rights of members of the public. Further, the disciplinary apparatus had no mechanism for identifying police officers who were repeatedly accused of engaging in misconduct.

145.    For instance, multiple witnesses have come forward with evidence that Defendant Guevara was part of Miedzianowski's criminal enterprise. Defendant Guevara and Miedzianowski worked together in gang crimes before Defendant Guevara became homicide detective. Defendant Guevara used his status as a detective to advance the criminal drug enterprise he participated in with Miedzianowski, and to pressure drug dealers that did not do their bidding. Guevara's assistance included working with Miedzanowski to pin murders on innocent men.

146.    In the case of *Klipfel v. Bentsen*, No. 94 C 6415 (N.D. Ill), a federal jury in Chicago returned a *Monell* verdict against the City, finding that the City was responsible for

maintaining a code of silence and a deeply flawed disciplinary system that allowed Chicago police officers (operating out of the very same police facilities as the Defendant Officers in this case) to operate a far-reaching, long-running criminal enterprise that included the subversion of homicide investigations.

147.     The *Klipfel* plaintiffs were two former federal agents from the Bureau of Alcohol, Tobacco and Firearms who brought allegations of rampant criminal misconduct among Gang Crimes officers to the attention of CPD officials. The evidence in that litigation included: Philip Cline, an Area Commander and future Chief of Detectives and Superintendent, personally filed two Internal Affairs complaints against Miedzianowski for tampering in homicide investigations, that resulted in no discipline whatsoever; and that Raymond Risley, an assistant deputy superintendent and head of Internal Affairs, not only knew about misconduct in homicide cases but actively participated in efforts to subvert the disciplinary investigation into Miedzianowski that was at the heart of the *Klipfel* litigation.

148.     As a matter of both policy and practice, municipal policy makers and department supervisors condoned and facilitated a code of silence within the Chicago Police Department, which has been acknowledged by leaders of the Chicago Police Department and elected officials in Chicago. In accordance with the code of silence, officers refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

149.     As a result of the City of Chicago's established practices, officers (including the Defendants here) have come to believe that they may violate the civil rights of members of the public and cause innocent persons to be charged with serious crimes without fear of adverse circumstances. The practices that enable this belief include failing to track and identify police officers who are repeatedly accused of serious misconduct, failing to investigate cases in which

the police are implicated in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct, and facilitating a code of silence within the Chicago Police Department. As a result of these policies and practices of the City of Chicago, members of the Chicago Police Department act with impunity when they violate the constitutional and civil rights of citizens.

150.    This belief extends to the Defendants in this case. By way of example, Defendant Guevara has a long history of engaging in the kind of investigative misconduct that occurred in this case. There are dozens of known cases in which Guevara and other Chicago police officers engaged in serious investigative misconduct similar to that described above. They engaged in such misconduct because they had no reason to fear that the City of Chicago and its Police Department would ever discipline them for doing so.

151.    The City of Chicago and its Police Department also failed in the years prior to the Plaintiff's wrongful conviction to provide adequate training to Chicago police detectives and other officers in many areas, including the following:

a.    The conduct of live lineup, photographic, and other identification procedures.

b.    The constitutional requirement to disclose exculpatory evidence, including how to identify such evidence and what steps to take when exculpatory evidence has been identified in order to ensure that the evidence is made part of the criminal proceeding.

c.    The need to refrain from physical and psychological abuse, and manipulative and coercive conduct, in relation to suspects and witnesses.

d.    The risks of wrongful conviction and the steps police officers should take to minimize risks.

e.    The risks of engaging in tunnel vision during investigation.

f.   The need for full disclosure, candor, and openness on the part of all officers who

participate in the police disciplinary process, both as witnesses and as accused

officers, and the need to report misconduct committed by fellow officers.

152.   The need for police officers to be trained in these areas was and remains obvious.
The City's failure to train Chicago police officers as alleged in the preceding paragraph caused
Plaintiff's wrongful conviction and his injuries.

153.   The city's failure to train, supervise, and discipline its officers, including the
Police Officer Defendants, condones, ratifies, and sanctions the kind of misconduct that the
Defendants committed against Plaintiff in this case. Constitutional violations such as those that
occurred in this case are encouraged and facilitated as a result of the City's practices and de facto
policies, as alleged above.

154.   The City of Chicago and final policymaking officials within the Chicago Police
Department failed to act to remedy the patterns of abuse described in the preceding paragraphs,
despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful
practices and ensured that no action would be taken (independent of the judicial process) to
remedy Plaintiff's ongoing injuries.

155.   The policies and practices described in the foregoing paragraphs were also
approved by the City of Chicago policymakers, who were deliberately indifferent to the
violations of constitutional rights described herein.

**Defendant Wojcik's History of Framing Innocent Persons**

156.   Defendant Wojcik has a long history of engaging in precisely the kind of
investigative misconduct that occurred in this case, including obtaining false eyewitness
identifications through manipulated identification procedures, manipulating witnesses,
fabricating evidence, suppressing exculpatory evidence, and coercing false confessions and false

22

statements from suspects and witnesses using physical and psychological violence, all in the course of maliciously prosecuting innocent persons. In addition to the cases in which individuals have been exonerated, there are dozens of other identified cases in which Defendant Wojcik engaged in serious investigative misconduct.

157. Given this extensive history of misconduct and the City of Chicago's failure to meaningfully supervise or discipline Wojcik and others, it is apparent that Wojcik engaged in such misconduct because he had every reason to believe that the City of Chicago and its Police Department condoned his behavior.

158. A few examples of Defendant Wojcik's misconduct include:

a. In On June 30, 1988, the FBI registered a complaint against Defendant Wojcik with the Chicago Police Department's Office of Professional Standards ("OPS"). The FBI complaint reported that Defendant Wojcik and another officer were under investigation for alleged extortion of a weapon from a F.B.I. informant. The FBI report detailed how Defendant Wojcik arranged, under FBI surveillance, for an illegal transfer of a rifle with a telescopic sight was an informant to Defendant Wojcik. An OPS investigation into the found that Defendant Wojcik had failed to properly inventory recovered property and had made a "false report" about this incident.

b. On March 21, 1988, Defendant Wojcik engaged in misconduct when he forced his way into a suspect's home, verbally abused the person, and also slapped the suspect several times in the head and kicked him in the body.

c. In September 1989, Defendant Wojcik and others officer engaged in misconduct when they physically and verbally abused a citizen. This included yelling "I am

going to break your fucking arm" and proceeding to twist his arm behind his back until his elbow fractured. It also included throwing him to the ground and kicking him.

d.   In October 1989, Defendant Wojcik engaged in misconduct when he searched a citizen's apartment without permission or lawful justification and was verbally abusive.

e.   In November 1989, Defendant Wojcik engaged in misconduct when he pointed a gun at a citizen, struck his car with a squad car, threw him and another individual to the ground, kicked him and another individual in the face, and punched him and two others in the face.

f.   In March 1991, Defendant Wojcik engaged in misconduct when he punched a citizen in the face during an arrest and while he was being held in an interrogation room. The citizen required medical attention at a hospital. Defendant Wojcik admitted to investigators that he struck the citizen in the face.

g.   In September 1991, Defendant Wojcik used excessive force on Gilbert Renslow.

h.   In February 1992, Defendant Wojcik engaged in misconduct when he entered a woman's apartment without a search warrant or permission while searching for a suspect.

i.   In October 1992, Defendant Wojcik engaged in misconduct when he and another detective entered a woman's apartment without a search warrant or permission.

j.   In December of 1992, Defendant Wojcik beat Roosevelt Myles and attempted to force him to falsely confess to a crime that he did not commit. Defendant Wojcik beat Mr. Myles with a phone book and a flashlight while Mr. Myles was handcuffed

to a wall and "kept slapping [him] until [he] said [he] will sign a statement." Defendant Wojcik likewise coerced witnesses into falsely identifying Mr. Myles.

k.   On July 2, 1994, Defendant Wojcik engaged in misconduct when he verbally abused and threatened a citizen during a traffic stop. Wojcik used his police car to push the complainant's car into a tree.

l.   In August 1994, Defendant Wojcik engaged in misconduct when he broke into his ex-girlfriend's home and struck a man inside the home in the man's head and face with a steel pipe-wrench and damaged various items of property. The man lost two dental caps in the beating. Defendant Wojcik was criminally charged with battery.

m.   In January 1995, Defendant Wojcik engaged in misconduct when he entered a woman's apartment without a search warrant or permission and had pointed a gun at her.

n.   On February 10, 1995, Defendant Wojcik engaged in misconduct when he came entered and searched a woman's home without a warrant, and choked her and threw her to the ground. The citizen required medical attention from a hospital for her injuries.

o.   In April 1995, Defendant Wojcik used physical force and threats to coerce a false confession out of Angel Rosado. When Rosado said he did not know anything about the homicide Defendant Wojcik was asking about it, Defendant Wojcik repeatedly hit and choked Rosado.

p.   In May of 1995, Defendant Wojcik engaged in misconduct when he helped Defendant Guevara and others frame Thomas Sierra for a murder he did not commit. Mr. Sierra was exonerated in January 2018.

25

q.   In June 1995, Defendant Wojcik and other officers engaged in misconduct when they abused a woman by pushing, punching, and kicking her in the stomach as they forced their way into her residence.

r.   In January 1996, Defendant Wojcik engaged in misconduct when he and others entered a woman's apartment without a warrant in search of a suspect.

s.   In February 1996, Defendant Wojcik engaged in misconduct when he searched a woman's car, bags, and person without permission or a warrant and threatened to physically abuse her.

t.   In December 1997, Defendant Wojcik engaged in misconduct when he searched two apartments without a warrant or permission while looking for a suspect.

u.   In October 1998 a citizen filed a complaint with OPS reporting that Defendant Wojcik had struck an individual on the head with a shotgun during an arrest. The victim was treated at the hospital for a laceration to the head, which he told doctors was caused by being struck with the shotgun.

v.   In October 1998, Defendant Wojcik engaged in misconduct when he entered and searched a residence without a warrant or authorization.

w.   In August 1999, Defendant Wojcik engaged in misconduct when he, along with Defendants Guevara and Halvorsen, physically abused a citizen in their custody. Following the incident, the victim was examined by a Federal Bureau of Prisons physician's assistant and was treated for bruises to the face, body, right wrist and both arms, and a contusion to the inner elbow and scalp.

x.   In 2000, Defendant Wojcik engaged in misconduct when he was assigned to investigate allegations made against Defendant Guevara by a defendant named Juan

26

Hernandez. Mr. Hernandez had filed a complaint reporting that Defendant Guevara had framed him for a murder that he did not commit and had used improper line-up techniques in the process. Defendant Wojcik failed to properly investigation the allegations and instead covered up Defendant Guevara's misconduct.

y.     In April 2000, Defendant Wojcik engaged in misconduct when he entered and searched a residence without a warrant or permission and arrested an individual without probable cause.

z.     In March 2001, Defendant Wojcik engaged in misconduct when he physically abused a suspect in custody. Defendant Wojcik slapped, punched, choked, and kicked the man. Defendant Wojcik further refused to allow him to speak to an attorney.

aa.    In April 2001, Defendant Wojcik engaged in misconduct when he searched a woman's residence without permission or a warrant and verbally abused her.

bb.    In July 2001, Defendant Wojcik engaged in misconduct when he burst into 17-year-old Danny Ramirez's bedroom and grabbed him by the hair" and pulled him from his bed. Defendant Wojcik was apparently looking for a suspect because he showed a photograph to Mr. Ramirez and demanded to know if the photo was of Mr. Ramirez or somebody else. Defendant Wojcik and others proceeded to search the apartment.  Mr. Ramirez was later taken to Area 5 where other detectives threatened him.

cc.    In July 2001, Defendant Wojcik engaged in misconduct when he searched an apartment without permission and stole $1400.

dd.    In August 2001, Defendant Wojcik used physical force and threats to coerce a false

27

confession from Miguel Skerrett. Despite Skerrett's repeated denials, Defendant Wojcik struck him, pushed his head up against the wall, called him a liar, punched him in the stomach, and kicked him in the back after he fell to the ground. Mr. Skerrett advised Defendant Wojcik that he was HIV-positive, that this made him particularly susceptible to pain, and that couldn't sustain any more abuse. Defendant Wojcik then told Mr. Skerrett what to say and Mr. Skerrett provided a false confession.

ee.   In August 2001, Defendant Wojcik and other detectives used physical force and threats to attempt to coerce a false confession from Phonakone Sangathit. Defendant Wojcik punched him several times in the chest, punched him in the back of the head, and grabbed him by the neck and choked him while slamming his head into a wall until Mr. Sangathit lost consciousness.

ff.   In January 2002, Defendant Wojcik and others engaged in misconduct when they searched a residence without warrant or justification.

gg.   In July 2003, Defendant Wojcik engaged in misconduct when he searched a home without a warrant or permission.

hh.   In March 2004, Defendant Wojcik engaged in misconduct when he and another detective physically abused a man in custody.

ii.   In June 2004, Defendant Wojcik engaged in misconduct when he filed false police reports to cover for the wrongful actions of officers who shot Seneca Smith.

jj.   In July 2005, Defendant Wojcik engaged in misconduct when he and other officers arrested Ms. Yurus, who was placed unbuckled into the back of a police van and transported to the station. During the drive to the station, she was knocked out of

her seat and suffered a laceration to her face. Upon arrival at the station, her requests for medical attention were denied. Defendant Wojcik repeatedly promised Ms. Yurus that she would be released if she told the police what they wanted to hear. Defendant Wojcik threatened to lock Ms. Yurus up and charge her with murder for the unrelated death of her son. In July 2006, Defendant Wojcik and others engaged in misconduct when they searched a woman's residence without justification or a warrant and damaged her property in the process.

kk.   In December 2007, engaged in misconduct when he held a suspect for three days without charges before he was released. In response to a lawsuit filed against the City, OPS investigated eight officers including Defendant Wojcik, for their involvement in a wrongful conviction. The so-called "offender" alleged that, in October 1988, he was forced to sign a false confession following threats by Defendant Wojcik and others.  (Ex. 19-60).

ll.   In January 2009, Defendant Wojcik engaged in misconduct when he a refused to initiate a citizen complaint that officers pushed the victim, placed a foot on his back, put him in a chokehold, kicked him, punched him in the face, waved a pocketknife at him and threatened to cut him, pushed him down the stairs, and stomped on him.

mm.   In July 2014, Defendant Wojcik and others engaged in misconduct when they searched a woman's apartment without a warrant or justification.

nn.   In October 2014, Defendant Wojcik engaged in misconduct when he approved police reports which later-released video revealed to be categorically false in the Laquan McDonald case where McDonald was shot to death by Chicago Police officer Jason Van Dyke. Defendant Wojcik was the "approving supervisor"

29

involved in the subsequent investigation. Defendant Wojcik refused to participate in the investigation or to comply with a subpoena for his testimony. This prompted the Inspector General to file a declaratory judgment action seeking to compel Defendant Wojcik's compliance. The Inspector General further explained that Defendant Wojcik, through counsel, had repeatedly declined to state whether "he would invoke his Fifth Amendment rights against self-incrimination out of concern for possible criminal exposure in connection with his role in the McDonald investigation." The United States Department of Justice specifically cited the false police reports Defendant Wojcik had approved as an example of what it called "highly troubling" procedures.

159.    Defendant Wojcik received little discipline from the City of Chicago or the Chicago Police Department for any of the conduct set out above.

**Defendant Guevara's History of Framing Innocent Persons**

160.    As a result of the policies and practices of the Chicago Police Department, described above, Defendant Guevara has framed dozens of other innocent men and women over the span of two decades. Like Plaintiff, these men and women have lodged independent accusations of similar misconduct against Defendant Guevara.

161.    As of the filing of this complaint, 39 men and women have had their convictions thrown out because of Defendant Guevara's misconduct. They are Jacques Rivera, Juan Johnson, Jose Montanez, Armando Serrano, Jorge Pacheco, Roberto Almodovar, William Negron, Jose Maysonet, Angel Rodriguez, Santos Flores, Arturo DeLeon-Reyes, Gabriel Solache, Ariel Gomez, Xavier Arcos, Ricardo Rodriguez, Robert Bouto, Thomas Sierra, Geraldo Iglesias, Demetrius Johnson, David Gecht, Juan Hernandez, Rosendo Hernandez, Ray Munoz, David

30

Lugo, Carlos Andino, Daniel Rodriguez, Jaime Rios, Jose Cruz, Marilyn Mulero, Nelson Gonzalez, Johnny Flores, Adolfo Rosario, Eruby Abrego, Jeremiah Cain, Edwin Davila, Alfredo Gonzalez, Gamalier Rivera, Madeline Mendoza, and John Martinez. These men and women served hundreds of years in prison for crimes they did not commit.

162.    Defendant Guevara has a long history of engaging in precisely the kind of investigative misconduct that occurred in this case, including obtaining false eyewitness identifications through manipulated identification procedures, manipulating witnesses, fabricating evidence, suppressing exculpatory evidence, and coercing false confessions and false statements from suspects and witnesses using physical and psychological violence, all in the course of maliciously prosecuting innocent persons. In addition to the cases in which individuals have been exonerated, there are dozens of other identified cases in which Defendant Guevara engaged in serious investigative misconduct.

163.    Given this extensive history of misconduct and the City of Chicago's failure to meaningfully supervise or discipline Guevara and others, it is apparent that Guevara engaged in such misconduct because he had every reason to believe that the City of Chicago and its Police Department condoned his behavior.

164.    Repeatedly, Defendant Guevara has invoked his Fifth Amendment right to not answer questions about allegations against him because truthful responses could subject him to criminal liability. The allegations Defendant Guevara has refused to respond to include allegations that he has manipulated dozens of witnesses to provide false identifications, he has fabricated false evidence, he has suppressed exculpatory evidence, including documentary evidence, he has tortured and abused suspects and witnesses and has coerced false statements from them, as well as every single instance of misconduct detailed below.

165.   A few examples of Defendant Guevara's misconduct include:

a.   Bill Dorsch is a former Chicago police detective. While serving with the Chicago

Police Department, Dorsch was assigned to investigate a murder. Several months

after the murder occurred, Defendant Guevara brought to the police station two

juveniles purporting to have witnessed a shooting and recorded the license place

of the shooter. Based on the information provided, Detective Dorsch created a

photo array for the juveniles in an attempt to identify the shooter. While the first

juvenile was viewing the photo array, and before he identified any of the

photographs, Defendant Guevara pointed to the suspect's photo and told the

juvenile "That's him."  The juvenile then agreed with Guevara, identifying the

flagged individual as the shooter. Following this, Dorsch directed Defendant

Guevara to leave the room and had the other juvenile view the same photo array;

this juvenile was unable to make any identification. Based on the first juvenile's

identification, the suspect was charged with murder. Subsequently, Dorsch spoke

to the two juveniles outside of Defendant Guevara's presence. The juveniles

admitted that they were paid to falsely claim that the suspect was the person

responsible for the shooting. After prosecutors spoke to the two juveniles, the

suspect was released.

b.   Defendant Guevara's activities have drawn the interest of federal law enforcement

officers. In 2001, the FBI authored a special report detailing the criminal activity

of Chicago police officer Joseph Miedzianowski and his associates, including

Defendant Guevara. The report details that Defendant Guevara, while acting in

his capacity as a police officer, would apprehend drug and gun dealers and then

32

allow them to "buy their way of trouble." According to the report, Guevara also took bribes to alter both positive and negative lineups of murder suspects. Finally, the report states that Guevara, using an attorney as a conduit, would receive cash in exchange for the ultimate dismissal of murder cases he investigated.

c.   In 1989, Defendant Guevara coerced Samuel Perez into falsely identifying Juan Johnson as the person who killed Ricardo Fernandez. Defendant Guevara made Perez get inside his car, showed Perez a photo of Juan Johnson, and told Perez that he wanted Johnson to take the blame for the murder. Unsurprisingly, Perez went on to falsely identify Johnson as one of the murderers.

d.   In 1989, Defendant Guevara also coerced Salvador Ortiz into making a false identification of Juan Johnson, which he later recanted.

e.   Juan Johnson was exonerated and brought suit against Defendant Guevara. A federal jury found that Guevara framed Johnson for murder and awarded Johnson $21 million in damages.

f.   In 1988, Defendant Guevara caused 12-year-old Orlando Lopez to falsely identify Jacques Rivera as the person who shot Felix Valentin. As a result, Rivera was convicted of the Valentin murder. In 2011, Lopez testified at an evidentiary hearing that he knew Rivera was the "wrong guy" when he made the identification. As a result, Rivera received a new trial. Ultimately, the State's Attorney dropped all charges and Rivera was granted a certificate of innocence.

g.   Also during the Felix Valentin shooting investigation, Defendant Guevara falsely claimed that the victim, Valentin, identified Jacques Rivera as his shooter before he died. Defendant Guevara reported to have obtained this identification at a time

when the victim was in a medically induced coma, unresponsive to any stimuli, and laying in a bed that was in constant motion to prevent his lungs from filling with fluid and killing him. Valentin could not possibly have provided the information that Defendant Guevara attributed to him.

h. After Jacques Rivera's exoneration, he brought suit against Defendant Guevara. A federal jury found that Guevara had violated Rivera's civil rights and awarded Rivera $17 million in damages, as well as $175,000 in punitive damages against Defendant Guevara, his partner Steve Gawrys, and his supervisor Ed Mingey.

i. In 1989, Defendant Guevara coerced Virgilio Muniz into making a false identification by repeatedly threatening Muniz, saying that if Muniz did not identify Manuel Rivera as the murderer, Muniz would "go down for the murder."

j. In 1989, Defendant Guevara coerced Virgilio Calderon Muniz (unrelated to Virgilio Muniz, described in the above paragraph) into making a false identification by telling him who to identify and making a veiled threat as to what would happen if he did not comply.

k. In 1991, Defendant Guevara coerced Wilfredo Rosario into making a false identification and giving false testimony before the grand jury. Guevara threatened that if Rosario did not identify Xavier Arcos as the murderer, Rosario would be "pinned" for the murder. Guevara fed Rosario details of the crime, such as the number of shots fired, the type of vehicle used in the crime, and the participants in the crime. Rosario recanted his identification of Arcos at trial. Though Arcos was still found guilty of murder by a jury, the appellate court overturned the conviction based on the lack of sufficient evidence.

34

l.      In 1991, Defendant Guevara told Efrain and Julio Sanchez to pick David Colon out of a lineup. As a result, these men falsely accused Colon of committing a murder, but later came forward to recant and shed light on Defendant Guevara's misconduct.

m.      In 1993, Defendant Guevara coerced an identification from Carl Richmond with threats, saying that he could make Richmond's life very uncomfortable if Richmond did not identify Robert Bouto as the murderer of one of Richmond's friends. Richmond, who was familiar with Guevara's tactics, believed that Guevara would honor this threat.

n.      In 1995, Defendant Guevara arrested Edwin Davila and, in an attempt to coerce a confession, chained Davila to the wall of an interrogation room and told him that he was going to frame him for murder. After Davila maintained that he was uninvolved, Guevara forced Davila to participate in a lineup in which two witnesses identified Davila as the perpetrator, despite that each of those witnesses previously told the police that they had not been able to see the shooter.

o.      In 1995, Defendant Guevara coerced Evelyn Diaz into making a false identification and providing false testimony to the Grand Jury by threatening Diaz that, if she did not identify Luis Serrano as the shooter, her children would be taken away by the Department of Children and Family Services.

p.      In 1995, Defendant Guevara told Luis Figueroa to falsely identify Angel Diaz as the perpetrator even though Figueroa did not see anything. Figueroa identified Diaz but recanted his identification at trial.

q.   In 1995, Defendant Guevara coerced Gloria Ortiz Bordoy into making a false statement and testifying falsely against Santos Flores at trial. During Ortiz Bordoy's six-to-eight hour interrogation, Guevara yelled in her face, threatened that her children would be taken by the Department of Children and Family Services, called her "the B word," and "raised his hand," saying that he "felt like smacking" her. Finally, without reading its contents, Ortiz Bordoy signed a statement that the detectives wrote out for her because she just wanted to "get out of there."

r.   In 1995, Defendant Guevara coerced Rodolfo Zaragoza, who was a victim and an eyewitness to a crime, into making a false identification and providing false testimony. Zaragoza was intimidated by Guevara and identified Ricardo Rodriguez as the offender because Guevara told him that Rodriguez was the shooter.

s.   In 1995, Defendant Guevara told Jose Melendez to falsely identify Thomas Sierra as the shooter of Noel Andujar, even though Melendez had not seen the shooter and told Defendant Guevara as much. In addition, Defendant Guevara wrote false reports saying that Jose Melendez and Alberto Rodriguez had identified a car as the one used in the Andujar shooting, when in fact both men had told Defendant Guevara that the car in question was not the one used in the shooting.

t.   In 1996, Defendant Guevara coerced Maria Rivera into making a false identification by unzipping his pants and propositioning her. Rivera later told the prosecutor that she had falsely identified an individual in a lineup at Guevara's direction. The prosecution abandoned murder charges against that individual.

36

u. In 1997, Defendant Guevara coerced Robert Ruiz into making a false identification. Guevara detained Ruiz repeatedly over the course of a ten-day period, locking him in an interrogation room without food, water, or a bathroom. Though Ruiz kept telling Guevara that he had not seen the shooter or the driver involved in the crime, Guevara told Ruiz whom to identify and what to say in his statement. Ruiz finally implicated Freddy and Concepcion Santiago in the murder because Ruiz believed that Guevara would continue to harass him until he changed his story. Ruiz recanted his identification at trial, and the judge found Freddy and Concepcion Santiago not guilty. The trial judge found it disturbing that Guevara was the lead detective in the case because the victim was Guevara's nephew.

v. In November 2001, Defendant Guevara's girlfriend, Judith Martinez, attended a trial in which Guevara was testifying and observed the testimony of trial witnesses. She then conferred with Guevara, even though the Court had ordered for all witnesses to be excluded from the courtroom to prevent witness collusion.

w. In 2011, the First District Appellate Court granted Tony Gonzalez a post-conviction hearing based on evidence that Defendant Guevara conducted an unduly suggestive lineup. In this instance, Guevara had concocted a photo array in which Gonzalez's photo was the only one that stood out from the rest.

x. In 1982, Defendant Guevara and another officer arrested and physically assaulted Annie Turner for smoking on a bus. Guevara called her a "bitch" and pushed her out of the back door of the bus. He twisted her arm, threatened to "snap" it, and handcuffed her so tightly that her skin broke. He also hit her across the face with a

metal bracelet he was wearing and called her a "nigger bitch." Turner sought medical treatment and filed a complaint with the Chicago Police Department's Office of Professional Standards (OPS).

y.   In 1982, Defendant Guevara and three other officers broke through Almarie Lloyd's locked front door and conducted a warrantless search of her home. When Lloyd asked who they were, she was told to shut up. The officers terrified Lloyd, her brother, and her two children, and left the home in shambles. Lloyd filed a complaint with OPS the next day.

z.   In 1983, Defendant Guevara and other officers forcibly removed Leshurn Hunt from his home and handcuffed him to a ring in the wall at the police station where he was beaten about the head, face, and body until he confessed to murder and robbery charges. Hunt was detained for approximately 23 hours and deprived of food, water, and sleep until after he confessed. Hunt sought medical treatment for his injuries and filed a complaint with the Office of Professional Standards. Witnesses who saw Hunt while in custody corroborated his claims that the Area Five police beat him. The criminal court judge suppressed Hunt's confession, and a jury returned a favorable verdict in a related civil rights action against the City of Chicago on Hunt's claim of excessive detention.

aa.  In 1984, Defendant Guevara and other officers physically assaulted Graciela Flores and her 13-year old sister, Ana, during a search of their home. During the search, officers did not identify themselves as police. Guevara repeatedly slapped Graciela, called her a "bitch," and pulled her hair. As a result of this incident, Graciela's arm was put in a sling and she spent one week in the hospital.

38

bb.  In 1985, Defendant Guevara attempted to coerce a false statement from Reynaldo Munoz. Guevara handcuffed Munoz and put him in the back of a squad car. When Munoz denied any knowledge of the incident Guevara was asking about, Guevara repeatedly hit him in the mouth with his fist. Guevara then took Munoz to rival gang territory where he allowed rival gang members to spit on Munoz and beat Munoz about the head.

cc.  In 1986, Defendant Guevara threw Rafael Garcia against a car, struck him in the face several times, kicked him, and hit him in the head. Garcia filed a complaint with OPS. Although Guevara denied the charges, Garcia's complaints were corroborated by physical evidence, as Garcia was treated at the hospital for lacerations to the head. After an investigation into the incident, OPS found that Guevara had lied about the incident and recommended that Guevara be suspended for two days.

dd.  In 1986, Defendant Guevara and two other officers coerced a confession from Daniel Pena by beating him about the face and ribs with their hands and about the groin and thighs with flashlights. Pena was taken to see a doctor where he complained about being beaten by the police. The doctor found bruising to Pena's legs and abrasions and lacerations to Pena's nose. Family members corroborated Pena's claims that he had been beaten while in police custody.

ee.  In 1986, Defendant Guevara pulled over Melvin Warren because Warren cut him off while driving westbound on Augusta Boulevard. Guevara called Warren a "nigger dog" and "threatened to tear [Warren's] head off." Guevara hit Warren in the face with a closed fist and then forced him down into the front seat of his car

39

and began to choke him. Two eyewitnesses confirmed that Guevara initiated the beating. In response to this incident, Warren sought medical treatment and filed a complaint with OPS. OPS sustained Warren's allegations that Guevara had physically and verbally assaulted him and recommended that Guevara be reprimanded.

ff.     In 1989, Defendant Guevara coerced a false confession from Victor Vera by transporting him to rival gang territory and threatening to release him unless he confessed to the murder of Edwin Castaneda. Fearing for his life, Vera agreed to falsely confess to a crime that he had nothing to do with.

gg.     In 1991, Defendant Guevara coerced David Rivera into signing a confession for murder by intimidation, threats, and inducements. Guevara told Rivera that if he confessed, he would serve seven years in prison; if he did not confess, he would be sent away for fifty years. Guevara then promised Rivera that if signed a statement, he could go home.

hh.     In 1992, Defendant Guevara engaged in misconduct when he interrogated Jacqueline Montanez without a youth officer present. The appellate court reversed and remanded Ms. Montanez's conviction for murder, nothing that "not only was the defendant interrogated before having an opportunity to confer with a concerned adult, but, worse, any opportunity to do so was effectively frustrated by police."

ii.     In 1993, Defendant Guevara arrested 15-year-old Eliezar Cruzado and threatened him with life imprisonment if Cruzado did not make a statement implicating himself in a murder. Guevara also told Cruzado that he could go home and see his

40

family again, but only if he agreed to make a statement. At the time, Cruzado had a limited ability to read and write.

jj.  In 1993, Defendant Guevara used physical force and threats to coerce a false confession from Adolfo Frias-Munoz. Over the course of the two-day interrogation, Frias-Munoz was handcuffed to a ring on the wall of the interrogation room, hit in the face with an open hand by Defendant Guevara, and beaten by two other officers. Though isolated in a locked interrogation room, Frias-Munoz could hear his wife screaming and his son crying in another room. Guevara threatened Frias-Munoz that if he did not confess, his wife would go to prison and his children would be taken away. Frias-Munoz, who did not speak English, agreed to give a statement to an Assistant State's Attorney. Frias-Munoz spoke in Spanish and Guevara translated the statement so that the prosecutor could write the statement in English. Frias-Munoz then signed a statement that he could not read.

kk.  In 1993, Defendant Guevara physically abused and threatened Francisco Vicente into providing false statements implicating Geraldo Iglesias in a murder. Vicente claimed that Iglesias spontaneously confessed to him that he was guilty of the crime for which Guevara had arrested him. Vicente has since testified that his statements were false and that Defendant Guevara and his colleagues beat him, threatened him, and fed him facts to ensure that he told their story.

ll.  In 1994, Defendant Guevara, after 14 hours of interrogation, coerced a confession from Adrian Duta by hitting him in the face with an open palm, punching him in the stomach, and telling him he could go home if he signed a statement. When

41

Duta's father came to see Duta at the station house, Duta was exhausted and crying. Duta repeatedly said that he did not know what he had signed and had only signed the document so he could go home. Duta complained to his father of being struck in the head and stomach by Guevara.

mm. In 1995, Defendants Guevara and Halvorsen coerced a confession from 17-year-old Santos Flores after handcuffing him to the wall of a locked interview room and refusing his requests for an attorney. During the course of the 11-hour interrogation, Guevara yelled at him, slapped him numerous times on the side of his head, and told him that, if he did not confess, he would never see the light of day. Flores eventually gave a statement to the police indicating his involvement in the crime. Flores' statement was ruled inadmissible on appeal on the grounds that it was elicited in violation of Miranda.

nn. In 1997, Defendant Guevara coerced a false confession from Voytek Dembski by beating him while he was chained to a wall in a locked interrogation room. Dembski, a Polish national who did not speak English, was interrogated by Guevara without Miranda warnings, without notification to the Polish consulate, and without a Polish language interpreter. Dembski could not read the statement he eventually signed as it was written in English.

oo. In 1997, Defendant Guevara used threats and physical force against Ariel Gomez, Paul Yalda, and several of their co-defendants to try to get them to sign false statements incriminating Gomez in the shooting of Concepcion Diaz. Guevara also used pressure and threats to try to force three eyewitnesses, Ruth Antonetty,

Debbie Daniels and Maria Castro, to falsely identify Ariel Gomez as the shooter even after they informed Guevara that they could not identify him as the shooter.

pp.    In 1998, Defendant Guevara repeatedly hit Rosauro Mejia in an attempt to coerce a confession from him. Mejia never confessed and was finally released after being held in custody for three days.

qq.    In 1998, Defendant Guevara repeatedly pulled Adriana Mejia's hair and struck her once on the back of her neck while she was interrogated. She asserts that Guevara *never* took an accurate statement from her, despite that she did have real knowledge of the crime he was questioning her about.

rr.    In 1998, Defendant Guevara repeatedly threatened and beat Arturo DeLeon-Reyes in order to coerce DeLeon-Reyes into giving an incriminating statement. After two days of isolation and interrogation, DeLeon-Reyes provided a false statement implicating himself in a murder in which he was not involved.

ss.    In 1998, Defendant Guevara repeatedly struck Gabriel Solache on the left side of his head and in the stomach while Solache was chained to the wall of a locked interrogation room. After 40 hours of interrogation, Solache gave a false statement so that the beating would stop. Solache sought medical treatment and sustained permanent hearing loss to his left ear.

tt.    In 1999, Defendant Guevara and his colleagues repeatedly punched David Gecht in the stomach and back and struck him during an interrogation. After this prolonged abuse, Gecht told Guevara and the other officers he would do "whatever they wanted," and adopted a fabricated statement, fed to him by Guevara, confessing to a shooting of which he had no knowledge.

uu. In addition, Guevara threatened Gecht's girlfriend, Colleen Miller, telling her that she would be arrested and that the child she was expecting would be born in prison and then taken from her if she did not cooperate with them. Guevara used Miller's fear for herself and her unborn child to extract a fabricated statement from her implicating Gecht in the shooting.

vv. In 1991, Defendant Guevara framed Demetrius Johnson for killing Edwin Fred. Guevara suppressed a lineup report documenting that a key eyewitness had identified a different person as the perpetrator in a lineup, and he fabricated a false police report to make it appear as if that identification had never occurred. In addition, to support his case against Johnson, Guevara manipulated and fabricated eyewitness identifications of Johnson as the shooter from witnesses Rosa Burgos, Ricardo Burgos, and Elba Burgos.

166. Defendant Guevara never received discipline from the City of Chicago or the Chicago Police Department for any of the conduct set out above.

167. In fact, the City of Chicago failed to supervise or discipline its police officers, including Defendants Guevara, Wojcik, and the other Defendants. Defendants engaged in the misconduct set forth in this complaint because they knew that the City of Chicago and its Police Department tolerated and condoned such conduct.

## COUNT I
### 42 U.S.C. § 1983 – Due Process
### (Fourteenth Amendment)

168. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

169. As described in detail above, the Police Officer Defendants, while acting individually, jointly, and in conspiracy with one another, as well as under color of law and within

44

the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial and his right not to be wrongfully convicted and imprisoned.

170.   In the manner described more fully above, the Police Officer Defendants fabricated witness statements falsely implicating Plaintiff in the crime.

171.   The Police Officer Defendants knew this evidence was false.

172.   The Police Officer Defendants obtained Plaintiff's conviction using this false evidence, and they failed to correct fabricated evidence that they knew to be false when it was used against Plaintiff during his criminal case.

173.   In addition, the Police Officer Defendants deliberately withheld exculpatory evidence from state prosecutors, Plaintiff, and Plaintiff's criminal defense attorneys, including evidence that that Defendants had manufactured false identifications of Plaintiff, thereby misleading and misdirecting the criminal prosecution of Plaintiff.

174.   In addition, based upon information and belief, the Police Officer Defendants concealed, fabricated, and destroyed additional evidence that is not yet known to Plaintiff.

175.   The [Police Officer Defendants' misconduct resulted in the unjust and wrongful criminal prosecution and conviction of Plaintiff and the deprivation of Plaintiff's liberty, thereby denying his constitutional right to a fair trial guaranteed by the Fourteenth Amendment. Absent this misconduct, the prosecution of Plaintiff could not have and would not have been pursued.

176.   The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

177.   As a result of the Police Officer Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and

emotional pain and suffering, forced and involuntary prison labor, and other grievous and continuing injuries and damages as set forth above.

178.     The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count VI.

**COUNT II**
**42 U.S.C. § 1983 – Coerced and False Confession**
**(Fifth and Fourteenth Amendments)**

179.     Plaintiff incorporates each paragraph of this complaint as if fully restated here.

180.     In the manner described more fully above, the Police Officer Defendants and the Prosecutor Defendant, acting as investigators and without probable cause to suspect Plaintiff of any crime, individually, jointly, and in conspiracy with one another, and others unknown, as well as under color of law and within the scope of their employment, forced Plaintiff to make false statements involuntarily and against his will, which incriminated him and which were used against him in criminal proceedings, in violation of his rights secured by the Fifth and Fourteenth Amendments.

181.     In addition, the Police Officer Defendants and the Prosecutor Defendant, acting as investigators and without probable cause to suspect Plaintiff of any crime, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, used physical violence and extreme psychological coercion in order to force Plaintiff to incriminate himself falsely and against his will in a crime he had not committed, in violation of his right to due process secured by the Fourteenth Amendment. This misconduct was so severe as to shock the conscience, it was designed to injure Plaintiff, and it was not supported by any conceivable governmental interest.

182. In addition, the Police Officer Defendants and the Prosecutor Defendant, acting as investigators and without probable cause to suspect Plaintiff of any crime, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, fabricated a false confession, which was attributed to Plaintiff and used against Plaintiff in his criminal proceedings, in violation of Plaintiff's right to a fair trial protected by the Fourteenth Amendment.

183. Specifically, these Defendants conducted, participated in, encouraged, advised, and ordered an unconstitutional interrogation of Plaintiff, using physical violence and psychological coercion, which overbore Plaintiff's will and resulting in him making involuntary statements implicating himself in the murder of Jose Garcia and shooting of Julio Lugo.

184. Those false incriminating statements were wholly fabricated by these Defendants and attributed to Plaintiff. Those false incriminating statements were used against Plaintiff to his detriment throughout his criminal case. They were the reason that Plaintiff was prosecuted and convicted.

185. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

186. As a result of these Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

187. The misconduct described in this Count by the Police Officer Defendants was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VI.

## COUNT III
### 42 U.S.C. § 1983 – Malicious Prosecution and Unlawful Detention

**(Fourth and Fourteenth Amendments)**

188.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

189.    In the manner described above, the Police Officer Defendants and the Prosecutor Defendant, acting as investigators and without probable cause to suspect Plaintiff of any crime, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so and in spite of the fact that they knew Plaintiff was innocent, in violation of his rights secured by the Fourth and Fourteenth Amendments.

190.    In so doing, these Defendants maliciously prosecuted Plaintiff and caused Plaintiff to be deprived of his liberty without probable cause and to be subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

191.    The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

192.    As a result of these Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

193.    The misconduct described in this Count by the Police Officer Defendants was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count VI.

**COUNT IV**
**42 U.S.C. § 1983 – Failure to Intervene**

194.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

48

195.    In the manner described above, during the constitutional violations described herein, one or more of the Police Officer Defendants or the Prosecutor Defendant stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the duty and the opportunity to do so.

196.    These Defendants had ample, reasonable opportunities as well as the duty to prevent this harm but failed to do so.

197.    The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

198.    As a result of these Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

199.    The misconduct described in this Count by the Police Officer Defendants was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count VI.

## COUNT V
### 42 U.S.C. § 1983 – Conspiracy to Violate Constitutional Rights

200.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

201.    In the manner described more fully above, the Police Officer Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to fabricate evidence, suppress evidence, and coerce statements, to detain, prosecute, and convict Plaintiff, without regard for Plaintiff's guilt or innocence, and thereby to deprive him of his constitutional rights.

202.     In so doing, these co-conspirators agreed to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

203.     In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

204.     The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

205.     As a result of these Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

206.     The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count VI.

## COUNT VI
## 42 U.S.C. § 1983 – Policy and Practice Claim against the City of Chicago

207.     Plaintiff incorporates each paragraph of this complaint as if fully restated here.

208.     As described in detail above, the City of Chicago is liable for the violation of Plaintiff's constitutional rights because Plaintiff's injuries were caused by the policies, practices, and customs of the City of Chicago, as well as by the actions of policy-making officials for the City of Chicago.

209.     At all times relevant to the events described in this complaint and for a period of time prior and subsequent thereto, the City of Chicago failed to promulgate proper or adequate rules, regulations, policies, and procedures for: conducting photographic and live lineup procedures by officers and agents of the Chicago Police Department and City of Chicago; the

conduct of interrogations and questioning of criminal suspects; the collection, documentation, preservation, testing, and disclosure of evidence; the writing of police reports and taking of investigative notes; obtaining statements and testimony from witnesses; and maintenance of investigative files and disclosure of those files in criminal proceedings. In addition, or alternatively, the City of Chicago failed to promulgate proper and adequate rules, regulations, policies, and procedures for the training and supervision of officers and agents of the Chicago Police Department and the City of Chicago, with respect to these subjects.

210. These failures to promulgate proper or adequate rules, regulations, policies, and procedures were committed by officers and agents of the Chicago Police Department and the City of Chicago, including the Defendants.

211. In addition, at all times relevant to the events described in this complaint and for a period of time prior thereto, the City of Chicago had notice of a widespread practice and custom by officers and agents of the Chicago Police Department and the City of Chicago under which individuals suspected of criminal activity, such as Plaintiff, were routinely deprived of their right to due process. For instance, it was common that suspects were prosecuted based on fabricated evidence, including fabricated eyewitness identifications and eyewitness identifications obtained using manipulated photographic or live lineup procedures.

212. Specifically, at all relevant times and for a period of time prior thereto, there existed a widespread practice and custom among officers, employees, and agents of the City of Chicago, under which criminal suspects were which criminal suspects were coerced to involuntarily implicate themselves by various means, including but not limited to one or more of the following: (1) individuals were subjected to unreasonably long and uninterrupted interrogations, often lasting for many hours and even days; (2) individuals were subjected to

actual and threatened physical or psychological violence; (3) individuals were interrogated at length without proper protection of their constitutional right to remain silent; (4) individuals were forced to sign or assent to oral and written statements fabricated by the police; (5) officers and employees were permitted to lead or participate in interrogations without proper training and without knowledge of the safeguards necessary to ensure that individuals were not subjected to abusive conditions and did not confess involuntarily and/or falsely; and (6) supervisors with knowledge of permissible and impermissible interrogation techniques did not properly supervise or discipline police officers and employees such that the coercive interrogations continued unchecked.

213.    In addition, at all times relevant to the events described in this complaint and for a period of time prior thereto, the City of Chicago had notice of widespread practices by officers and agents of the Chicago Police Department and the City of Chicago, which included one or more of the following: (1) officers did not record investigative information in police reports, did not maintain proper investigative files, or did not disclose investigative materials to prosecutors and criminal defendants; (2) officers falsified statements and testimony of witnesses; (3) officers fabricated false evidence implicating criminal defendants in criminal conduct; (4) officers failed to maintain or preserve evidence or destroyed evidence; and (5) officers pursued wrongful convictions through profoundly flawed investigations.

214.    These widespread practices, individually and together, were allowed to flourish because the leaders, supervisors, and policymakers of the City of Chicago directly encouraged and were thereby the moving force behind the very type of misconduct at issue by failing to adequately train, supervise, and control their officers, agents, and employees on proper

interrogation techniques and by failing to adequately punish and discipline prior instances of similar misconduct, thus directly encouraging future abuses such as those affecting Plaintiff.

215. The above widespread practices and customs, so well settled as to constitute de facto policies of the City of Chicago, were able to exist and thrive, individually and together, because policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

216. As a result of the policies and practices of the City of Chicago, numerous individuals have been wrongly convicted of crimes that they did not commit.

217. In addition, the misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago in that the constitutional violations committed against Plaintiff were committed with the knowledge or approval of persons with final policymaking authority for the City of Chicago or were actually committed by persons with such final policymaking authority.

218. Plaintiff's injuries were directly and proximately caused by officers, agents, and employees of the City of Chicago, including but not limited to the individually named Defendants, who acted pursuant to one or more of the policies, practices, and customs set forth above in engaging in the misconduct described in this Count.

## COUNT VII
## State Law Claim – Malicious Prosecution

219. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

220. In the manner described above, the Police Officer Defendants and the Prosecutor Defendant, acting as investigators and without probable cause to suspect Plaintiff of any crime, individually, jointly, and in conspiracy with one another, as well as within the scope of their employment, accused Plaintiff of criminal activity and exerted influence to initiate and to

continue and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so.

221.    In so doing, these Defendants caused Plaintiff to be subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

222.    The judicial proceedings were terminated in Plaintiff's favor and in a manner indicative of his innocence when his conviction was vacated and charges against him were dropped in July 2022.

223.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, and in total disregard of the truth and Plaintiff's clear innocence.

224.    As a result of these Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT VIII
### State Law Claim – Intentional Infliction of Emotional Distress

225.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

226.    The actions, omissions, and conduct of the Police Officer Defendants and the Prosecutor Defendant as set forth above were extreme and outrageous. These actions were rooted in an abuse of power and authority and were undertaken with the intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiff, as is more fully alleged above.

227.    As a result of these Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT IX
## State Law Claim – Willful and Wanton Conduct

228.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

229.    At all times relevant to this complaint the Police Officer Defendants and the Prosecutor Defendant had a duty to refrain from willful and wanton conduct.

230.    Notwithstanding that duty, these Defendants acted willfully and wantonly through a course of conduct that showed an utter indifference to, or conscious disregard of, Plaintiff's rights.

231.    As a result of these Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT X
## State Law Claim – Civil Conspiracy

232.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

233.    As described more fully in the preceding paragraphs, the Police Officer Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for a crime he did not commit and conspired by concerted action to accomplish an unlawful purpose and/or to achieve a lawful purpose by unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

234.    In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

235.    The violations of Illinois law described in this complaint, including Defendants' malicious prosecution of Plaintiff and their intentional infliction of emotional distress, were accomplished by Defendants' conspiracy.

236.    The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

237.    As a result of these Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT XI
## State Law Claim – Respondeat Superior

238.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

239.    While committing the misconduct alleged in the preceding paragraphs, the Defendants were employees, members, and agents of the City of Chicago, acting at all relevant times within the scope of their employment.

240.    Defendant City of Chicago is liable as principal for all torts committed by its agents.

## COUNT XII
## State Law Claim – Indemnification

241.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

242. Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

243. The Police Officer Defendants were employees, members, and agents of Defendant City of Chicago, acting at all relevant times within the scope of their employment in committing the misconduct described herein.

244. Defendant City of Chicago is responsible to pay any judgment entered against the Police Officer Defendants.

245. The Prosecutor Defendant was an employee, member, and agent of Defendant Cook County, acting at all relevant times within the scope of their employment in committing the misconduct described herein.

246. Defendant Cook County is responsible to pay any judgment entered against the Prosecutor Defendant.

WHEREFORE, Plaintiff ERUBY ABREGO, respectfully requests that this Court enter a judgment in his favor and against Defendants JEROME BOUGUCKI, FRANK CAPITELLI, DANIEL ENGEL, REYNALDO GUEVARA, GERI LYNN YANOW, as special administrator of the ESTATE OF ERNEST HALVORSEN, ANTHONY WOJCIK, RAY SCHALK, the CITY OF CHICAGO, ANDREANA TURANO MICHIELS, and COOK COUNTY, awarding compensatory damages, attorneys' fees, and costs against each Defendant, punitive damages against each of the Individual Defendants, and any other relief that this Court deems just and appropriate.

## JURY DEMAND

Plaintiff, ERUBY ABREGO, hereby demands a trial by jury pursuant to Federal Rule of

Civil Procedure 38(b) on all issues so triable.

**ERUBY ABREGO**

BY:     s/ Steve Art

*One of Plaintiff's Attorneys*

Jon Loevy
Anand Swaminathan
Steve Art
Renee Spence
Carla Abrigo
Loevy & Loevy
311 N. Aberdeen, 3rd Floor
Chicago, IL 60607