**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ERUBY ABREGO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 23-cv-01740 |
| | ) | |
| REYNALDO GUEVARA, GERI LYNN | ) | Hon. Steven C. Seeger |
| YANOW, as special administrator of the | ) | |
| ESTATE OF ERNEST HALVORSEN, | ) | |
| ANTHONY WOJCIK, DANIEL ENGEL, | ) | |
| JEROME BOGUCKI, RAY SCHALK, | ) | |
| FRANK CAPPITELLI, the CITY OF | ) | |
| CHICAGO, ANDREANA TURANO | ) | |
| MICHIELS, and COOK COUNTY, | ) | |
| | ) | |
| Defendants. | ) | |

**TURANO'S MEMORANDUM OF LAW IN SUPPORT OF**
**DISMISSAL OF PLAINTIFF'S AMENDED COMPLAINT**

**INTRODUCTION**

On March 21, 2023, Plaintiff filed a Complaint stemming from his arrest and conviction

for the murder of Jose Garcia and aggravated battery of Julio Lugo in 1999. Dkt. #1, ¶1. On July

31, 2023, Defendant Turano filed a motion to dismiss or alternatively, for a more definite

statement. Dkt. #59. Rather than respond to Turano's motion, Plaintiff filed an Amended

Complaint. Dkt. #66. Plaintiff sues multiple former Chicago Police Officers, the City of Chicago,

Turano, and Cook County. Plaintiff alleges the following counts against Turano: Count II- 42

U.S.C. § 1983 – Coerced and False Confession (Fifth and Fourteenth Amendments), Count III 42

U.S.C. § 1983 – Malicious Prosecution and Unlawful Detention (Fourth and Fourteenth

Amendments), Count IV 42 U.S.C. § 1983 – Failure to Intervene, Count VII State Law Claim –

Malicious Prosecution, Count VIII State Law Claim – Intentional Infliction of Emotional Distress, and Count IX State Law Claim – Willful and Wanton Conduct.

Turano was an Assistant State's Attorney (ASA) with the Cook County State's Attorney's Office at the time. In her capacity as an ASA, Turano took Plaintiff's court reported statement regarding the murder of Garcia and aggravated battery of Lugo after the Police Officer Defendants already secured two witness statements implicating Plaintiff and after Plaintiff had already been arrested. Dkt. # 66, ¶ 25, 49, 50, 51, 60, 61, 62, & 95. Plaintiff further concedes he never told Turano about any alleged abuse by the Police Officer Defendants.

Turano is entitled to absolute prosecutorial immunity as to all claims because her act of taking Plaintiff's court-reported statement was performed in her prosecutorial capacity after probable cause was already established and after Plaintiff was arrested. Alternatively, Turano is entitled to qualified immunity as to Count IV-Failure to Intervene. Alternatively, Count IX should also be dismissed because Illinois Law confers no separate cause of action for willful and wanton conduct.

## **LEGAL STANDARD**

When ruling on a motion to dismiss pursuant to Rule 12(b)(6), courts accept as true the well pled facts of a complaint and draw all reasonable inferences in favor of the plaintiff. *Perkins v. Silverstein*, 939 F.2d 463, 466 (7th Cir. 1991). A court is not required, however, to accept as true a legal conclusion couched as a factual allegation or unsupported conclusions of fact. *Papasan v. Allain*, 478 U.S. 265, 286 (1986); *Hickey v. O'Bannon*, 287 F.3d 656, 658 (7th Cir. 2002).

Traditionally, courts refer to only what is contained in the pleadings when evaluating motions to dismiss and may treat the motion as one for summary judgment if matters outside the

pleadings are presented. Fed. R. Civ. P. 12(d). The pleadings include the complaint, the answer, and any written instruments attached as exhibits. Fed. R. Civ. P. 10(c); *Northern Ind. Gun & Outdoor Shows v. City of S. Bend*, 163 F.3d 449, 452 (7th Cir. 1998); see also *Hyung Seok Koh v. Graf*, 2013 U.S. Dist. LEXIS 136341, at *26 (N.D. Ill. 2013).  However, a court may consider extraneous documents for a motion to dismiss—without treating it as a motion for summary judgment—if the extraneous matters are referred to in the plaintiff's complaint and are central to the Plaintiff's claim. *Venture Assocs. Corp. v. Zenith Data Sys. Corp*, 987 F.2d 429, 431-42 (7th Cir. 1993); Koh, 2013 U.S. Dist. LEXIS, at *26-27 (internal quotation marks omitted). The Seventh Circuit held in *Geinosky v. City of Chicago* that there are multiple instances where documents "outside the pleadings" can be considered at the 12(b)(6) stage. *Geinosky*, 675 F.3d 743, 745 fn. 1 (7th Cir. 2012) ("A motion under Rule 12(b)(6) can be based only on the complaint itself, documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice.") *188 LLC v. Trinity Industries, Inc*., 300 F.3d 730, 735 (7th Cir.2002) (documents referred to in complaint and central to claim); *Wright v. Associated Ins. Cos*., 29 F.3d 1244, 1248 (7th Cir.1994) (same)

## PLAINTIFF'S ALLEGATIONS

On May 22, 1999, Jose Garcia and Ramone Torres were sitting in a parked car near the intersection of Belmont and Monticello in Chicago. Dkt. #66, ¶ 29.[1] Julio Lugo and Isidro Quinones were standing next the parked car. Dkt. #66, ¶, 30. While they were talking by the car, a male shouted gang slogans from across the street and opened fire with the handgun. Dkt. #66, ¶ 31. Jose Garcia was struck in the head and eventually succumb to his injuries. Dkt. #66, ¶ 32, 36.

---

[1] For purposes of this motion, Turano accepts the allegations as Plaintiff alleges them, but she denies any wrongdoing alleged.

Julio Lugo was struck in the shoulder and buttocks and was taken to the hospital for treatment before eventually being released. Dkt. #66, ¶ 34, 37.

Lugo was a member of the Latin Kings street gang and the shooter was suspected to be a member of the rival Orchestra Albany ("OA") gang as he yelled slogans such as "OA Love" and "King Killer" prior to the shooting. Dkt. #66, ¶ 38, 39. Just before the shooting, Lugo and Quinones had been riding in the car with Fred Marrero, another Latin King, when they were confronted by several members of the OA gang, who were riding in a gold-colored Chevy Caprice, that shouted gang slogans and threw bottles at the Latin King's car. Dkt. #66, ¶ 40. Police searched the area and located a gold-colored Chevy Caprice belonging to Juan Parra, a suspected OA member. Police arrested Parra and took him to Area 5. Dkt. #66, 45. After being held overnight, Parra gave a statement to police and an Assistant States Attorney. *See* the Court Reporter Statement of Juan Parra taken by ASA Jake Rubinstein attached as Exhibit A.[2] In Parra's statement, he said that he, "Sef", who he identified as Plaintiff, Cain, who he later identified as Jeremiah Cain, and "PeeWee" drove into Latin King territory, encountered a car containing Latin Kings, and got out of their car to pursue the Latin Kings, who got away. Dkt. #66, ¶ 49, 50; Ex. A, pg. 8, 12-19. "PeeWee" and Cain returned to the car but Plaintiff did not. Dkt. #66, ¶ 50; Ex. A, pg. 19. Parra heard several shots and saw Plaintiff running back to the car holding a handgun. Dkt. #66, ¶ 50; Ex. A. pg. 21. Plaintiff alleges the Police Officer Defendants obtained Parra's statement by coercion, suppressed that they obtained Parra's statement by

---

[2] Juan Parra and Jeremiah Cain's Statements are summarized in Plaintiff's Amended Complaint and critical to analyzing the allegations thereof. As such, it is proper for the Court to consider them in ruling on Turano's 12(b)(6) motion to dismiss without converting it into a Motion for Summary Judgment. See *Geinosky v City of Chicago*, 675 F.3d 743, 745 fn. 1 (7th Cir. 2012), *188 LLC v. Trinity Industries, Inc*., 300 F.3d 730, 735 (7th Cir.2002) *Wright v. Associated Ins. Cos*., 29 F.3d 1244, 1248 (7th Cir.1994).

coercion, suppressed all of the circumstances of Parra's statement, and suppressed that they had fabricated the statement. Dkt. #66, ¶ 46, 47, & 51.

Next, police arrested Jeremiah Cain and located the murder weapon in Cain's bedroom. Dkt. #66, ¶ 53-55. Police questioned Cain and eventually, he agreed to give a statement. Dkt. #66, ¶ 56-61. See the Court Reporter Statement of Jeremiah taken by ASA Nancy Nazarian attached as Exhibit B.[2] In Cain's statement, he described meeting with Plaintiff, Parra who he identifies as "Howie", and "PeeWee," in Koz Park, and him giving Plaintiff a handgun. Dkt. #66, ¶ 60; Ex. B, pg. 6-10. Plaintiff, Cain, Parra, and "PeeWee" drove to Belmont near Kimball where they saw some Latin Kings, and Cain, Parra and "PeeWee" got out of the car and tried to throw bottles at the Latin King's car. Ex. B, pg. 14-15. Plaintiff remained in the car. *Id.* The Latin Kings got away and the four of them drove around the corner. Ex. B, pg. 16-17. Plaintiff then went to find the Latin King's car while the others waited in the alley. Dkt. #66, ¶ 60; Ex. B, pg. 18-19. Cain heard several gunshots, after which Plaintiff returned to the car and gave the handgun back to Cain. Dkt. #66, ¶ 60; Ex. B, pg 18-20. Plaintiff alleges the Police Officer Defendants obtained Cain's statement by coercion, suppressed that they obtained Cain's statement by coercion, suppressed all of the circumstances of Cain's statement, and suppressed that they had fabricated the statement. Dkt. #66, ¶ 59, 62.

Next, police arrested Plaintiff and Nicasio Santiago. Plaintiff alleged the Police Officers physically and psychologically abused and mistreated Plaintiff during questioning. Dkt. #66, ¶ 72-79, 83-93. Plaintiff alleges that after the abuse from the Police Officer Defendants, Plaintiff's will was overborn and he agreed to provide a statement to Turano in which he falsely confessed to committing the shooting. Dkt. #66, ¶ 95. Plaintiff concedes Turano played no role in the alleged misidentification of Plaintiff as the shooter by witnesses. Dkt. #66, ¶ 102-119.

In September 2004, Plaintiff was tried for the murder of Garcia and aggravated battery with a firearm of Lugo Dkt. #66, ¶ 120. Plaintiff testified in his own defense at trial, denying that he was involved in the shooting and claimed that he was tortured. Dkt. #66, ¶ 123. Plaintiff's trial testimony concedes he was alone with Wojcik whenever Wojcik allegedly struck Plaintiff at the police station. *See* Transcript of Plaintiff's Trial Testimony, attached as Ex. C, pp. 73-74, 77-78.[3] Therefore, Turano could not have witnessed these alleged beatings. Moreover, Plaintiff concedes he never advised Turano of any alleged beatings. The pertinent parts of Plaintiff's testimony involving Turano are as follows:

Q      The State's attorney was there. Why didn't you tell her that the officer was beating you?

A      Because I was scared.

Ex. C, p. 82, lines 9-11

Q      Your signature is on each and every page of that statement? [Referring to Plaintiff's Court Reported Statement]
A      Each and every page
Q      And in fact, everything that's in that statement, you were asked questions and you gave those answers, correct?
A      Yes
Q      And after the statement was done, you went through that statement line by line with the assistant state's attorney, didn't you?
A      Yes
Q      At that time you did that, you made corrections, isn't that right?
A      Yes
Q      And you initialed those corrections, isn't that right?
A      Yes

Ex. C, p. 99, lines 15-24 and p.100, lines 1-7.

---

[3] Plaintiff's trial testimony is described in Plaintiff's Amended Complaint and is critical to analyzing the allegations against Turano. As such, it is proper for this Court to consider Plaintiff's sworn testimony in ruling on Turano's motion. See *Geinosky*, 675 F.3d at 745 fn. 1 (7th Cir. 2012), *188 LLC.*, 300 F.3d at 735 (7th Cir.2002) *Wright*, 29 F.3d at 1248 (7th Cir.1994) Moreover, the Court may take judicial notice of prior trial testimony in related cases. *Green v. Warden, U.S. Penitentiary*, 699 F.2d 364, 369 (7th Cir.1983). To allow Plaintiff to testify under oath to one version of events at his criminal trial and allow Plaintiff to allege a different version of events in an unsworn pleading signed by his attorney in this Court would make a mockery of our judicial system. *Dye v. Wargo*, 253 F.3d 296, 298 (7th Cir. 2001), *Brown v. Oil States Skagit Smatco*, 664 F.3d 71, 77 (5th Cir. 2011).

6

Q      Everything in this statement you said?
A      Yes.  It's all a lie

Ex. C, p. 100, lines 11-12.

Q      You were – no, that everything you said was being taken down, right?
A      Yes
Q      You could have said anything you wanted to, right?
A      Right
Q      Never said anything about any sort of beating, right?
A      Right.  Because I was scared.
Q      In fact, what you did say is that you were treated well?
A      Right.  Because I was scared.
Q      By the assistant state's attorney, right?
A      Right
Q      And by the police?
A      Right

Ex. C, p. 101, lines 6-21.

Q      At no time while she was at the station did you ever tell her [Turano] anything
       about being beaten?
A      No.  I was scared to come forth then.
Q      At any time you were there, did you tell her that you had any injuries anywhere?
A      No, I didn't.

Ex. C, p. 102, lines 5-10.

Plaintiff's sworn trial testimony refutes is unsworn Amended Complaint allegations that Turano knew of any alleged abuse. Plaintiff was ultimately convicted of the first-degree murder of Garcia and aggravated battery with a firearm of Lugo. Dkt. #66, ¶ 120. In July 2022, the Circuit Court of Cook County vacated Plaintiff's conviction, and the State entered a motion of *nolle prosequi* on the remaining counts against him. Dkt. #66, ¶ 133.

## <u>ARGUMENT</u>

**I.      TURANO IS ENTITLED TO ABSOLUTE PROSECUTORIAL IMMUNITY FOR ALL OF PLAINTIFF'S FEDERAL CLAIMS (COUNTS II, III, AND IV).**

It is well settled that prosecutors are absolutely immune from suits for damages relating to their initiation and presentation of the state's case. *Imbler v. Pachtman*, 424 U.S. 409, 431

(1976). "[A]bsolute immunity shields prosecutors even if they act maliciously, unreasonably, without probable cause, or even on the basis of false testimony or evidence. *Smith v. Power*, 346 F.3d 740, 742 (7th Cir. 2003). The policy served is "concern that harassment by unfounded litigation" could "cause a deflection of the prosecutor's energies from his public duties" and lead him to shade his decisions instead of exercising the independence of judgment required by his public trust." *Imbler*, 424 U.S. at 423. The *Imbler* court held that whether or not an action falls within the scope of his prosecutorial duties is determined by its function. *Id*. The *Imbler* court recognized that "the duties of a prosecutor in his role as advocate for the State involves actions preliminary to the initiation of a prosecution," and "decisions on a wide variety of sensitive issues" including "questions of whether to present a case to a grand jury, whether to file an information, whether and when to prosecute . . ." *Id*. at 431 n.33. Furthermore, "[p]reparation, both for the initiation of the criminal process and for a trial, may require the obtaining, reviewing, and evaluating of evidence." *Id*. The Court observed in *Imbler* that an out-of-court "effort to control the presentation of [a] witness' "testimony" is entitled to absolute immunity. *Id*. at 430 n.32.

For purposes of absolute immunity, it is irrelevant whether the protected party acted negligently, with malice, or in bad faith. *Bradshaw v. DeGand*, 1992 U.S. Dist. LEXIS 911, *4 (N.D. Ill. January 30, 1992 (Conlon, J.) (citing *Stump v. Sparkman*, 435 U.S. 349, 356 (1978) (absolute immunity for the judiciary precludes civil actions, even when a judge acts in bad faith)). When considering an immunity defense, a court should focus on the conduct for which immunity is claimed, not the harm that the conduct allegedly caused or the question of whether it was lawful. *Buckley v. Fitzsimmons,* 509 U.S. 259, 271 (1993). Immunity is immunity from suit,

8

not merely a defense to liability. See, e.g, *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (discussing qualified immunity).

In *Fields v. Wharrie*, 672 F.3d 505 (7th Cir. 2012), after the plaintiff's murder conviction was reversed and he was granted a certificate of innocence, he sued several prosecutors involved in his criminal prosecution. The Seventh Circuit held in *Fields* that a prosecutor is absolutely immune from suit for all actions and decisions in furtherance of his prosecutorial duties and found further that absolute immunity extends beyond an individual prosecutor's decision to indict or try a case. *Fields*, 672 F.3d at 509.

When "determining whether particular actions of government officials fit within a common-law tradition of absolute immunity, or only the more general standard of qualified immunity, [courts] have applied a 'functional approach,' "looking to "the nature of the function performed, not the identity of the actor who performed it." *Smith v. Burge*, 222 F.Supp.3d 669, 694 (N.D. Ill. 2016) (citing *Buckley*, 509 U.S. at 269) When considering a prosecutor's function, a significant factor is whether probable cause to arrest plaintiff existed. *Hill v. Coppleson*, 627 F.3d 601, 605 (7th Cir. 2010) (Citing *Buckley,* 509 U.S. at 274). Once probable cause exist to arrest plaintiff, a prosecutor can consider herself to be an advocate for the State. *Id.*

In this case, the allegations in the Amended Complaint establish that probable cause existed to arrest Plaintiff prior to Defendant Turano's involvement. Probable cause to arrest exists "when the facts and circumstances that are known to [the officer] reasonably support a belief that the individual has committed, is committing, or is about to commit a crime." *Holmes v. Village of Hoffman Estates*, 511 F.3d 673, 679 (7th Cir. 2007). Both Juan Parra and Jeremiah Cain gave statements implicating Plaintiff in the shooting of Garcia and Lugo. Dkt. #66, ¶ 50, 60; Ex. A, pg. 8-21; Ex. B, pg. 14-20. Police found a handgun in Cain's bedroom that was later

confirmed to be the murder weapon. Dkt. #66, ¶ 54-55. While Plaintiff alleges the Police Officer Defendants obtained Parra and Cain's statement through coercion, Plaintiff also alleges the Police Officer Defendants suppressed all of the circumstances of both statements. Dkt. #66, ¶ 46, 47, 51. 59, & 62. Plaintiff does not allege Turano knew of any alleged coercion used to secure these statements or that she was part of the alleged conspiracy between the Defendant Police Officers. Dkt. #66, ¶ 203-209.

Accepting Plaintiff's allegations as true, probable cause existed to arrest Plaintiff prior to Turano's involvement. Plaintiff also concedes the was arrested and taken to the police station after these statements were secured. Dkt. #66 ¶ 63. Therefore, there was probable cause to arrest based upon Parra and Cain's statements and Plaintiff was in fact arrested prior to any involvement by Turano. Plaintiff also concedes that he agreed to provide a statement based upon the Police Officer Defendants alleged interrogation before meeting Turano. Dkt. #66 ¶¶ 92-94. With the facts and circumstances surrounding Parra and Cain's statement suppressed from Turano, she is left with the statements on their face, the fact that the murder weapon was found in Cain's bedroom, adding corroboration to Cain's statement and Plaintiff's alleged willingness to give a court reported statement all while Plaintiff concedes he never told Turano about any alleged coercion or torture. Clearly, probable cause existed and Plaintiff was indeed under arrest prior to Turano's involvement as an advocate for the State in a prosecutorial capacity. Therefore, Turano is entitled to absolute immunity.

Furthermore, Turano's role was limited to taking the court-reported statement of Plaintiff. Courts in this district have found that ASAs taking statements from suspects are entitled to absolute prosecutorial immunity. *See Kitchen v Burge*, 781 F.Supp. 2d 721, 730 (2011); *Andrews v. Burge*, 660 F. Supp. 2d 868, 878 (N.D. Ill. 2009). The *Andrews* court stated:

> It is within the proper role of an advocate for the State to take a court reported statement, as well as to see and hear the defendant give the statement, rather than simply take the word of the police that the defendant has confessed. The prosecutor acts within his core functions when he evaluates the evidence gathered by police and, in the case of a confession, takes steps to see that the words of the defendant are properly preserved. A prosecutor should not be deprived of immunity because, in a case of murder, he decides to hear what the defendant has to say for himself.

*Andrews v. Burge*, 660 F. Supp. 2d 868, 878 (N.D. Ill. 2009). Plaintiff's allegations that Turano was acting in an investigatory capacity in taking Plaintiff's statement is a legal conclusion that is not entitled to the presumption of truth. *Allain*, 478 U.S. at 286 (1986); *O'Bannon*, 287 F.3d at 658 (7th Cir. 2002).

Moreover, Plaintiff's allegations that Turano had knowledge of his alleged abuse by the Police Officer Defendants prior to his giving his court-reported statement is refuted by Plaintiff's own trial testimony. Ex. C, p. 82, lines 9-11; 101, lines 6-21; 102, lines 5-10. At trial, Plaintiff admitted he never told Turano of any alleged abuse. *Id.* As such, Plaintiff's unsworn Amended Complaint allegations signed by his attorney implying Turano's knowledge of Plaintiff's alleged abuse are unsupported by his sworn trial testimony and not entitled to the presumption of truth. Plaintiff's allegations concede probable cause existed prior to Defendant Turanos' involvement in the case and her role in taking Plaintiff's statement was squarely prosecutorial in nature. Therefore, Turano is entitled to absolute prosecutorial immunity and Counts II, III, and IV should be dismissed.

## II. ALTERNATIVELY, TURANO IS ENTITLED TO QUALIFIED IMMUNITY FOR COUNT IV.

Even if this Court concluded that Turano is not entitled to absolute immunity at this juncture, it should dismiss Plaintiff claim for failure to intervene in Count IV. The qualified immunity doctrine "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known." *Pearson v Callahan,* 555 U.S. 223, 231 (2009) (internal quotations omitted). In assessing whether a state actor is entitled to qualified immunity, courts undertake a two-part inquiry. *Saucier v Katz*, 533 U.S. 194, 200 (2001). First, courts consider whether the facts alleged set forth a violation of a constitutional right. *Id.* at 201. Second, courts consider whether the right was clearly established at the time of the alleged misconduct. *Id.* Courts have discretion to decide which of these two prongs "should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236. As with absolute immunity, qualified immunity entitles defendants to immunity from suit rather than just a defense from liability. *Mitchell v Forsyth,* 472 U.S. 511, 526 (1985).

Turano is entitled to qualified immunity as to Plaintiff's failure to intervene claim (Count IV) because there was no clearly established duty for prosecutors to intervene in the circumstances alleged in the complaint in 1999 and Plaintiff admits he never told Turano about any alleged abuse, but instead answered all her questions while giving his court-reported statement. A right is clearly established when, at the time of the challenged conduct, the contours of a right are "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 640, 639-40 (1987) To show that the right in question was clearly established at the time the alleged violation occurred, a plaintiff must point to closely analogous cases which establish that the conduct was unlawful or demonstrate that the violation was so obvious that a reasonable state actor should know that what he is doing—or in this case not doing—violates the constitution. *Vickery v. Jones*, 100 F.3d 1334, 1339-40 (7th Cir. 1996); see also *Lunini v. Grayeb*, 395 F.3d 761, 769 (7th Cir. 2005) ("[T]he plaintiff must demonstrate either that a court has upheld the purported right in a case factually similar to the one under review, or that the alleged misconduct constituted an obvious violation

12

of a constitutional right."). "Although the plaintiff need not point to a case directly on point, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Doe v. Village of Arlington Heights*, 782 F.3d 911, 915 (7th Cir. 2015) (quoting *Ashcroft v. Al-Kidd*, 131 S.Ct. 2074, 2083 (2011) (emphasis added)). Counts in this district have found that prior to 2012, a prosecutor's duty to intervene was not clearly established. *Wilson v. Est. of Burge*, No. 21-CV-03487, 2023 WL 2750946, at *23 (N.D. Ill. Mar. 31, 2023); *Serrano v. Guevara*, 315 F. Supp. 3d 1026, 1038 (N.D. Ill. 2018); *Andrews v. Burge*, 660 F. Supp. 2d 868, 876 (N.D. Ill. 2009). There is no clearly established duty for Turano to intervene in the circumstances alleged in the complaint in 1999 when she is unaware of those circumstances as they occurred prior to meeting Plaintiff and Plaintiff concedes he never told Turano of the alleged circumstances leading to his agreement to give a court-reported statement. Therefore, Defendant Turano is entitled to qualified immunity as to Count IV.

### III. DEFENDANT TURANO IS ENTITLED TO ABSOLUTE IMMUNITY FOR THE STATE LAW CLAIMS AGAINST HER (COUNTS VII, VIII, and IX).

As Plaintiff's state law claims against Defendant Turano are necessarily predicated upon the same factual allegations as Plaintiff's §1983 claims, Defendant Turano is entitled to absolute immunity from plaintiff's state law claims as well. Illinois courts have followed the United States Supreme Court's pronouncement in *Imbler* on prosecutorial immunity. In *White v. City of Chicago*, 369 Ill. App. 3d 765 (1st Dist. 2006), the Illinois Appellate Court reaffirmed the application of absolute prosecutorial immunity, even in light of allegations of intentional misconduct by the prosecutor. In *White*, the plaintiffs alleged that the State's Attorney's Office: (a) re-investigated a murder for which the plaintiffs had been cleared, and charged them knowing they had no connection to the crime; (b) determined that another person had committed the murders; (c) determined that the main prosecution witness was untruthful; and (d) determined

that the physical evidence did not support the charges. *White*, 369 Ill. App. 3d at 768. The plaintiffs alleged that the second investigation actually supported the findings of the original investigation clearing the plaintiffs. Despite allegations of actual knowledge of these facts, and that the State's Attorney and one of his assistants suppressed exculpatory information and induced a prosecution witness to testify falsely before the grand jury by paying him $4,000, the appellate court upheld the defendants' immunity. Recognizing the severity of the allegations against the prosecutors, the *White* court found that they were nevertheless protected from suit, based on absolute prosecutorial immunity. *Id.* at 775-77.

Defendant Turano is entitled to absolute prosecutorial immunity as to Counts VI, VIII, and IX, and said Counts should, therefore, be dismissed with prejudice.

## IV    ALTERNATIVELY, COUNT IX SHOULD BE DISMISSED BECAUSE ILLINOIS LAW CONFERS NO SEPARATE CAUSE OF ACTION FOR WILLFUL AND WANTON CONDUCT.

Count IX of Plaintiff's Complaint purports to assert a cause of action under Illinois law for "Willful and Wanton Conduct." Dkt #66, ¶ 231-234. Plaintiff alleges Defendants have a duty to refrain from willful and wanton conduct in connection with the investigation of the murder of Jose Garcia and shooting of Julio Lugo and in breach of that duty showed an utter indifference to, or conscious disregard of, Plaintiff's rights through the various actions taken during the investigation. However, under well-settled Illinois law, "there is no separate, independent tort of willful and wanton conduct." *Jane Doe-3 v. McLean Cnty. Unit Dist. No. 5 Bd. of Directors*, 2012 IL 112479, ¶ 19; *Krywin v. Chicago Transit Authority*, 238 Ill.2d 215, 235 (2010). "Rather, willful and wanton conduct is regarded as an aggravated form of negligence." *McLean*, 2012 IL 112479, ¶ 19. Accordingly, to recover for damages based on willful and wanton conduct, a

plaintiff must plead and prove the basic elements of a negligence claim in addition to alleging

either a deliberate intention to harm or a conscious disregard for the plaintiff's welfare. *Id.*

Here, because there is no recognized standalone claim for willful and wanton conduct or

"a duty to refrain from willful and wanton conduct" under Illinois law, Count IX does not state a

claim for which relief can be granted. In *Fletcher v. Bogucki, et al.*, the Court recently dismissed

such a claim on the basis that the allegation that a "duty to refrain from willful and wanton

conduct in connection with the … murder investigation" is insufficient to allege even a

negligence claim aggravated by willful and wanton conduct. No. 20-CV-04768, 2021 WL

4477968, at *8 (N.D. Ill. Sept. 30, 2021). Similarly, in this case, Plaintiff's erroneous invocation

of a standalone "willful and wanton conduct" claim and failure to allege a duty recognized under

Illinois law is fatal to his claim in Count IX and requires dismissal. *Id.*

## CONCLUSION

WHEREFORE, Defendant Judge ANDREANA TURANO MICHIELS respectfully

requests this Court dismiss the Complaint against her with prejudice and order any further relief

this Court deems fair and just.

Respectfully submitted,

s/ William B. Oberts
Special State's Attorney for
defendant, Andreana Turano

William B. Oberts - #6244723
Kevin C. Kirk -  # 6329937
Tribler Orpett & Meyer, P.C.
225 W. Washington St., Suite 2550
Chicago, IL 60606
(312) 201-6400
wboberts@tribler.com
kckirk@tribler.com

15

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned hereby certifies that a true and correct copy of Defendant Turano's Memorandum of Law in Support of Motion to Dismiss Plaintiff's Amended Complaint was served upon:

| | |
|---|---|
| **<u>*Attorneys for Plaintiff*</u>**<br>Jonathan I. Loevy<br>Anand Swaminathan<br>Arthur R. Loevy<br>Carla Agbiro Linton<br>Renee Spence<br>Steven Edwards Art<br>Loevy & Loevy<br>311 N. Aberdeen 3rd FL<br>Chicago, IL 60607<br>(312)243−5900<br>jon@loevy.com<br>anand@loevy.com<br>arthur@loevy.com<br>agbiro@loevy.com<br>spence@loevy.com<br>steve@loevy.com<br><br>**<u>*Attorneys for Cook County*</u>**<br>Kelli Huntsman<br>Cook County State's Attorney's Office<br>Civil Actions Bureau<br>500 Richard J. Daley Center<br>Chicago, IL 60602<br>312−603−3151<br>kelli.huntsman@cookcountyil.gov<br><br>**<u>*Attorneys for Anthony Wojcik, Jerome Bogucki, Ray Schalk, Daniel Engel*</u>**<br>James G. Sotos<br>Josh M. Engquist<br>Joseph M. Polick<br>Maurice Hunt<br>Thomas J. Sotos<br>Elizabeth R. Fleming<br>The Sotos Law Firm, P.C<br>141 W. Jackson Blvd., #1240A<br>Chicago, IL 60604<br>jsotos@jsotoslaw.com<br>Jenguist@jsotoslaw.com<br>jpolick@jsotoslaw.com<br>mhunt@jsotoslaw.com<br>efleming@jsotoslaw.com<br>tsotos@jsotoslaw.com | **<u>*Attorneys for defendant, City of Chicago*</u>**<br>Eileen E. Rosen<br>Andrew J. Grill<br>Austin G. Rahe<br>Catherine M. Barber<br>Jessica Zehner<br>Lauren M. Ferrise<br>Theresa B. Carney<br>Rock Fusco & Connelly LLC<br>321 N. CLARK STREET, SUITE 2200<br>Suite 2200<br>Chicago, IL 60654<br>312−494−1000<br>erosen@rfclaw.com<br>agrill@rfclaw.com<br>arahe@rfclaw.com<br>cbarber@rfclaw.com<br>jzehner@rfclaw.com<br>lferrise@rfclaw.com<br>tcarney@rfclaw.com<br><br>**<u>*Attorneys for Reynaldo Guevara*</u>**<br>Steven B. Borkan<br>Timothy P. Scahill<br>Graham P. Miller<br>Misha Itchhaporia<br>Emily E. Schnidt<br>Molly Boekeloo<br>Whitney Newton Hutchinson<br>Borkan & Scahill, Ltd.<br>20 S. Clark Street, Suite 1700<br>Chicago, IL 60603<br>(312) 580-1030<br>sborkan@borkanscahill.com<br>tscahill@borkanscahill.com<br>gmiller@borkanscahill.com<br>mitchhaporia@borkanscahill.com<br>whutchinson@borkanscahill.com<br>eschnidt@borkanscahill.com<br>mboekeloo@borkanscahill.com |

16

service was accomplished pursuant to ECF as to Filing Users and complies with LR 5.5 as to any party who is not a Filing User or represented by a Filing User by mailing a copy to the above-named attorney or party of record at the address listed above, from 225 W. Washington Street, Suite 2550, Chicago, IL 60606, prior to 5:00 p.m. on the 5th day of September, 2023, with proper postage prepaid.

s/ William B. Oberts
an Attorney

# EXHIBIT A

1

1    RE: INVESTIGATION OF THE FATAL SHOOTING OF

2                        JOSE GARCIA

3

4

5

6                    S T A T E M E N T

7

8                            of

9                      JUAN PARRA,

10        taken in an interview room at Area 5 Police

11   Station, 5555 West Grand Avenue, Chicago, Cook

12   County, Illinois, on March 24th, 1999.

13

14

15   PRESENT:        MR. JAKE RUBINSTEIN,
                     ASSISTANT STATE'S ATTORNEY
16

17
                     DETECTIVE SCHALK,
18                   STAR NO. 20718

19

20

21   Reported By:    Debra L. Kelly, C.S.R.
                     Illinois State License No. 084-003815
22
     Book No.        03-2499
23

24        ----------------------------

A.S.A. _Jw' Rubinstein_     _Juan parra_     Det R. Schalk

2

1    MR. RUBINSTEIN:  Let the record reflect that

2    we are in an interview room at Area 5 Violent

3    Crimes.  Today's date is March 24th, 1999.  The

4    time is 9:15 p.m.

5         Present in the room with me, Assistant

6    State's Attorney Jake Rubinstein, are Detective

7    Schalk, the court reporter, and Juan Parra.

8         We are here to take the statement of

9    Juan Parra concerning the investigation of the

10   fatal shooting of Jose Garcia which occurred on

11   March 22nd, 1999 at approximately 5:45 p.m. at

12   3159 North Monticello in Chicago, Illinois.

13                    EXAMINATION

14                        BY

15                  MR. RUBINSTEIN

16        Q.   Juan, I talked to you earlier and

17   explained that I am an Assistant State's Attorney,

18   a lawyer and prosecutor, and not your lawyer; is

19   that correct?

20        A.   Yes.

21        Q.   And before we spoke, I advised you of

22   your Constitutional rights; is that correct?

23        A.   Yes.

24        Q.   I'm going to read you your rights again.

A.S.A. _Jake Rubinstein_     _illegible signature_     Det. R. Schalk

Abrego 018394

3

1          Do you understand you have the right to

2     remain silent?

3          A.   Yes.

4          Q.   Do you understand that anything you say

5     can be used against you in a court of law?

6          A.   Yes.

7          Q.   Do you understand you have the right to

8     talk to a lawyer and have him present with you

9     while you are being questioned?

10         A.   Yes.

11         Q.   Do you understand if you cannot afford

12    to hire a lawyer and you want one, a lawyer will

13    be appointed by the Court to represent you before

14    any questioning?

15         A.   Yes.

16         Q.   Understanding these rights, do you wish

17    to talk to us now?

18         A.   Yes.

19         Q.   Juan, please state your name out loud

20    and spell it for the court reporter?

21         A.   My whole name?

22         Q.   Yes.

23         A.   J-u-a-n, P-a-r-r-a.

24         Q.   Where do you live, Juan?

A.S.A. _Jan Nulmileno_                    _Det. R. Schick_

4018  (JMR)  R.S.                                                    4

4018

| 1  | A. | 4019 Oakdale. |
| 2  | Q. | And with whom do you live, Juan? |
| 3  | A. | My father, my mother, and my two |
| 4  | sisters. | |
| 5  | Q. | What is your father's name? |
| 6  | A. | Juan Parra. |
| 7  | Q. | And what is your mother's name? |
| 8  | A. | Luz Mora. |
| 9  | Q. | How did you spell that? |
| 10 | A. | M-o-r-a. |
| 11 | Q. | And the first name is spelled L-u-z? |
| 12 | A. | Yeah. |
| 13 | Q. | Are you Juan Parra, Jr.? |
| 14 | A. | Yes. |
| 15 | Q. | Juan, how old are you? |
| 16 | A. | 19 years old. |
| 17 | Q. | What is your date of birth? |
| 18 | A. | 07-27-79. |
| 19 | Q. | July 27th, 1979? |
| 20 | A. | Yes. |
| 21 | Q. | Where did you go to high school? |
| 22 | A. | To Roosevelt High School. |
| 23 | Q. | How many years did you go to Roosevelt |
| 24 | High School for? | |

A.S.A. JM Nulmiera            Det R. Schell

5

| | | |
|---|---|---|
| 1 | A. | Two years. |
| 2 | Q. | Did you finish your sophomore year |
| 3 | there? | |
| 4 | A. | Nope. |
| 5 | Q. | You went during your sophomore year? |
| 6 | A. | Yes. |
| 7 | Q. | Do you have a GED? |
| 8 | A. | No, I don't, sir. |
| 9 | Q. | Can you read and write English? |
| 10 | A. | Yes. |
| 11 | Q. | Are you a member of any gang, Juan? |
| 12 | A. | Yes. |
| 13 | Q. | What gang are you a member of? |
| 14 | A. | OA's. |
| 15 | Q. | What is the OA's? |
| 16 | A. | It's supposed to be Orchestra Albany. |
| 17 | Q. | Is that a Chicago street gang? |
| 18 | A. | Yes. |
| 19 | Q. | What rank do you hold in the OA's? |
| 20 | A. | I'm just like a soldier. |
| 21 | Q. | Is that the lowest rank in the OA's? |
| 22 | A. | It's supposed to be. |
| 23 | Q. | How long have you been a member of the |
| 24 | OA's? | |

A.S.A.

Det R. Schall

Abrego 018397

6

1       A.   Like about a month ago.

2       Q.   Since about a month ago?

3       A.   Yes.

4       Q.   Can you describe the territory of the

5  OA's on the north side and the west side of

6  Chicago?

7       A.   One on Darwin and it's another one on

8  Shubert, Avers, and Kosciuszko Park.

9       Q.   Is Kosciuszko Park on Diversey?

10      A.   On Diversey, yeah.

11      Q.   Is that the area you hang out as an OA?

12      A.   Yes.

13      Q.   Who are the Kings?

14      A.   Supposed to be rival gang.

15      Q.   Are the Kings a rival gang of the OA's?

16      A.   Yes.

17      Q.   Are the Kings also known as the Latin

18  Kings?

19      A.   Yes.

20      Q.   Are the Latin Kings and the OA's

21  enemies?

22      A.   Yes.

23      Q.   Do they fight?

24      A.   Yes.

A.S.A. *[signature]*      *[illegible]*      Det. R. *[signature]*

7

```
 1        Q.   Where is the territory of the Kings?

 2        A.   On the north side?

 3        Q.   Yes.

 4        A.   It's by Belmont and Pulaski.

 5        Q.   I'd like now to talk about Sunday, March

 6   21st, 1999, do you remember where you were on

 7   Sunday, March 21st?

 8        A.   Yes.

 9        Q.   Where were you?

10        A.   In Trak Auto.

11        Q.   Is that an auto parts store?

12        A.   Yes.

13        Q.   What street is that on?

14        A.   Milwaukee and Pulaski.

15        Q.   Do you remember what time of day you

16   were there?

17        A.   Yes.

18        Q.   Around what time?

19        A.   It was about 12:00 o'clock, close to

20   1:00.

21        Q.   When you were at the auto parts store

22   did you see anyone you know?

23        A.   Yes.

24        Q.   Who did you see?
```

A.S.A. Jni Rubinstein

Dct R. Scholl

Abrego 018399

8

1     A.   I seen Sef, Eruby.

2     Q.   I'm going to show you what is marked as

3  Exhibit No. 1, it's a photograph.  Who is this in

4  this photograph?

5     A.   That's Eruby, Sef.

6     Q.   His first name is Eruby?

7     A.   Eruby.

8     Q.   Do you know him as Sef?

9     A.   Yes.

10    Q.   Is this the person you saw at the auto

11  parts store on Sunday?

12    A.   Yes.

13    Q.   Is he a member of any gang?

14    A.   Yes.

15    Q.   What gang he is a member of?

16    A.   OA.

17    Q.   Does he hold any rank in the OA gang?

18    A.   I think he does.

19    Q.   Who rank does he hold?

20    A.   He's not a soldier.  I don't know what

21  he holds, but he's not a soldier.

22    Q.   Is he higher or lower than a soldier?

23    A.   Higher.

24    Q.   How long have you know Sef?

A.S.A. *(handwritten signature)*     *(handwritten signatures)*     Det. R. Schick

9

```
 1        A.   I used to go to school with him, grammar
 2   school, and then he went away out of the state and
 3   he just came back.
 4        Q.   Have you ever known Sef to carry guns or
 5   handle guns?
 6        A.   I seen him with a gun before.
 7        Q.   When you saw Sef at the auto parts store
 8   on Sunday, March 21st, did you have a conversation
 9   with him?
10        A.   Yes.
11        Q.   What did you talk about?
12        A.   Well, he was telling me about those
13   Kings on Belmont and Pulaski going around
14   Kosciuszko Park starting trouble with him and with
15   the OA's that are hanging out.
16        Q.   Is Kosciuszko Park OA territory?
17        A.   I think it is.
18        Q.   Did he tell you about any specific
19   incidents between the Kings and the OA's?
20        A.   He told me something about his nephew
21   getting rammed by a van.
22        Q.   His nephew's car or his nephew?
23        A.   His nephew's car got hit by a van by the
24   Kings.
```

A.S.A. _Jw Nulmister_                    _from p hire_
                                                Det R Schall

Abrego 018401

10

1     Q.   Did he say if he was there when this

2  happened?

3     A.   He said he was there.

4     Q.   Did he mention any other incidents with

5  the Kings?

6     A.   Yes, he did.

7     Q.   What other incidents did he mention?

8     A.   He told me he was on Belmont and Kimball

9  when he seen a brown Caprice and he got into it

10  with them or something.

11     Q.   Did he say who was in the brown Caprice?

12     A.   He said he thinks it was the Kings.

13     Q.   Do you know what he meant when he said

14  he got into it with them?   the Kings' (JMR)  RS

15     A.   He told me ~~he~~ Pee wee broke ~~his~~ window or

16  something.

17     Q.   Did he say he broke the window on the

18  brown Caprice?

19     A.   Uh-huh, Pewee did.

20     Q.   I want to talk to you now about March

21  22nd, 1999, which is Monday, the day after you had

22  this conversation with Sef in the auto partS

23  store.  Do you know where you were around 4:00

24  p.m. on that day?

A.S.A. Jon Rubinsten                         Det R. Schell

Abrego 018402

11

```
 1        A.   4:00 p.m., I went to the park.

 2        Q.   Which park did you go to?

 3        A.   Kosciuszko Park.

 4        Q.   Who did you go there with?

 5        A.   With my friend Carlos.

 6        Q.   Did you drive there or walk there?

 7        A.   I drove over there.

 8        Q.   What car did you drive over there?

 9        A.   A Chevy Caprice.

10        Q.   What color?

11        A.   It's brown.

12        Q.   Does it have any other color on it?

13        A.   It has a blue door.

14        Q.   Whose car is that?

15        A.   My car.

16        Q.   Are you the registered owner of that

17   car?

18        A.   Yes.

19        Q.   Did you drive that car or did Carlos

20   drive the car to the park?

21        A.   I drove to the park.

22        Q.   Carlos was a passenger?

23        A.   Yes.

24        Q.   What happened when you got to the park?
```

A.S.A. *JNV Nulinslew*          *Jaye Jour*          DET. R. Schull

Abrego 018403

```
 1        A.   When I got to the park the OA's were out
 2   there, meaning Cain, Sef, Pewee, and Carlos was
 3   there and Josari.                    RS
 4        Q.   I'm up going to show you what I have
 5   marked as Exhibit No. 2, do you know who is
 6   pictured in this photograph?
 7        A.   Yes.
 8        Q.   Who is that?
 9        A.   Cain.
10        Q.   Is he one of the OA's that was out there
11   in the park on Monday?
12        A.   Yes.
13        Q.   How long have you known Cain?
14        A.   I know him since like last summer.
15        Q.   Does Cain hold any rank in the OA's?
16        A.   No, he's just a soldier.
17        Q.   Have you ever known Cain to carry guns?
18        A.   Yeah, I seen him with a gun before last
19   summer.
20        Q.   I'm going to show you now what I have
21   marked as Exhibit 3, which is another photograph,
22   and I'm going to ask you if you recognize the
23   person pictured in this photograph?
24        A.   Yes.
```

A.S.A. _Jnv Rulinstein_

_Det. R. Schll_

Abrego 018404

13

1       Q.   Who is that?

2       A.   Pewee.

3       Q.   Was Pewee one of the people who was in

4  the park on Monday, March 22nd?

5       A.   Yes.

6       Q.   Is Pewee also an OA?

7       A.   Yes.

8       Q.   How long have you known Pewee?

9       A.   For like since summer too.  I met him at

10  the park.

11      Q.   Did you go over and talk to these OA's

12  in the park on Monday?

13      A.   Yes, I got out and talked to them.

14      Q.   What did you talk about?

15      A.   When I got there they were talking about

16  the incidents with the Kings.

17      Q.   When you say incidents, what are you

18  referring to?

19      A.   About, you know, starting trouble, the

20  Kings starting trouble with the OA's at the park.

21      Q.   Who was saying what?

22      A.   Sef was saying what happened to his

23  nephew, about the car that got rammed and they

24  were just talking about them coming around, you

A.S.A. *JW Nulmoran*           *Tracy Pierre*
                                   Det. R. Schell

14

1    know.

2         Q.    At some point did everyone start talking

3    about going and getting back at the Kings for the

4    things they had done?

5         A.    Nope.

6         Q.    Was there a discussion about leaving the

7    park and going somewhere?

8         A.    Yes.

9         Q.    What was that discussion about?

10        A.    They are talking about let's go by the

11   Kings' neighborhood, by the Kings.

12        Q.    And what did all of you say you were

13   going to do when you went to the King's

14   neighborhood?

15        A.    We say, you know, we're going to start

16   trouble with them.

17        Q.    What do you mean by start trouble?

18        A.    Like if we see a King, you know, beat

19   them up or hit one of their cars or do something

20   to them or something.

21        Q.    Do what to their cars?

22        A.    You know, ram it or something.

23        Q.    If you were able to catch a King would

24   you beat them up?

A.S.A. JM Rulmilem                Det. R. Slach

Abrego 018406

15

```
1        A.   Me?

2        Q.   The group?

3        A.   Supposed to be, yeah.

4        Q.   At some point did everybody decide to

5   leave the park?

6        A.   Yeah.

7        Q.   How did you leave, did you leave walking

8   or in a car?

9        A.   I left in a car.

10       Q.   Whose car?

11       A.   My car.

12       Q.   Who was driving?

13       A.   I was driving.

14       Q.   Who was in the front passenger seat?

15       A.   Sef.

16       Q.   Who was in the back seat?

17       A.   Cain and Pewee.

18       Q.   You mentioned earlier that a man named

19  Carlos and a man named Josari were also at the

20  park, did they come with you in your car?

21       A.   No.

22       Q.   When you got into your car where did you

23  go?

24       A.   Down Pulaski.
```

A.S.A. *[signature]*     *[signature]*

Det. R. *[signature]*

Abrego 018407

16

1     Q.  Towards where?

2     A.  Towards Belmont.

3     Q.  Why were you going to the area of

4  Belmont and Pulaski?

5     A.  To see if some Kings were out there.

6     Q.  Why did you think there would be Kings

7  in the area of Belmont and Pulaski?

8     A.  That's supposed to be the Kings'

9  territory.

10     Q.  Was there any conversation about the

11  Kings in the car on the way to Belmont and

12  Pulaski?

13     A.  Yes.

14     Q.  Conversation about what?

15     A.  About, you know, if you see a King start

16  trouble with them.

17     Q.  What happened when you got to the area

18  of Belmont and Pulaski?

19     A.  I turned right.

20     Q.  Onto what street?

21     A.  To Belmont.

22     Q.  And then where did you go?

23     A.  I went straight ahead past Milwaukee and

24  then I hit Lawndale.

A.S.A. *Jm Rubinstein*       *[signature]*   Det. R. Scholl

Abrego 018408

17

1      Q.   The corner of Lawndale and what other

2 street?

3      A.   Lawndale and Pulaski -- I mean Lawndale

4 and Belmont.

5      Q.   What happened at Lawndale and Belmont?

6      A.   They seen a brown Caprice. ~~A~~ Then I saw it.

7      Q.   Did they say anything when they seen the

8 brown Caprice?

9      A.   Yes.

10      Q.   What did they say?

11      A.   That's the Caprice going around and

12 starting shit -- starting trouble with them.

13      Q.   When I say they, I'm referring to Pewee,

14 Cain and Sef?

15      A.   Yes, Pewee, Cain, and Sef.

16      Q.   Did they say that was the Kings' car,

17 the brown Caprice?

18      A.   They told me it was the King's car.

19      Q.   Did they tell you to stop your car or

20 keep on driving?

21      A.   They told me to turn on Lawndale.

22      Q.   Did you turn on Lawndale?

23      A.   Yes, I did.

24      Q.   Did you stop the car on Lawndale or did

A.S.A. *JW Nulmstein*

Det. R. Shell

18

1    you keep going?

2        A.   I stopped the car.

3        Q.   What happened when you stopped the car

4    on Lawndale?

5        A.   They got out of my car.

6        Q.   Who got out?

7        A.   Pewee, Sef, and Cain.

8        Q.   Where did they go when they got out?

9        A.   They was chasing the King's car, the

10   brown Caprice.

11       Q.   Did you wait when they went to chase the

12   Caprice?

13       A.   Yes, I did.

14       Q.   When they got out of the car did you see

15   them doing anything?

16       A.   Yes, they are picking up bottles to like

17   go after the car.

18       Q.   As you sat there on Lawndale did you

19   hear any noises?

20       A.   Yes, I heard broken glass.

21       Q.   The sound of glass breaking?

22       A.   Uh-huh.

23       Q.   Did you see anyone throwing any bottles?

24       A.   No, cause they ran out the car.

A.S.A. _Jon Rubinstein_       _from Kane_

_Det. R. Sibell_

19

```
 1        Q.   What street were they running on?

 2        A.   Belmont.

 3        Q.   Was that around the corner from where

 4   you were?

 5        A.   Yes.

 6        Q.   At some point did some of them come back

 7   to your car?

 8        A.   Yes.

 9        Q.   Who came back to your car?

10        A.   Cain and Pewee.

11        Q.   Did Sef come back with them?

12        A.   No, he didn't.

13        Q.   Did Cain and Pewee get into your car?

14        A.   Yes.

15        Q.   What happened when they got into your

16   car?

17        A.   They got into my car and I was like,

18   where is Sef at.

19        Q.   What did they say?

20        A.   They said he's coming, reverse.

21        Q.   Did you reverse?

22        A.   I reversed a little.

23        Q.   Did they say anything about what had

24   happened around the corner on Belmont?
```

A.S.A. *[signature]*  *[signature]*  Det. R. *[signature]*

Abrego 018411

20

1      A.   No, they didn't.

2      Q.   What did you do after you reversed the

3  car?

4      A.   I reversed the car and they told me go

5  through an alley cause I think Sef was going

6  around.

7      Q.   What was he going around for?

8      A.   I don't know.

9      Q.   Was he going to find the Kings?

10     A.   I think he was still chasing the Kings.

11     Q.   After they told you to pull into the

12  alley, did you pull into the alley?

13     A.   Yes, I did.

14     Q.   Is that the alley between Monticello and

15  Lawndale?

16     A.   Yes.

17     Q.   What did you do when you got into the

18  alley?

19     A.   I stopped like in the middle of the

20  alley cause I was looking for Sef cause that was,

21  you know, he was not in his neighborhood, so I

22  made sure I was looking for him.

23     Q.   Did you wait for Sef?

24     A.   Yes.

A.S.A. JW Rubinstein

Dist. R. Scholl

Abrego 018412

21

1   Q.   Did you see Sef come back to your car?

2   A.   Yes.

3   Q.   Was he running or walking?

4   A.   He was running.

5   Q.   Was he running fast or just jogging?

6   A.   You could say he was running.

7   Q.   Did he run up to the car?

8   A.   Yeah.

9   Q.   What did he do when he came up to the

10  car?

11  A.   He got in my car and I seen like a gun

12  in his hand. That's when I knew Sef had shot somebody.
              JMR      RS

13  Q.   Before Sef came back to your car while

14  you were waiting for him, did you hear any noises?

15  A.   Yes, I hear two gunshots.

16  Q.   After Sef got back in the car did you

17  see anything in his hand?

18  A.   Yes, I seen like a gun.

19  Q.   What color was it?

20  A.   It was black.

21  Q.   What did Sef do with the gun?

22  A.   He put it in his slip -- how you call

23  that -- on his waist.

24  Q.   In his waist?

A.S.A. JMN Nulmican                              DET. R. Scholl

22

```
1        A.   Yeah.

2        Q.   Did he say anything to you?

3        A.   No, he was like he did not say

4   anything.  He was just like, make a right, make a

5   right.

6        Q.   Did anyone tell you what to do, where to

7   drive?

8        A.   Well, I got to Monticello and he told me

9   make a right, so I did make a right.

10       Q.   He told you to make a right?

11       A.   Uh-huh.

12       Q.   Did you make a right?

13       A.   Yes, I did.  I was driving the wrong way on Monticello, which is a one way street.

14       Q.   Where did you drive to?

15       A.   To Ridgeway.

16       Q.   Once you got to Ridgeway where did you

17   go?

18       A.   I went to George.

19       Q.   George Street.  And then where did you

20   go once you got to George Street?

21       A.   I made a right down Avers.  I went

22   towards Avers.

23       Q.   Where did you stop?

24       A.   On Avers and George.
```

A.S.A. JM Rubinstein

DET. R. Schell

23

1    Q.   What happened when you stopped?

2    A.   I told him get out of here, to get out

3    of my car.

4    Q.   Did they get out of your car?

5    A.   Yes.

6    Q.   After they got out of your car where did

7    you go?

8    A.   I went to my friend's house, Jose.

9    Q.   Where does Jose live?

10   A.   Lawndale and Diversey.

11   Q.   What did you do when you got to Jose's

12   house?

13   A.   I beeped and he came out.

14   Q.   You beeped your horn?

15   A.   Yes.

16   Q.   When he came out did you talk to him?

17   A.   Yes.

18   Q.   What did you talk about?

19   A.   I told him to go by my house with me so

20   I could drop my car off and go downtown to get my

21   tips from my job, from the hotel I work for.

22   Q.   Did he ride with you over to your house

23   to drop off your car?

24   A.   Yes.

A.S.A. _JAN Rubinstein_          _[signature]_
                                  DET. R. Scholl

24

1    Q.   Did you drop off your car?

2    A.   Yes.

3    Q.   Then what did you do?

4    A.   I went with him in his car.

5    Q.   Where did you go?

6    A.   To the hotel.

7    Q.   What did you do when you got to the

8  hotel?

9    A.   I went inside and got my tips.

10   Q.   After you did that, what did you do

11 then?

12   A.   We went back to the neighborhood and we

13 bought some beer and we went to his house.

14   Q.   What did you do at his house?

15   A.   Nothing, just watched cable and drank

16 some beer.

17   Q.   When I say his house, I mean Jose's

18 house.  How long did you stay there?

19   A.   Like till 11:00 o'clock.

20   Q.   What happened at 11:00 o'clock?

21   A.   He went and dropped me off.

22   Q.   Where did he drop you off?

23   A.   At my house.

24   Q.   What did you do when you got home?

A.S.A. _Jm Nulin来_          _Mange franc_
                                Det. R. Schila

Abrego 018416

25

```
1        A.   I went to sleep.
2        Q.   Juan, since you have been here at the
3   police station have the police treated you well?
4        A.   Yeah.
5        Q.   Have I treated you well since we have
6   been talking today?
7        A.   Yes.
8        Q.   Juan, have you had the opportunity to
9   have food since you have been at the police
10  station?
11       A.   Yes.
12       Q.   What did you have to eat?
13       A.   The first thing on Tuesday I had a
14  McDonald's and pop, water, pop, water.
15       Q.   What did you have other than that?
16       A.   I had cookies and I had a sandwich.
17       Q.   Have you also had the opportunity to
18  drink pop and water?
19       A.   Yes.
20       Q.   Have you been allowed to use the
21  bathroom whenever you needed to?
22       A.   Yes.
23       Q.   Have any threats been made to you in
24  order for you to make this statement today?
```

A.S.A.

DET. R. Schall

Abrego 018417

26

1     A.   No.

2     Q.   Has anyone made any promises to you in

3  order to make this statement today?

4     A.   No.

5     Q.   Are you giving there statement freely

6  and voluntarily because you want to tell the

7  truth?

8     A.   Yes.

9     Q.   Are you under the effects of any drugs

10  or alcohol right now?

11    A.   No.

12    Q.   What is going to happen now, Juan, is

13  the court reporter going to take the statement you

14  just gave and she will type it up into a written

15  form and then you and I and the detective will sit

16  together and read over the statement together.

17  You have the opportunity to make any changes or

18  corrections or additions to the statement that you

19  want to make.  Once you are satisfied with the

20  statement, you will sign it and I'll sign it and

21  the detective will sign it, okay?

22    A.   Yes.

23

24

A.S.A. *(signature)*     *(signature)*    Det. *(signature)*

Abrego 018418

27

```
1          MR. RUBINSTEIN:  This will conclude the
2     statement of Juan Parra.  The time is now 9:35
3     p.m.
4          X _____
5
6
7     WITNESSES TO SIGNATURE:
8
9     ASA _____
10
11
12    Det. _____
13
14
15
16
17
18
19
20
21
22
23
24
```

EXHIBIT 1



A.S.A. AM Nielinolaw                    Det R. Schall

Abrego 018420



Abrego 018421



EXHIBIT 3

A.S.A. *Jan Mulinstani*
Det. *R Schell*

Abrego 018422

# EXHIBIT B

1

1    RE: INVESTIGATION OF THE DEATH OF JOSE GARCIA

2

3

4

5                    S T A T E M E N T

6

7                          of

8                   JEREMIAH CAIN,

9         taken in an interview room at Area 5 Police

10   Station, 5555 West Grand Avenue, Chicago, Cook

11   County, Illinois, on March 24th, 1999.

12

13

14   PRESENT:        MS. NANCY NAZARIAN,
                     ASSISTANT STATE'S ATTORNEY
15

16
                     DETECTIVE TONY WOJCIK,
17                   STAR NO. 20834

18

19

20   Reported By:    Debra L. Kelly, C.S.R.
                     Illinois State License No. 084-003815
21
     Book No.        03-2499
22

23                ----------------------------

24

Abrego 018355

2

```
 1          MS. NAZARIAN:  Let the record reflect that we
 2    are in an interview room at Area 5 Violent
 3    Crimes.  Today's date is March 24th, 1999.  The
 4    time is 18:35 p.m.
 5              Present in the room with me, Assistant
 6    State's Attorney Nancy Nazarian, are Detective
 7    Tony Wojcik, the court reporter, and Jeremiah
 8    Cain.
 9              We are here to take the statement of
10    Jeremiah Cain concerning the investigation of the
11    murder of Jose Garcia which occurred on March
12    22nd, 1999 at approximately 17:45 p.m at 3159
13    North Monticello in Chicago, Illinois.
14                         EXAMINATION
15                             BY
16                        MS. NAZARIAN
17         Q.   Jeremiah, I talked to you earlier and
18    explained that I am an Assistant State's Attorney,
19    a lawyer and prosecutor, and not your lawyer; is
20    that correct?
21         A.   Yes.
22         Q.   And before we spoke, I advised you of
23    your Constitutional rights; is that correct?
24         A.   Yes.
```

3

1    Q.    I'm going to read you your rights again.

2          Do you understand you have the right to

3    remain silent?

4    A.    Yes.

5    Q.    Do you understand that anything you say

6    can be used against you in a court of law?

7    A.    Yes.

8    Q.    Do you understand you have the right to

9    talk to a lawyer and have him present with you

10   while you are being questioned?

11   A.    Yes.

12   Q.    Do you understand if you cannot afford

13   to hire a lawyer and you want one, a lawyer will

14   be appointed by the Court to represent you before

15   any questioning?

16   A.    Yes.

17   Q.    Understanding these rights, do you wish

18   to talk to us now?

19   A.    Yes.

20   Q.    What is your name?

21   A.    Jeremiah Cain.

22   Q.    Would you spell it for the court

23   reporter?

24   A.    J-e-r-e-m-i-a-h, C-a-i-n.

4

```
 1      Q.   Jeremiah, how old are you?
 2      A.   23.
 3      Q.   What is your date of birth?
 4      A.   03-29-75.
 5      Q.   Where do you live?
 6      A.   3935 West Diversey.
 7      Q.   Who do you live with?
 8      A.   My mom.
 9      Q.   And what is your mom's name?
10      A.   Jane Cain.
11      Q.   Does she also go by Frances?
12      A.   Yes.
13      Q.   Can you read and write English?
14      A.   Yes.
15      Q.   What grade did you go to in school?
16      A.   Sophomore year.
17      Q.   Is that in high school?
18      A.   Yes.
19      Q.   What high school?
20      A.   Carl Schurz.
21      Q.   Do you have your GED?
22      A.   Yes.
23      Q.   When did you get your GED?
24      A.   About 1995.
```

5

```
1       Q.   Are you a member of a gang?

2       A.   Yes.

3       Q.   Which gang are you a member of?

4       A.   The OA's.

5       Q.   What does OA stand for?

6       A.   Orchestra Albany.

7       Q.   Is it fair to say they are associates

8   with or rivals of the Latin Kings?

9       A.   Rivals.

10      Q.   Did you hold a rank?

11      A.   Yes.

12      Q.   What rank do you hold in the OA's?

13      A.   3rd Seat.

14      Q.   3rd Seat?

15      A.   Yes.

16      Q.   What does that mean?

17      A.   Chief of security.

18      Q.   As chief of security what are your

19  duties in the gang?

20      A.   Hold on to all of the pistols and stuff.

21      Q.   What does that mean?

22      A.   I hold on to the guns for them in my

23  apartment.

24      Q.   Are these pistols for the gang?
```

Abrego 018359

6

| | | |
|---|---|---|
| 1 | A. | Yes. |
| 2 | Q. | And they're used in what way? |
| 3 | A. | For whatever they need to be used for. |
| 4 | Q. | Now, I'm showing you a picture that I |

have marked as Exhibit A, do you recognize that

photograph?

| | | |
|---|---|---|
| 7 | A. | Yes. |
| 8 | Q. | Who is it a photograph of? |
| 9 | A. | Sef. |
| 10 | Q. | When you say Sef, how did you know Sef? |
| 11 | A. | From in the park. |
| 12 | Q. | Is he also a member of your gang? |
| 13 | A. | Yes. |
| 14 | Q. | How long have you known Sef? |
| 15 | A. | For a little over a year. |
| 16 | Q. | Does he hold a rank in your gang? |
| 17 | A. | Yes. |
| 18 | Q. | What is his rank? |
| 19 | A. | 2nd Seat. |
| 20 | Q. | Is that higher or lower than your rank? |
| 21 | A. | Higher. |
| 22 | Q. | Does he give you orders? |
| 23 | A. | Yes. |
| 24 | Q. | Let me direct your attention to March |

*[handwritten signatures]* Grand Coin ASA Nazarian

7

```
 1    22nd, 1999.  Now, in the afternoon did you see Sef
 2    on that day?
 3        A.    Yes.
 4        Q.    Where did you see him?
 5        A.    In the park.
 6        Q.    Which park is that?
 7        A.    Kosciuszko Park.
 8        Q.    Where is that park in relation to where
 9    you live?
10        A.    Across the street on Diversey.
11        Q.    Now, your address, is that a house or
12    apartment?
13        A.    An apartment.
14        Q.    What floor?
15        A.    3rd Floor.
16        Q.    When you saw Sef in the park that day
17    who else was with you?
18        A.    Pewee and Howie was there.
19        Q.    I'm showing you a photograph that I have
20    marked as Exhibit B, do you recognize the person
21    in that photograph?
22        A.    Yes.
23        Q.    Who is that a photograph of?
24        A.    That's Pewee.
```

8

```
 1        Q.   Did you know Pewee's real name?
 2        A.   No, I don't.
 3        Q.   Going back to Sef, do you know Sef's
 4   real name?
 5        A.   No, I don't.
 6        Q.   How long have you known Pewee for?
 7        A.   Almost a year and a half.
 8        Q.   Is he in your gang?
 9        A.   Yes.
10        Q.   Does he hold a rank in your gang?
11        A.   No.
12        Q.   Is it fair to say he's a soldier?
13        A.   Yes.
14        Q.   Is that below you in rank?
15        A.   Yes.
16        Q.   I'm showing you a photograph that I have
17   marked as Exhibit C, do you recognize the person
18   in that photograph?
19        A.   Yes.
20        Q.   Who is that a picture of?
21        A.   Howie.
22        Q.   Do you know Howie's real name?
23        A.   I know his first name is Juan.
24        Q.   How long have you known Howie?
```

9

1    A.   About a year.

2    Q.   Where do you know him from?

3    A.   From the park. *Kosciuszko Park, where the CAs hangout.*

4    Q.   Is he also a member of your gang?

5    A.   Yes.

6    Q.   What rank is he?

7    A.   He's a soldier.

8    Q.   Same as Pewee?

9    A.   Yes.

10   Q.   Now, when you saw Sef and Howie and

11 Pewee in the park, did you have a discussion with

12 Sef?

13   A.   Yes, I did.

14   Q.   What did Sef say to you and what did you

15 say to Sef?

16   A.   He said that he wanted to go for a ride

17 over by Belmont to see if there were any Kings

18 over there.

19   Q.   Did he say anything about why he wanted

20 to go see if there were any Kings over there?

21   A.   He wanted to beat them up or if he could

22 shoot one of them if possible.

23   Q.   And you agreed to do that with him?

24   A.   Yes.

10

1      Q.   After you agreed to do that with him,

2  did he say anything else about going over there?

3      A.   No, he just said go get the thing and

4  we'll go over there.

5      Q.   What did you understand "the thing" to

6  mean?

7      A.   The pistol.

8      Q.   What pistol was that?

9      A.   The 357 _caliber revolver _ ꞁ nn ꙮ

10     Q.   Where was that 357?

11     A.   In my apartment.

12     Q.   Did you go and get that gun?

13     A.   Yes, I did.

14     Q.   When you went to get that gun was

15  anybody with you?

16     A.   Yes.

17     Q.   Who was with you?

18     A.   Sef.

19     Q.   I'm showing you a photo that I have

20  marked as Exhibit D, what is that a photograph of?

21     A.   The 357.

22     Q.   The gun you went to go get with Sef?

23     A.   Yes.

24     Q.   When you went into your apartment, where

11

1   was the gun?

2        A.   In my laundry basket.

3        Q.   Did you take the gun out of your laundry

4   basket?

5        A.   Yes.

6        Q.   What did you do when you took it out of

7   the laundry basket?

8        A.   Handed it to Sef.

9        Q.   What did he do with it?

10       A.   Put it in his waistband.

11       Q.   Did you see him put it in his waistband?

12       A.   Yes.

13       Q.   Where did the two of you go after you

14  did that?

15       A.   Went downstairs by the park into Howie's

16  car.

17       Q.   Now, you say Howie's car, where was he

18  when you went back down there?

19       A.   He was parked on Harding, right next to

20  the park.

21       Q.   Where physically was he?

22       A.   In the driver's seat of the car.

23       Q.   Where was Pewee?

24       A.   He was standing by the car.

12

1      Q.   Describe the car, what did it look like?

2      A.   A brown four door Caprice with tinted

3  windows with a blue corner panel.

4      Q.   What part of the car is the blue corner

5  panel?

6      A.   The front left side.

7      Q.   The driver's side?

8      A.   Yes.

9      Q.   Did you get into that car?

10     A.   Yes.

11     Q.   When you got into the car, where did you

12  sit?

13     A.   In the back seat.

14     Q.   Passenger or driver's side?

15     A.   Passenger side.

16     Q.   Where did Sef go?

17     A.   He was on the front passenger side.

18     Q.   And Pewee?

19     A.   He sat next to me.

20     Q.   In the back?

21     A.   Yes.

22     Q.   Did you drive in the car?

23     A.   Howie was driving.

24     Q.   Where did you all go?

Jeremiah Cain    ASA Nezanan    G. Ujel drusry

Abrego 018366

13

A.    We went to Belmont. *Sef said in the car that Sef had the gun and would use it on the Kings if he had to.* mm ⊕

Q.    Which direction were you headed on

Belmont?

A.    Towards Kimball.

Q.    Now, when you got onto Belmont towards

Kimball, what happened?

A.    We seen another brown Caprice with 3

guys in it.  Pewee mentioned that those were the

guys that had rammed him earlier in the week and

he said they were Kings.  So Howie rolled his

window down and represented to them.

Q.    What does that mean, represented?

A.    ~~Through~~ *Threw* mm ⊕ up a gang sign to him.

Q.    Would you show me?

A.    (Indicating).

Q.    You are showing your ~~fist~~ *First* mm ⊕ and your last

fingers and your thumb are raised on your hand.

The two middle fingers are bent down towards the

palm; is that the sign?

A.    Yes.

Q.    Is that the sign of the Crown?

A.    Yes.

Q.    And that's the Latin King's sign?

A.    Yes.

14

1     Q.   Why did Howie throw up that sign?

2     A.   To see if they would throw it up to make

3  them think we were with them.

4     Q.   After Howie did that, what did you all

5  decide to do?

6     A.   After they threw their sign up we pulled

7  over right on the next street and as soon as they

8  got into traffic we exited the car and approached

9  the car.  *other* _nn_

10     Q.   Let me stop you there.  You said they

11  pulled into traffic, where was their car when you

12  first saw them and what traffic did they pull

13  into?

14     A.   They were coming off of a side street

15  making a left on Belmont towards Kimball.

16     Q.   The same direction you were headed?

17     A.   Yes.

18     Q.   When Howie pulled the car up, who got

19  out of the car?

20     A.   Me, Pewee, and Howie got out of the car.

21     Q.   What were the three of you going to go

22  do?     _the people out of the other_ _nn_

23     A.   Try and pull one of ~~them out of the~~

24  car.  Pewee threw a bottle at the window and Howie

_ASA Nazarian_ _+20834_

Abrego 018368

15

1   had a bat and was going to hit the window with it

2   but they pulled off into traffic.

3       Q.   When you say you were going to pull

4   somebody out of the car, you say they pulled in

5   front over you on Belmont?

6       A.   Yes.

7       Q.   And Pewee threw a bottle at that car?

8       A.   Yes.

9       Q.   What happened to the car after Pewee

10   threw the bottle?

11       A.   They pulled into oncoming traffic and

12   proceeded towards Kimball Avenue.

13       Q.   At any time did you see anybody in this

14   car with a weapon?

15       A.   No.

16       Q.   Did they threaten you in any way?

17       A.   No.

18       Q.   Were you able to get anybody out of that

19   car?

20       A.   No.

21       Q.   What happened after they pulled off?

22       A.   We jumped back in the car.

23       Q.   Howie's car?

24       A.   In Howie's car.

16

1        Q.   When you jumped back in Howie's car

2  could you see which direction the other car went?

3        A.   It headed towards the Kimball direction.

4        Q.   You didn't see where it went though?

5        A.   No.

6        Q.   When you got back into ~~the~~ *Howie's* car, where

7  did you get back in the car?

8        A.   In the back seat.

9        Q.   The passenger side or the driver's side?

10       A.   Passenger side.

11       Q.   Where did Pewee get back in the car?

12       A.   In the passenger, in the rear passenger

13  side.

14       Q.   What about Howie?

15       A.   He was still in the driver' seat.

16       Q.   While the three of you were out of the

17  car chasing these people, chasing the car down

18  Kimball, what was Sef doing during this time?

19       A.   He was still in the car.

20       Q.   Doing what?

21       A.   They were on Belmont when we were

22  chasing them.

23       Q.   Okay, not Kimball, *the other car was on* Belmont.  What was

24  Sef doing?

ASA Nazarian

17

1    A.    Waiting in the car to see if they were

2  going to pull out a pistol.

3    Q.    What was he going to do if they pulled a

4  pistol?

5    A.    Exchange fire if necessary.

6    Q.    When you got back in the car did Sef say

7  anything to you when you got back into the car?

8    A.    He said let's go around the block and

9  see if we can find them on the next block.

10   Q.    What did you understand that to mean?

11   A.    To go over there and see if we could

12 find that other car.

13   Q.    And do what if you found them?

14   A.    Shoot at them or beat them up.

15   Q.    Did you drive around to see if you could

16 find them?

17   A.    Yes.

18   Q.    When you drove around did you drive

19 around the block?

20   A.    Yes.

21   Q.    Did you see that car again?

22   A.    Yes, we did.

23   Q.    When you saw that car where did you go?

24   A.    Well we went around the block and we

18

1    pulled into the mouth of the alley and Sef jumped

2    out and said wait right here, I'll be right back. *I knew Sef*

     *was going to try to shoot at a Latin King*

3         Q.   And did you drive into the alley?

4         A.   Well, after he got out of the car we

5    pulled up a little bit into the alley so no one

6    else could see us and we heard --

7         Q.   Hold on, when he *got* out of the car did

8    you see him again?

9         A.   No, not for like almost two minutes.

10        Q.   During those two minutes did you hear or

11   see anything unusual?

12        A.   Yes, I heard something.

13        Q.   What did you hear?

14        A.   I heard a few gunshots.

15        Q.   Before you heard those gunshots what

16   were you doing in the car?

17        A.   I was looking out the back window.

18        Q.   What were you looking for?

19        A.   To see if anyone was looking at us.

20        Q.   Anyone like who?

21        A.   Like any pedestrians or Kings or police

22   or anything like that.

23        Q.   Now, when you heard those gunshots could

24   you see where they were coming from?

*Second Cir.   ASA Nazarian   [initials] +20831*

Abrego 018372

19

```
 1        A.   No, I could not.
 2        Q.   Could you see Sef?
 3        A.   No, I could not.
 4        Q.   Now, when did you see Sef again?
 5        A.   Within two minutes after leaving the
 6   car.
 7        Q.   Where did you see him?
 8        A.   Coming back into the car.
 9        Q.   When Sef got back into the car, did he
10   say anything?
11        A.   He said let's go.
12        Q.   Was Howie still driving?
13        A.   Yes, he was.
14        Q.   What did Howie do?
15        A.   He proceeded around the block to
16   Belmont, took Belmont to Pulaski, Pulaski to
17   Diversey to the front of my building on Diversey.
18        Q.   During that drive after Sef got back in
19   the car, did Sef saying anything else other than
20   let's go?
21        A.   No, he did not.
22        Q.   When you got back to the apartment or in
23   front of your apartment building, did he say
24   anything then?
```

ASA Nazarian

Abrego 018373

20

1       A.    Yes.

2       Q.    What did he say?

3       A.    He said put this pistol away.

4       Q.    Who did he say that to?

5       A.    To me.

6       Q.    And did you agree to do that?

7       A.    Yes.

8       Q.    Did you get out of the car at that

9 point?

10      A.    Yes.

11      Q.    Did anybody else get out of the car?

12      A.    Pewee got out.

13      Q.    Could you see were Pewee went?

14      A.    Across the street to the Mexican

15 restaurant.

16      Q.    What about Howie and Sef, what did they

17 do?

18      A.    They drove off together.

19      Q.    Where did you go?

20      A.    I went upstairs to put the pistol away. *That's when I noticed the gun had been fired.*

21      Q.    Where did you put it?

22      A.    In my room.

23      Q.    Now, the police came to your home

24 earlier today, correct?

*[handwritten signatures] ASA Nazarian #20834*

Abrego 018374

21

1      A.   Yes.

2      Q.   Your mom was there and you were there?

3      A.   Yes.

4      Q.   They came into your house, right?

5      A.   Yes.

6      Q.   And they asked if they could search your

7    room?

8      A.   Yes.

9      Q.   And you agreed to let them search your

10   room; is that correct?

11     A.   Yes.

12     Q.   Jeremiah, have you been treated well by

13   the police?

14     A.   Yes.

15     Q.   Have you been treated well by me, the

16   Assistant State's Attorney?

17     A.   Yes.

18     Q.   Have you had anything to eat or drink

19   since you have been here at Area 5?

20     A.   Yes.

21     Q.   What have you had to eat and drink?

22     A.   Four Cokes and a submarine sandwich.

23     Q.   Have you been allowed to use the

24   bathroom whenever you needed to?

22

1    A.   Yes.

2    Q.   Has anyone made any threats or promises

3  to you in return for your statement?

4    A.   No.

5    Q.   Are you under the influence of any drugs

6  or alcohol at this time?

7    A.   No.

8    Q.   The court reporter will now type up your

9  statement.  You and I will read over the statement

10  together and you will be allowed to make any

11  additions or corrections that you wish; do you

12  understand that?

13    A.   Yes.

14    MS. NAZARIAN:  This will conclude the

15  statement of Jeremiah Cain.  The time is now 18:50

16  p.m.

17

18    X _____

19

20  WITNESSES TO SIGNATURE:

21

22  ASA _____

23

24  Det. _____



Abrego 018377



Exhibit B

Abrego 018378



Abrego 018379



Exhibit D

Abrego 018380

# EXHIBIT C

1     THE COURT: Step right up, Mr. Abrego.

2        ERUBY ABREGO,

3 called as a witness, having been first duly sworn, was

4 examined and testified as follows:

5       DIRECT EXAMINATION

6       BY

7       MR. EPSTEIN:

8   Q Eruby, could you please state your name, for

9 the record?

10   A Eruby Abrego.

11   Q And how old are you, sir?

12   A I am 25.

13   Q Sir, where did you grow up?

14   A I grew up in the Logan Square area, sir.

15   Q Okay.  You went to -- what high schools did

16 you to go?

17   A I enrolled into Schurz and I enrolled into

18 Kelvyn Park.

19   Q Okay.  And you say you grew up in Logan

20 Square.  Do you still -- or did you live in Logan

21 Square prior to going to jail?

22   A No.

23   Q Where did you live prior to that?

24   A 3635 Whipple.  That's where I was staying.

Abrego 008279



```
1        Q    And when I say that you went to jail, you
2   have been in jail in this case, is that right?
3        A    Yes.
4        Q    This case only?
5        A    Yes.
6             MR. REGNER:  Objection.
7             THE COURT:  Overruled.
8   BY MR. EPSTEIN:
9        Q    After you went to high school, you lived --
10  you moved to where you live now, is that right?
11       A    Yes.
12       Q    How many brothers and sisters do you have?
13       A    I have one sister and a deceased brother.
14       Q    And is your sister older or younger than you?
15       A    She is older.
16       Q    How much older?
17       A    37.
18       Q    And tell me about your parents, your mother
19  and father, do you live with then?
20       A    Yes.  I live with my mother.
21       Q    Okay.  What about your father?
22       A    I don't live with my father.
23       Q    Do you still have contact with your father?
24       A    Yes, yes.
```

AAAA- 63

Abrego 008280

1    Q    Sir, could you please tell us how you became

2    involved with the gang of OA?

3    A    What do you mean how did I get involved?

4    Q    How old were you when you first became an OA?

5    A    About 15, sir.

6    Q    And why did you become a member of the OA?

7    A    Peer pressure.

8    Q    And describe when you say peer pressure.

9    What exactly do you mean?

10    A    Because the neighborhood I lived in, you

11    know, it was all OA gang area and all my friends were

12    OA and it's like I was the only one that, you know, the

13    last one to join a gang.

14    Q    What about if you went in Latin King area and

15    you weren't a member of a gang, what would happen to

16    you?

17    A    I would probably get beat up.

18    Q    Did you ever get beat up by any Latin Kings

19    or any other gangs?

20    A    Oh, yes.

21    Q    And this is not -- you grew up in the Belmont

22    and Central area or at least for some time?

23    A    Yes.  In that general area.

24    Q    Okay.  So, when you joined the gang, it was

AAAA- 64

Abrego 008281



1    because of trouble with other gangs and because your

2    friends were also in the same gang?

3         A    Right.  Yes.

4         Q    Sir, I am going to turn your attention to

5    March of 1999.  Are you familiar with Kosciuszko Park?

6         A    Yes, sir.

7         Q    Okay.  And what would you do on a average day

8    in March of 1999, at Kosciuszko Park?

9         A    Basketball, you know, we got outside

10   basketball, indoor basketball.  We got tennis courts.

11   You know, there is all types of activities to do in the

12   park.  We got an indoor pool, softball, all types of

13   activities.

14        Q    And did you live near Kosciuszko Park in

15   March of 1999?

16        A    No, no.

17        Q    Prior to that, did you live near Kosciuszko

18   Park?

19        A    Yes, sir.

20        Q    I am going to turn your attention now to

21   March 22nd of 1999.  Well, actually before I do that, I

22   want to ask you, do you know an individual by the name

23   of Jason Rodriguez?

24        A    Yes, sir, I know him.

AAAA- 65

Abrego 008282

1  Q What is his nickname?

2  A Spirit.

3  Q What does Mr. Rodriguez look like?

4  A He is about maybe about five-eleven,

5 dark-skinned complected.  He got wavy hair.

6  Q Wavy hair?  How long is his hair?

7  A Maybe about -- it's like a little longer than

8 a crew cut, wavy hair, so you can't really tell.

9  Q Back in March of 1999, he was a member of the

10 OA, right?

11  A Yes, he was.

12  Q Sir, I am going to turn your attention to

13 March 20th -- 22nd of 1999.  You heard some of the

14 testimony by various people.  I am going to ask you

15 this.  Were you ever in a vehicle with Nicasio Santiago

16 and Jason Rodriguez in the area of Belmont and

17 Monticello?

18  A No, I wasn't.

19  Q At that time, did you have -- if you weren't

20 in the vehicle then, did you have a gun on your person

21 on March 22nd of 1999 anywhere around Belmont and

22 Monticello?

23  A No.

24  Q Were you ever at Belmont and Monticello

AAAA- 66

Abrego 008283



1    between the hours of 4:00 and 7:00 pm?

2        A    No, sir.

3        Q    And sir, more importantly, did you ever shoot

4    at anyone between the hours of 5:00 and 7:00 pm on

5    March 22nd of 1999?

6        A    No.

7        Q    Sir, how tall are you?

8        A    About five-four.

9        Q    And your complexion has remained the same

10    since 1999?  Did you ever go to Florida and get a dark

11    tan?

12        A    No.

13        Q    And your hair is about the same as it was

14    back in March of 1999?

15        A    Except it's falling out now.

16        Q    Now, on March 24th, what happened, of 1999?

17    What happened, if anything?

18        A    I was picked up at my sister's house.

19        Q    Okay.  And what did they do?  What happened

20    when the police arrived at your sister's house?

21        A    They were trying to get in the house.

22        Q    And did they ultimately get in the house?

23        A    Oh, yes.

24        Q    What happened when they got in the house?

AAAA- 67

1     A    They -- I guess they secured the area.  Made

2    sure that everybody was out of the rooms.  They were in

3    the rooms and took every one into the main dining room.

4    Every one is all together.

5     Q    Okay.  What -- actually, who was this at the

6    time?

7     A    It was myself, Nicasio Santiago, my little

8    nephew, Gilbert, my sister, Debbie Daniels, and her

9    live-in boyfriend, Roger.

10     Q    Okay.  Once the police had the area secured,

11    where was every one?

12     A    We were all in the dining room first.

13     Q    And how did they have you?

14     A    They had me down on my knees.  They had all

15    the guys on our knees with our hands behind our heads.

16     Q    What if anything happened -- do you know who

17    Officer Wojcik is?

18     A    At that time, I didn't know who he was.

19     Q    What did he do, if anything?

20     A    He was there.

21     Q    Okay.  What did he do when he came into the

22    house?

23     A    He was asking us, you know, who we are, you

24    know, our names and what our nicknames are.

AAAA- 68

Abrego 008285

1        Q    What happened after he asked you that?

2        A    I told him who I was and --

3        Q    When you say who you were, what did you tell

4  him?

5        A    I told him Eruby Abrego.  And he asked me

6  what did he call you.  I told him they call me Sef.

7  And he took me into the front of the house, which is

8  the living room.

9        Q    And what happened?  What did he do with you

10  there?

11        A    He told me that I was in big trouble and that

12  I know what I did.

13        Q    And what happened after that, after he told

14  you that?  What happened?

15        A    I told him I didn't know what he was talking

16  about.

17        Q    And what did he do when you said that?

18        A    He struck me twice in the face with an open

19  hand.

20        Q    He slapped you twice?

21        A    Yes.  Twice.  One and then back with the back

22  end.

23        Q    Back hand and his forehand?

24        A    Yes.

AAAA- 69

Abrego 008286

1    Q    Was it hard or was it just wake up?

2    A    No.  It was hard.  It was hard.

3    Q    Sir, what happened after that occurred?

4    A    They cuffed me up, get ready to take me, I

5  guess to the police station.

6    Q    Okay.  And did you arrive at the police

7  station?

8    A    Yes, I did.

9    Q    And where did they put you?

10    A    Well, they walked me through the back of it,

11  you know, Grand and Central, big police station.

12  Walked me to the back of all the stairs.  Brought me

13  into where there is a bunch of computers and brought me

14  in a little room, a bunch of little rooms, but they put

15  me in one certain room.

16    Q    And sir, could you describe what the room

17  looked like?

18    A    It was -- I don't know the size, but I know

19  it was -- probably -- first, you know, a little maybe

20  like two feet on each side, you could probably touch

21  the walls.  And it was probably about eight feet.

22  Maybe the other way.

23         THE COURT:  Indicating he extended his arms

24  to both sides.

AAAA- 70

1    BY MR. EPSTEIN:

2        Q   About two feet on each side, Judge.

3        A   With a little bench, with a little rail that

4   goes from as long as the bench, a little rail up on

5   top.

6        Q   And sir, describe for the jury how wide was

7   the chair of the bench.

8        A   The bench, I would say about eight inches.

9        Q   Okay.  And the rail, where did that run along

10   the bench?

11        A   The rail, more like a raise, but it was just

12   like a big tube that, you know, went into the wall on

13   both sides, curved into the wall.

14        Q   And were you handcuffed at the time?

15        A   Oh, yes.  As soon as I got, there, they

16   cuffed me to the bar and I sat on the little bench that

17   I was sitting on.

18        Q   Okay.  So, when you first got there, was it

19   uncomfortable?

20        A   Yes.

21        Q   And how long was it before you became sleepy,

22   if you became sleepy?

23        A   I was tired.  Yes.  I -- I couldn't sleep.

24        Q   What time -- let me ask you this:  What time

AAAA- 71

1    did they arrest you?

2        A    I would say maybe about 9:00 to 10:30.  I was

3    in bed when I heard then coming in.

4        Q    9:00 to 10:30 at night?

5        A    No.  In the morning when they came to arrest

6    me.

7        Q    They took you to the police station and you

8    sat in there.  How long -- well, is there any clocks or

9    anything to that effect?

10        A    No.  Ain't no clocks.  Nothing but one

11    solid-colored wall.

12        Q    Okay.

13        A    No window.  No nothing.

14        Q    All right.  How long was it before anybody

15    came in, if you can guesstimate?

16        A    I would say about maybe an hour and a half.

17        Q    Okay.  It might have been longer.  It might

18    have been shorter because you have no way of telling

19    time?

20        A    Right.  Right.

21        Q    Who came in?

22        A    Three detectives.

23        Q    And what did they say or do when you came in?

24        A    Asking me questions.  And, you know, I just

AAAA- 72

1    kept telling then that I didn't know what they were

2    talking about.  I didn't know what was going on.  I

3    told then I didn't even know why I am here.

4         Q    Okay.  What if anything did they do in

5    response?

6         A    They didn't believe me, if that's what your

7    asking.  They didn't believe me.

8         Q    And did they -- at some point, they left or

9    did they stay further?

10        A    They all left.

11        Q    Okay.  And how long was it, if you can

12   estimate, for the next officer came in?

13        A    About 15 minutes, maybe 20 minutes.  One of

14   then circled right back and came in the interrogation

15   room with me.

16        Q    Do you remember who it was?

17        A    Now, I know who he is.  At the time, I didn't

18   know.  But you know, he had his -- Tony Wojcik.

19        Q    All right.  And that was the officer that

20   testified here on the stand in your trial?

21        A    Yes.

22        Q    And what if anything did he do at the time?

23        A    He started asking me more about, you know, to

24   let him know what I had did, if I had did anything, you

AAAA- 73

1    know?  Like I kept telling him, I don't know what your

2    talking about.  You know?  He got mad.  He called me a

3    liar, you know?  Started swinging.  Started, you know,

4    beating on me.

5         Q    Where was he punching you?

6         A    On my upper body, you know?  Arms, chest,

7    ribs, back, you know?  Just swinging, like I was a

8    punching bag.

9         Q    Were you handcuffed at the time?

10        A    Yes.

11        Q    And so, your arm is handcuffed to the wall

12   and he was punching you in the stomach and the back?

13        A    Yes.

14        Q    Did that cause your body to flash about a

15   lot?

16        A    Yes, it did.

17        Q    Did that -- because you were handcuffed, did

18   you get bruises on you are arm?

19        A    Yes.  From being jerked around because they

20   were tight.

21        Q    What if anything -- how long did he hit on

22   you?

23        A    Maybe about 20 punches, 25, at the most.  I

24   am not too sure.  But I know, you know, I was getting

AAAA- 74

Abrego 008291

1    hit.

2           Q    Was it hard?

3           A    Yes.

4           Q    Was each one hard or was just one hard and

5    the rest were soft?

6           A    First few ones were hard.  Caught me off

7    guard, knocked the wind out.  And the rest, you know,

8    after I got the -- first one, I didn't feel no more.

9    Man, I was numb, after the first few.

10          Q    You didn't feel any more and you were being

11   hit, but you didn't feel it any more?

12          A    Right.  Right.

13          Q    And how long in time, if you can recall, did

14   he remain in the room on that visit?

15          A    After that, he just left out.

16          Q    When he left, did you feel sore?

17          A    Yes, I was sore.

18          Q    Well, how long was it before somebody else

19   came and visited you?

20          A    Maybe later on that night.  I couldn't tell

21   what time.  You know, there was no window.  I couldn't

22   see no sun.  I don't know.

23          Q    Was it hours?

24          A    Maybe a few hours.

AAAA- 75

1    Q   And who came in to see you the next time?

2    A   Officer Wojcik.

3    Q   And what did he do at that time?

4    A   Kept interrogating me about, you know, what
5 is going on and comes in there and came in there with
6 some statements.  And shows me, say look, I want you to
7 look at this, look at your friends are saying.  So, you
8 know, I got to read to then.  You know, he let me read
9 then, both of then.

10   Q   And what happened after he left those
11 statements you with?

12   A   I read then.

13   Q   And did he return or --

14   A   Yes.  He returned and grabbed then.

15   Q   What did he do then?

16   A   He left.

17   Q   How long was it before somebody returned to
18 speak to you again?  You can estimate.  Your best
19 estimate.

20   A   Maybe night time.  I don't know.

21   Q   Your not sure?

22   A   I am not sure.

23   Q   It was some time that --

24   A   I just don't.

AAAA- 76

Abrego 008293

1      Q    You lost track of time at some point?

2      A    Right.  I was getting pulled out the room to

3   go here and, you know, to go to the lineup at one time.

4   All that, you know?  A lot of stuff going on.

5      Q    Okay.  When the next person came in, what if

6   anything happened?

7      A    Okay.  I had -- before he came in, I was

8   hollering because I was cuffed, for me to use the

9   washroom.  And they wouldn't let me use the washroom.

10  So, I took it upon myself to use the washroom, you

11  know, where I was at.

12     Q    Was it a long time before?

13     A    Yes.  About -- I had got there morning.  It

14  had to be late night.

15     Q    Were you at the point of peeing on yourself?

16     A    Yes, yes.

17     Q    You peed on the floor because you didn't want

18  to pee in your pants?

19     A    Right.  Yes.

20     Q    And what happened when detective -- strike

21  that.

22              Did Detective Wojcik see this?

23     A    Yes.  He came in because I kept hollering,

24  you know, I want to use the washroom.  No one come and

                        AAAA- 77



1    let me out of the room.

2         Q    When he came in and saw, what did he see?

3         A    He seen urine on the floor.

4         Q    What did he say?

5         A    He snapped.

6         Q    What did he do?

7         A    He beat on me some more.

8         Q    Sir, what occurred after you -- what if

9    anything occurred?

10        A    I don't understand.

11        Q    You had said that you had gone to a lineup

12   and I was asking you what happened after that, if

13   anything?  He took you back to investigate, that same

14   room?

15        A    Yes.

16        Q    Handcuffed you to the same bar?

17        A    Yes.

18        Q    And how long, if you can guesstimate, do you

19   know that you were there after that?

20        A    In that room?  About three hours because when

21   I was complaining, I was telling -- no, there is urine

22   on the floor, you know, can they move me.

23        Q    Okay.  What happened -- did you at some point

24   speak to a state's attorney?

AAAA- 78

1    A    Yes, I did.

2    Q    Before you talked to the state's attorney,

3    though, who if anyone spoke to you?

4    A    Can you please repeat that question?

5    Q    Before you spoke to the state's attorney

6    while you were in the interview room, who if anyone

7    spoke to you?

8    A    Mr. Wojcik.

9    Q    And what did he say at that time?

10   A    That he is asking me, you know, are you going

11   to tell me what I want to hear.

12   Q    What were you saying?

13   A    Man, I was scared.  I am tired of getting

14   beat and tired of being in this room.  You know, I

15   don't know what time it is.

16   Q    How many times did he beat on you in total?

17   A    Twice.

18   Q    He came in twice?

19   A    Two separate times.

20   Q    And I interrupted you.  He was saying -- your

21   going to go along with this and your saying --

22   A    Right.  You are going along -- remember, I

23   said I read the statements, so I already knew what they

24   said.

AAAA- 79

Abrego 008296

1     Q    And what was he saying with respect to those

2  statements?

3     A    For me to, you know, go off of what their

4  statements say, you know?

5     Q    And what did he ask you to do anything?  What

6  if anything did he ask?

7     A    Just to say, you know, what I got to say.

8     Q    What did you understand that to mean, say

9  what you got to say?

10     A    To say that I had committed that crime.

11     Q    And what if anything did you tell him?

12     A    I told him whatever he wanted to hear.  I

13  thought he was going to beat on me some more.

14     Q    Now, at some point, Officer Smith came in and

15  spoke with you, is that right?

16     A    Yes.  The man that was just up here?

17     Q    Yes.

18     A    Yes.

19     Q    And why did he come in and visit you, if you

20  know?

21     A    Because I kept telling him that I was in the

22  park and that he seen me.  He seen me in the park.  You

23  can ask him.

24     Q    When you say he saw you, who saw you?

AAAA- 80

1        A    Officer Smith.  He seen me inside the field

2    house at that time, you know?  Because it's a park.

3    Once your in the field house, you can't see out into

4    the park.

5        Q    So, Officer Wojcik didn't believe that?

6        A    No, he didn't.

7        Q    When you told him that you were in the park,

8    what did he say -- or did he do?

9        A    He said I was lying.

10       Q    Now, I want to take you a little forward a

11   little bit to the time you were talking to the state's

12   attorney.  At some point, you were speaking with the

13   state's attorney?

14       A    Yes, I was.

15       Q    Who was in the room with you with the state's

16   attorney?

17       A    Detective Wojcik and another detective.

18       Q    And do you know who that detective is?

19       A    No, I don't.

20       Q    And with respect to your statement, you

21   ultimately signed a statement, is that right?

22       A    Yes.

23       Q    Why did you sign the statement?

24       A    I was scared, hungry.


                            AAAA- 81

1        Q   What were you afraid of?

2        A   Getting beat.

3        Q   The statement that you gave, you included

4  some facts that weren't correct, right?

5        A   Yes.

6        Q   And why did you do that?

7        A   So that could be like a flaw, you know, that

8  is not true.

9        Q   The state's attorney was there.  Why didn't

10  you tell her that the officer was beating you?

11       A   Because I was scared.

12       Q   You trust the state's attorney?

13       A   No.

14       Q   You spoke to an attorney Dan Gallagher later,

15  right?  You saw the attorney that testified a couple of

16  days ago?

17       A   Yes.

18       Q   He was the public defender assigned to you at

19  bond court, right?

20       A   Right.

21       Q   How long in total did you even know Mr.

22  Gallagher?

23       A   I met him maybe 20-30 minutes before I went

24  out in front of the bond Judge.

AAAA- 82

Abrego 008299

1    Q    Did you ever see him again?

2    A    No, I didn't.

3    Q    And what did you tell Dan Gallagher?

4    A    Well, as soon as I got here, I told him, you

5    know, that I was beaten.  And he told me, you know,

6    show if I had any markings and I showed him my

7    markings.

8    Q    What did you do in court, if anything?  Did

9    you show anything in court?

10   A    When I went into the court, yes, I lifted up

11   my shirt and showed everybody.

12   Q    Do you recall if Mr. Gallagher was looking at

13   you while he was speaking to the Judge?

14   A    Yes.  He seen all my cuts and bruises and

15   stuff like that.

16   Q    Sir, after that, after they take you to bond

17   court and then they process you in the jail?

18   A    Yes.

19   Q    And then you go through a medical exam,

20   right?

21   A    All type of exams, yes.

22   Q    And do you recall Mr. Loveless testified, I

23   believe, it was yesterday, do you remember him?

24   A    Yes.

AAAA- 83

1     Q   Okay.  And what if anything did you tell Mr.

2  Loveless?

3     A   I had told him that I was vomiting blood and

4  that I was beaten.

5     Q   And what did he did after you told him that?

6     A   He wrote something down.

7     Q   Who did you see after that?  Do you recall

8  who you saw after Mr. Loveless?  Did you go with the

9  rest of the inmates or did you go somewhere else to

10  talk to somebody or anyone else?

11     A   There was like different sections you stop

12  at.  They take blood here and they do this, they take

13  your picture, they examine you.  The other ones do

14  other things.

15     Q   Okay.  Now, Eruby, I want to talk to you

16  about the -- Nicasio Santiago.  You know who he is,

17  right?

18     A   Yes.

19     Q   And how do you know him?

20     A   He been living in the neighborhood over there

21  all his life.

22     Q   And is he in the gang that your in?

23     A   Yes, he is.

24     Q   And is your best friend?  Is he a buddy?

AAAA- 84

Abrego 008301



```
 1    Acquaintance?  How would you describe your relationship
 2    with Mr. Santiago?
 3         A    He is an acquaintance.  He is an acquaintance
 4    because of the gang.
 5         Q    And how many people are in the OA?
 6         A    Total?
 7         Q    Right.
 8         A    About 50.
 9         Q    50 right there where you are at?
10         A    No.  In total, the whole shebang, yes, about
11    50.
12         Q    Mr. Abrego, when you were at the park on
13    March 22nd of 1999, at approximately 6:45, between 5:00
14    and 7:00 -- or let me ask you this.  Did you see Jason
15    Rodriguez at all between the hours of 5:00 and 7:00 pm?
16         A    No.
17         Q    Did you see Nicasio Santiago between 5:00 and
18    7:00 pm --
19         A    No, I didn't.
20         Q      -- at the park or anywhere near there?
21              Do you know -- you saw Julio Lugo
22    testify?
23         A    Yes.
24         Q    Did you see him on March 22nd of 1999?
```

AAAA- 85

1    A    No, I didn't.

2    Q    And what about Ramon Torres?

3    A    No.

4    Q    And Fred Marrero, had you seen him then?

5    A    I hadn't seen none of then.

6    Q    Now, sir, in late 2003, the -- you had

7    your -- some new prints taken of your palms?

8    A    Yes.

9    Q    They had taken your fingerprints when you

10   first got arrested?

11   A    Yes.

12   Q    And then later in late 2003, last year, they

13   took your palm prints?

14   A    Yes, they took my palm prints, the whole

15   side, everything.

16   Q    And you hadn't done that previously?

17   A    No.

18   Q    Mr. Abrego, obviously, you know that your

19   charged with a serious crime.  I am going to ask you

20   again, did you fire a gun at a person by the name of

21   Mr. Garcia or Julio Lugo on March 22nd, 1999?

22   A    No.

23   Q    Were you with a lookout for somebody else who

24   fired a gun on March 22nd, 1999?

AAAA- 86

1    A    No, I wasn't.

2    Q    Were you even aware that anybody was out

3    doing such a thing on March 22nd, 1999?

4    A    No.

5         MR. EPSTEIN:  I have no further questions.

6         THE COURT:  Recess for five minutes and then

7    we will take cross examination.

8              If your looking at an hour of cross,

9    I am breaking for lunch now.

10        MR. REGNER:  Let's break.  We will break,

11   your Honor.

12        THE COURT:  All right.  Tell the jury we are

13   going to take then to lunch now and we will resume

14   after lunch, 2:00 o'clock.

15        MR. HOOD:  Two things on the record.

16        THE COURT:  Yes.

17        MR. HOOD:  One is that throughout the

18   pendency of this trial, Mr. Epstein has -- countless

19   times said there is no defensive alibi, clearly putting

20   his client on the stand and elicits the fact that he

21   was at Koz Park during the shooting.

22             The other thing is, for the record, I

23   believe he violated the Flacks (Phonetic) motion, when

24   he said have you been in jail, and on this case, but

AAAA- 87

Abrego 008304

1   nothing else.

2       MR. EPSTEIN:  Can I respond?

3       MR. HOOD:  First, we would ask his testimony

4   be stricken.  He put in an alibi that he -- we have

5   asked 50 times if we have asked once and he always said

6   reasonable doubt.  No alibi.

7       THE COURT:  Denied.  You can cross him on all

8   those issues.

9       MR. EPSTEIN:  Briefly, for the record, I

10  never asked him was he at Koz Park at the time of the

11  shooting.  I did point out he was at Koz Park at the

12  time that Mr. Smith said.  It's not an alibi.  They

13  have to show it's circumstantial to the fact he has to

14  have time to get there.  Specifically, Judge, with

15  respect to the fact that he was in jail because other

16  witnesses brought out the fact that he was in jail, I

17  didn't want the jury to assume he was in jail on other

18  charges, which would be --

19      THE COURT:  I am not getting into that.

20      MR. EPSTEIN:  One final issue.

21      THE COURT:  It was a slick way of getting

22  around it.  I know it.  You know it.  Everybody knows

23  it and I am looking the other way.  So, you know, your

24  ahead right now.  Don't push that issue.


AAAA- 88

1    MR. EPSTEIN:  There is one issue.  It's

2    completely a different issue.

3                Elizabeth Montalvo.  We never crossed

4    that bridge.  Apparently, I waited as long as I could

5    to see if she was going to appear in the custody of the

6    police.  She hasn't appeared.  I ask that in my motion

7    that I filed a month or two ago be -- the request was

8    to admit her testimony.  We could do this after lunch,

9    if you wish.  I wanted to bring it up.  It's something

10   I want to do, to admit her testimony outside of her

11   hearsay statements which were denied in the chambers

12   hearing.

13               THE COURT:  That will be denied.  I already

14   barred her testimony pursuant to the chambers issue.  I

15   rethought her position.  I would have re-assessed it in

16   fact she would have been here.  She is not here.  I

17   don't really know that she was actually re-subpoenaed

18   for trial, but I went ahead and issued a warrant any

19   way.  And if she comes in, I will deal with that issue

20   of whether she is really in contempt of court at that

21   time.  Because in fact, she might not be.  But be that

22   as it may, I am not putting in any portions of her

23   testimony through transcript in this trial.

24               Denied.  Request denied.


AAAA- 89

1          Darryl Hawkins, can we ship him back.

2          MR. HOOD:  We are done with him.

3          THE COURT:  No longer needed.  Santiago, do

4    we still need him?

5          MR. EPSTEIN:  Well, that depends on the

6    rebuttal of the State.  Actually, on Darryl Hawkins,

7    Judge, I would ask both of then wait until the end of

8    the case.

9          THE COURT:  Hawkins is gone.  Santiago, we

10   will hold.

11              (Whereupon a lunch recess was had

12              and the proceedings continued as

13              follows.)

14          Mr. Abrego, you can retake the witness

15   stand.

16              And bring out the jury.

17              You can be seated.

18              Okay.  Every one could be seated.

19              Cross examination?

20      MR. REGNER:  Thank you.

21              CROSS EXAMINATION

22              BY

23              MR. REGNER:

24      Q    Your an OA street gang member?

AAAA- 90

```
1        A    Yes, sir.

2        Q    You have been one for ten years?

3        A    Yes.

4        Q    In March of 1999, you had a territory by Koz

5   Park?

6        A    I didn't understand the question.

7        Q    The street gang had a territory by Koz Park?

8        A    Yes.

9        Q    What were the geographic boundaries?

10       A    The park.

11       Q    There were six square blocks?

12       A    Yes.

13       Q    Including the park by Diversey?

14       A    Yes.

15       Q    And at that time, your nickname was Sef?

16       A    Yes, it was.

17       Q    And you go by that today?

18       A    Yes.

19       Q    And as you sit here today, you are still an

20   OA street gang member?

21       A    Yes.

22       Q    And that carries on to where you are now?

23       A    Yes.

24       Q    And you still control things as an AO street
```

AAAA- 91

1    gang member where you are now?

2        A    No, sir.

3        Q    Tell us how the gang works, Eruby.

4        A    As far as what do you mean how it works?

5        Q    Well, this is the gang that it's -- the

6    business of the gang is to hang out, right?

7        A    Hang out, you know.

8        Q    And in March of 1999, you were hanging out in

9    the park, right?

10       A    Yes.

11       Q    You weren't working?

12       A    No.  I was playing hoops.

13       Q    Having meetings?

14       A    No.

15       Q    Where were the meetings?

16       A    Anywhere.  Park.

17       Q    Did you have big meetings?

18       A    I didn't really participate in big meetings.

19       Q    Small meetings?

20       A    Small meetings.

21       Q    Show us what the Orchestra Albany symbol is.

22       MR. EPSTEIN:  Objection.

23       THE COURT:  The Defendant has demonstrated

24    that symbol.

AAAA- 92

Abrego 008309

```
 1    BY MR. REGNER:

 2         Q    What is disrespect?

 3         A    Being flipped.

 4         Q    What does flipping mean?

 5         A    Flipping the symbol, the gang symbol.

 6         Q    When somebody does that to you, what does it

 7    mean?

 8         A    It means disrespect.

 9         Q    Flip the OA symbol?

10              Who are your rivals -- strike that?

11              THE COURT:  Demonstrated by the defendant.

12              THE WITNESS:  Really everybody, really.

13    BY MR. REGNER:

14         Q    In March 22nd 1999, you lived at 3626 North

15    Whipple, correct?

16         A    Yes.

17         Q    Belmont and Monticello is Latin King

18    territory, right?

19         A    From my understanding, yes.

20         Q    They are your rivals?

21         A    Yes.

22         Q    You hate those guys?

23         A    Yes.

24         Q    Now, in the gang, besides signs and meetings,
```

Abrego 008310

1    you have colors, right?

2          A    Yes, we do.

3                MR. EPSTEIN:  Judge, I can't see the witness.

4                THE COURT:  Move over.

5    BY MR. REGNER:

6          Q    What are the colors?

7          A    Brown and yellow.

8          Q    And during that time, in March 22nd, 1999 in

9    particular, you were wearing colors, right?

10         A    March 22nd?

11         Q    Yes.

12         A    No.

13         Q    You were wearing colors all month, right?

14         A    No.

15         Q    Your colors are brown and gold?

16         A    Right.  They are.

17         Q    And that's your gang uniform?

18         A    It doesn't mean I wear it every day.

19         Q    In March 22nd 1999, you had rank in the gang.

20    You know what that means, right?

21         A    I know what rank means, but I didn't have no

22    rank.

23         Q    What does rank mean?

24         A    Someone with a position.


AAAA- 94

```
 1      Q    You were second chief?

 2      A    No, I wasn't.

 3      Q    Did you hear Nicasio Santiago say you were

 4   yesterday?

 5      A    No.

 6           MR. EPSTEIN:  Misstatement of the testimony,

 7   Judge.

 8           THE COURT:  Sustained.

 9   BY MR. REGNER:

10      Q    Now, you and the Latin Kings are always in

11   opposition, isn't that right?

12      A    Not always.

13      Q    When do you and the Latin Kings get along?

14      A    If someone, you know, if someone knows one of

15   then, you know, and they are one of the guys' family

16   members or friends, then there is never no problems.

17   But if they don't know then, that's when they don't get

18   along.

19      Q    OAs are Peoples -- or OAs are folks?

20      A    Yes, sir.

21      Q    And Latin Kings are Peoples?

22      A    Right.

23      Q    Now, in the gang, what is a violation?

24      A    When you get beat up for something.
```

AAAA- 95

Abrego 008312

1        Q    And who does -- who administers that?

2        A    Usually, first seats in the gangs, which are

3    called governors.

4        Q    When one gang member testifies against a

5    fellow gang member, that's a cause for a violation,

6    isn't it?

7        A    Yes.  If he is still a member.

8        Q    What is an nation gun?

9        A    A gun that -- it's in the neighborhood, a

10   neighborhood gun.

11       Q    And who keeps that gun in the neighborhood?

12       A    I wouldn't know.

13       Q    The OA had a nation gun?

14       A    Yes.

15       Q    And they bought it from -- you had something

16   to do with buying it, isn't that right?

17       A    No.

18       Q    You know Tony Vasquez?

19       A    Yes.  I seen him before.

20       Q    You met him before?

21       A    Yes.

22       Q    He has seen you?

23       A    Yes.  He is a drug addict.  Always out on the

24   street.

AAAA- 96

Abrego 008313

1    Q    Right.

2              And while -- times you have seen him,

3    you were with Gilbert, your nephew?

4    A    I would be with a bunch of people.

5    Q    Gilbert was an OA street gang member?

6    A    Yes, he was.

7    Q    And Jeremiah Cane?

8    A    I seen him with Jeremiah Cane?  I didn't

9    understand.

10   Q    You have been Jeremiah Cane when you have

11   seen Tony Vasquez, right?

12   A    Not.

13   Q    You have been with Nicasio Santiago when you

14   have scene Tony Vasquez?

15   A    No.

16   Q    In March -- on the 22nd of March, 1999, the

17   OA street gang that you belonged to had a nation gun,

18   isn't that right?

19        MR. EPSTEIN:  Objection, asked and answered.

20        THE COURT:  Overruled.

21        THE WITNESS:  What was the question?

22   BY MR. REGNER:

23   Q    On March 22nd 1999, your gang had a nation

24   gun, right?

AAAA- 97

Abrego 008314

1     A     Yes.

2     Q     And that gun was a 357-Magnum?

3     A     I would guess yes.

4     Q     Six-shot?

5     A     Yes.

6     Q     It was bought at a gun shop?

7     A     I don't know where it was bought.

8     Q     Tony got that gun, right?

9     A     I have no idea.

10    Q     You and Nicasio got those guns from Tony,

11    right?

12          MR. EPSTEIN:  Objection as to what Nicasio

13    has.

14          THE COURT:  Overruled.  If he understands.

15          THE WITNESS:  I didn't understand.

16          THE COURT:  Rephrase it.

17    BY MR. REGNER:

18    Q     You and Nicasio got those guns, right?

19    A     Me and Nicasio?

20    Q     Yes.  Nicasio Santiago got those guns for you

21    from Tony?

22    A     No.  He didn't get no guns from me.

23    Q     You gave a court-reported statement in this

24    case, isn't that right?


                        AAAA- 98


Abrego 008315

1     A     Yes.

2     Q     And you have been shown it today, I believe,

3  have you?

4     A     Yes, I have been.

5     Q     Okay.  Showing you what defense has been

6  marked as People's Exhibit 19A through F.

7              Approaching the witness, your Honor?

8              THE COURT:  Yes.  Go ahead.

9  BY MR. REGNER:

10    Q     This is the court-reported statement?

11    A     Yes, it is.

12    Q     Take a moment and look at it.  Is that your

13  statement?

14    A     Yes.

15    Q     Your signature is on each and every page of

16  that statement?

17    A     Each and every page.

18    Q     And in fact, everything that's in that

19  statement, you were asked questions and you gave those

20  answers, correct?

21    A     Yes.

22    Q     And after that statement was done, you went

23  through that statement line by line with the assistant

24  state's attorney, didn't you?


                        AAAA- 99

1      A    Yes.

2      Q    At the time you did that, you made

3 corrections, isn't that right?

4      A    Yes.

5      Q    And you initialed those corrections in your

6 own, hand?

7      A    Yes, I did.

8      Q    And you identified all the photographs in

9 that statement?

10     A    Yes.

11     Q    Everything in this statement you said?

12     A    Yes.  It's all a lie.

13     Q    When you gave the statement, it was you, the

14 assistant state's attorney and Detective Jerome Bogucki

15 that was here today, right?

16     A    Yes.  And another Detective Wojcik was there

17 too.

18     Q    Detective Wojcik was in here too?

19     A    Yes.  He was in the room.  He didn't sign it.

20     Q    You were in front of a court reporter, right?

21     A    I was in front of a few people in there.

22 There was some lady.  The lady asks me questions and

23 another lady is doing what he is doing.

24     Q    She doesn't work for the police?

AAAA- 100

Abrego 008317

1          THE COURT:  Indicating the court reporter in

2     the courtroom.

3     BY MR. REGNER:

4          Q    Not a police officer, right?

5          A    No.

6          Q    You were -- no, that everything you said was

7     being taken down, right?

8          A    Yes.

9          Q    You could have said anything you wanted to,

10    right?

11         A    Right.

12         Q    Never said anything about any sort of

13    beating, right?

14         A    Right.  Because I was scared.

15         Q    In fact, what you did say is that you were

16    treated well?

17         A    Right.  Because I was scared.

18         Q    By the assistant state's attorney, right?

19         A    Right.

20         Q    And by the police?

21         A    Right.

22         Q    And before you took this court-reported

23    statement, you spoke to the assistant state's attorney

24    alone, didn't you?

AAAA- 101

1    A    I don't recall that.

2    Q    You saw Ms. Turano-Michiels, correct, she was

3    in court the other day?

4    A    Yes.  I seen her.

5    Q    At no time while she was at the station did

6    you ever tell her anything about being beaten?

7    A    No.  I was scared to come forth then.

8    Q    At any time you were there, did you tell her

9    that you had any injuries anywhere?

10   A    No, I didn't.

11   Q    You were feeling bad?

12   A    No, I didn't.

13   Q    Now, you testified today that as soon as you

14   got to the station, you were beaten, is that right?

15   A    Yes, I was.

16   Q    Okay.  So, the first time from the get go,

17   you went into an interview room?

18   A    Not the first time.  I said that three

19   officers came inside the room and asked me some

20   questions and I told then what I had told then and then

21   they left and one officer came back.  That's what I

22   said.

23   Q    When you went in the room?

24   A    Right.

AAAA- 102

1        Q   The first time, you weren't beaten at all?

2        MR. EPSTEIN:  Objection.

3        THE COURT:  Overruled.

4        THE WITNESS:  No, not when all three officers

5  were in the room, no.

6  BY MR. REGNER:

7        Q   A short time later, you saw Detective Wojcik

8  returned alone?

9        A   Yes.

10       Q   When Detective Wojcik returned, he gave you a

11  savage beating, right?

12       A   He beat me.

13       Q   About how many times?

14       A   About 20 or 25 punches.

15       Q   Where did he strike you?  Show us.

16       A   On my upper body, ribs, back, arms, you know?

17  He was swinging.

18       Q   All the way down your arms?

19       A   I had one arm cuffed up.  I had my right arm

20  cuffed up and I am, you know --

21       Q   So, you got your right arm cuffed?

22       A   Yes.

23       Q   And Detective Wojcik is hitting you with an

24  instrument, maybe?

AAAA- 103

1    A    No.  No instrument.

2    Q    What is he hitting you with?

3    A    His fist.

4    Q    Where did he hit you first?

5    A    In my chest, all in my upper body.

6    Q    Where did he hit you next?

7    A    All over.  You know, when you swing.

8    Q    He hit your arms?

9    A    Arms.

10   Q    And he hit your legs?

11   A    Back, chest.

12   Q    Hit your face?

13   A    No, he didn't hit my legs.  He didn't hit my

14   face then.  Not that time.

15   Q    He hit your ribs, your stomach?

16        MR. EPSTEIN:  Objection, asked and answered.

17        THE COURT:  Overruled.

18        THE WITNESS:  What was that?

19   BY MR. REGNER:

20   Q    He hit your ribs, stomach, back?

21   A    Yes.

22   Q    Did he thrash you around?

23   A    As far as beating me up, thrashing me around?

24   Q    Yes.

AAAA- 104

Abrego 008321

1        A    Yes.

2        Q    And all the time your flailing around while

3    you were stuck to -- you were handcuffed to the wall?

4        A    Yes, I am.

5        Q    So, your going back and forth along this --

6        A    No.  I was just cuffed up.

7        Q    And you said it was so bad, it was -- you

8    were numb?

9        A    Yes.

10       Q    Bleeding at that point?

11       A    No, I wasn't bleeding at that point.

12       Q    Well, now some time after that, you

13   participated in a lineup, right?

14       A    Yes.

15       Q    You sat next to five guys?

16       A    Yes, I did.

17       Q    And in that lineup -- let me show you this.

18            That lineup was taken after the

19   savage beating, right?

20       A    Yes.

21       Q    You mentioned it was a few hours later, I

22   believe or --

23       A    I think it was.

24       Q    Was it a few minutes?

AAAA- 105

1          A    It might have been an hour or so later,

2     45 minutes.

3          Q    Showing Defense Counsel Exhibits 8A, 55, and

4     54.

5               Approaching the witness?

6               THE COURT:  Sure.

7     BY MR. REGNER:

8          Q    Showing you what has been marked as People's

9     Exhibit 8 for identification or has been admitted.  Is

10    that a photograph of that lineup you took?

11         A    Yes, it is.

12         Q    That's you sitting in the lineup, right?

13         A    Yes.

14         Q    You can't see an injury on you, can you?

15         A    No, not from that -- not from the picture.

16         Q    This is another photograph from that lineup.

17    Do you recall this picture being taken?

18               Showing him People's Exhibit 54.

19         A    Yes.

20         Q    That's a picture of you standing, right?

21         A    Right.

22         Q    Not a mark on you, is there, in that

23    photograph?

24         A    I got marks by my arm.  You see the marks,

AAAA- 106

1     you know?

2              MR. REGNER:  Your Honor, the witness is

3     indicating the left arm on the photograph.

4              THE COURT:  Left arm.

5     BY MR. REGNER:

6         Q    Showing you what is a picture of People's 55.

7     That's another picture when that lineup was taken,

8     right?

9         A    Right.

10        Q    It shows it's a fair and accurate picture of

11    you?

12        A    Yes.

13        Q    Not a mark on your face, is there?

14        A    You see on my face looks red?

15        Q    No.

16        A    You don't?

17        Q    Your face isn't red there, is it?

18        A    Look -- it looks like you could see like

19    welts in there.

20             MR. REGNER:  Let the record reflect --

21             THE COURT:  He is pointing to the left side

22    of his face.

23    BY MR. REGNER:

24        Q    These photographs fairly and accurately show

AAAA- 107

Abrego 008324

```
 1      how you looked after that lineup?

 2          A    Right.

 3          Q    And they showed how you looked right after

 4      that savage beating, right?

 5          A    Right.

 6          Q    Okay.  Now, then, you said you were beaten

 7      again?

 8          A    Yes, I was.

 9          Q    By Detective Wojcik?

10          A    He was the only one beating me.

11          Q    Where was this now?

12          A    In the interrogation room.

13          Q    How far after -- how long after the lineup

14      did this beating occur?

15          A    After the lineup?

16          Q    Yes.

17          A    Maybe about an hour.

18          Q    And at that time, tell us what happened.

19          A    Well, the reason he beat me is because --

20          Q    I am not asking you the reason.  What

21      happened?

22          A    I urinated on the floor because I was calling

23      for someone to take me out to the bathroom.  And like I

24      said, no one wanted to take me to the bathroom.  I am
```

AAAA- 108

1    cuffed, so I can't go to the door.  So, you know, I

2    pulled down my sweat pants where I was handcuffed

3    sitting and I urinated on the floor.

4         Q    I asked you about Detective Wojcik beating

5    you.  Did you understand my question?

6         A    No, I didn't.

7         Q    Okay.  Then I will rephrase.

8         A    I thought I did.

9         Q    Detective Wojcik came into the interview room

10   again you said?

11        A    Right.

12        Q    And you said he beat you again?

13        A    Right.

14        Q    Where did he beat you?

15        A    All my upper body, chest.

16        Q    How did he beat you?

17        A    With his fists.

18        Q    How many times did he hit you?

19        A    20.

20        Q    Hit you in the chest?

21        A    Only in the chest this time.

22        Q    This went on for how long?

23        A    About 25 punches, if that.

24        Q    And then some time after this -- this beating

AAAA- 109

Abrego 008326

1    is when you say that's when you had -- you gave this

2    statement, right, that you were there and you were the

3    shooter?

4        A    Yes.  I had -- I was already -- I am in a

5    little room.  I am tired of being in rooms handcuffed

6    to this wall.

7        Q    Did you say you were the shooter after that?

8        A    No.

9        Q    After seeing Detective Wojcik.

10       A    No.

11       Q    At some point in time, you admitted being the

12   shooter?

13       A    Like at 4:00 in the morning, I was going

14   crazy.  I wanted -- he promised me, you know, your

15   going to be all right, this and that.  Just go along

16   with the statements.  All right.  Do what you want me

17   to do.  Stop meet beating me.

18       Q    So, you gave this statement that was

19   incorporated in that court-reported statement, correct?

20       A    Yes.

21       Q    And this again was after the beating, right,

22   you gave this statement?

23       A    Right.

24       Q    And then they paraded you in front of a court

                          AAAA- 110

1    reporter, right?

2         A    Yes.

3         Q    A civilian?

4         A    Yes.

5         Q    And after you gave the court-reported

6    statement at 8:35 am on March the 26th, 1999, they took

7    a photograph of you, right?

8         A    Right.

9         Q    People's 20.

10                   Can I approach the witness, your

11   Honor?

12                   THE COURT:   Sure.

13   BY MR. REGNER;

14        Q    Showing you what has been marked as

15   People's 20.  What is that?

16        A    It's a picture of me.

17        Q    Is that the picture that was taken on March

18   26th at 8:35?

19        A    I would think so.

20        Q    Okay.  Flip it.

21                   Is your signature on the back?

22        A    Yes.

23        Q    Did you sign that in your own hand?

24        A    Yes, I did.


                         AAAA- 111

```
 1          Q    Does it have a time on it?

 2          A    8:50.

 3          Q    Another photograph after your savage

 4     beatings, right?

 5          A    Yes.

 6          Q    By the way, what is the symbol of the OA

 7     street gang?

 8                         What about gang graffiti?

 9          A    What about gang graffiti?

10          Q    What is the symbol or the signal of the OA

11     street gang?

12          A    An O and an A.

13          Q    Showing you what has been admitted as

14     People's 63.

15                         Showing you a photograph marked 63.

16     What is that a photograph of?

17          A    The OA symbol and all that.

18          Q    That's the OA symbol?

19          A    Yes.

20          Q    That's your symbol?

21          A    Yes.  OA symbol.

22          Q    It's a symbol that someone drew or etched in

23     an interview room at Area 5 violent crimes, right?

24          A    I guess so.  You got the picture of it.
```

Abrego 008329

1                MR. EPSTEIN:   Judge, I move to strike.   This

2      witness had no personal knowledge of what is contained

3      in the photograph, by his own testimony.

4                THE COURT:   He was asked if that was a

5      symbol, a graffiti symbol of the OAs.   He said yes.

6      BY MR. REGNER:

7           Q    Now, after this savage beating and after this

8      court-reported statement was taken and after all these

9      photographs were taken of you, which by the way -- and

10     show no injuries, correct?

11          A    Correct.

12          Q    Then you appeared in bond court, right?

13          A    Right.

14          Q    There you met a public defender whose job it

15     is to respect you?

16          A    Yes.

17          Q    That public defender didn't take any

18     photographs, did he?

19          A    No, he didn't, but I told him.

20          Q    You said that you were beaten?

21          A    Yes.

22          Q    But he didn't take any photographs?

23          A    No, he didn't.

24          Q    You lifted up your shirt?

                        AAAA- 113

1      A    Yes, I did.

2      Q    He looked at you?

3      A    Yes.

4      Q    Then you went through processing and met with

5    an emergency medical technician by the name of Al

6    Loveless right in Cermak Hospital as part of Cook

7    County?

8      A    Yes.

9      Q    You told him you were beaten, right?

10     A    Yes.

11     Q    He didn't make any notation of it, did he?

12          MR. EPSTEIN:  Objection as to what Mr.

13    Loveless --

14          THE COURT:  Sustained.

15          THE WITNESS:  No.  I told him no, though.

16    BY MR. REGNER:

17     Q    Now, on March the 25th -- or strike that.

18          March the 22nd 1999, you looked a lot

19    different than you do today, isn't that right?

20     A    Not too much different.

21     Q    About 50 pounds at least heavier?

22     A    About 20.

23     Q    Facial hair?

24     A    Yes.  Still got facial hair.


                         AAAA- 114


Abrego 008331

```
 1        Q    At that time, you were wearing gang colors?

 2        A    Gang colors?

 3        Q    Gang colors.

 4        A    In that picture, no.

 5        Q    What is a hoodie?

 6        A    An hoodie is a hooded sweater.

 7        Q    And back then, you were hanging out at Koz

 8   Park?

 9        A    I didn't understand you?

10             MR. EPSTEIN:  Objection.

11             MR. REGNER:  Strike that.

12             THE COURT:  Sustained.

13   BY MR. REGNER:

14        Q    March the -- the month of March of 1999, you

15   were hanging out at Koz Park, right?

16        A    Yes, playing basketball.

17        Q    Outside?

18        A    Right.

19        Q    Every day?

20        A    Yes.

21        Q    Showing you again 54 and 55, these are

22   photographs that showed what you looked like back then,

23   right?

24        A    Yes.
```

Abrego 008332

1       Q    You don't look like that now, do you?

2            MR. EPSTEIN:  Objection, asked and answered.

3            THE COURT:  Sustained.

4   BY MR. REGNER:

5       Q    Now, it's been five years and seven months

6   about since March 22nd 1999, something like that?

7       A    Yes.

8       Q    Your not hanging out in Koz Park any more,

9   are you?

10      A    No.

11      Q    Today, your telling us that you weren't there

12  when this shooting happened, right?

13      A    Yes.

14      Q    You know nothing about it?

15      A    I know nothing.

16      Q    You were at Koz Park?

17      A    Yes, I was.

18      Q    You gave us an alibi, right?

19           MR. EPSTEIN:  Objection, that's a legal

20  conclusion.

21           THE COURT:  Sustained.

22  BY MR. REGNER:

23      Q    What your saying is you were not there at the

24  time of the murder, isn't that right?


                         AAAA- 116



1      A    Yes.

2         MR. REGNER:  Your Honor, I am marking

3  People's Exhibit 64 for identification.

4  BY MR. REGNER:

5      Q   I am handing you what has been marked as

6  People's Exhibit 64 for identification.  I want you to

7  take a moment to look at that.

8         MR. EPSTEIN:  Judge, I would object.  I

9  believe counsel is going to --

10        THE COURT:  Sustained.

11  BY MR. REGNER:

12     Q   You were present here on the eve of trial on

13  Monday with your attorney, right?

14     A   The 13th of September?

15     Q   Yes.

16     A   Yes, I was.

17     Q   You were right here in front of the Judge?

18     A   Yes, I was.

19     Q   And at that time, it was asked whether you

20  were going to give an alibi defense, wasn't it?

21        MR. EPSTEIN:  Objection, Judge.  Same

22  objection.  I ask this whole --

23        THE COURT:  Sustained.  Go to a different

24  line of questioning.

Abrego 008334

1    BY MR. REGNER:

2         Q    So, on March 22nd, 1999, you were about

3    200 pounds?

4              MR. EPSTEIN:  Objection, asked and answered.

5              THE COURT:  Overruled.

6              THE WITNESS:  I weighed 189.

7    BY MR. REGNER:

8         Q    Had a little mustache?

9         A    Yes.

10        Q    Your Hispanic?

11        A    Yes, I am.

12        Q    I am going to show you People's 8 again.

13   It's a photograph of that lineup?

14        A    Yes.

15        Q    When you were arrested on March 24th, you put

16   on your own clothes, right?

17        A    Yes.

18        Q    And those are your own clothes that you were

19   wearing at the station, isn't that right?

20        A    Right.

21             MR. REGNER:  Nothing further, your Honor.

22             THE COURT:  Redirect?

23                       REDIRECT EXAMINATION

24                       BY

                              AAAA- 118

```
 1                     MR. EPSTEIN:

 2        Q    Mr. Abrego, you were asked whether those were

 3   your own clothes.  Were you given a change of clothes

 4   while you were at the Area 5 headquarters.

 5        A    Yes, I was.

 6             MR. EPSTEIN:  Your Honor, may I approach?

 7             THE COURT:  Sure.

 8   BY MR. EPSTEIN:

 9        Q    I am handing you what has been marked and

10   previously marked as Exhibit 20 as a photograph of you.

11   I don't think you got an opportunity to look at that on

12   your cross examination.  If you could take a look at

13   that closely and tell me if you see any indication

14   whatsoever of injuries on your arms or face or anything

15   else that's exhibited?

16        A    Yes.  There is marks on my arms.

17        Q    Sir, do you see any bruises around the wrist

18   area where you would be handcuffed?

19        A    It appears like it.

20             MR. EPSTEIN:  Your Honor, may I approach?

21             THE COURT:  Go ahead.

22   BY MR. EPSTEIN:

23        Q    Showing you what has been marked previously

24   54 and 55, these are the photos the State just showed
```

AAAA- 119

Abrego 008336

1    you a second ago, is that correct?

2         A    Yes.

3         Q    Sir, is your shirt lifted in that picture?

4         A    No, it's not.

5         Q    How about the other Exhibit, Exhibit 55,

6    either in those pictures is your shirt lifted?

7         A    No.

8         Q    Did you lift your shift in open court with

9    attorney Dan Gallagher?

10        A    Yes, I did.

11        Q    And Mr. Gallagher looked at your body and

12   what did he tell the Judge?

13        A    That I had bruises and scratch marks to my

14   arms and chest.

15        Q    And what had you told -- where did you tell

16   Mr. Gallagher those bruises and marks on your chest had

17   come from?

18        A    From the detectives on the case.

19        Q    Mr. Abrego, let me ask you this.  Did

20   Detective Wojcik come into where you were handcuffed to

21   the rail sitting on an eight-inch to one-foot bench and

22   physically take his fist and drive it into your

23   stomach?

24        A    Yes, he did.

AAAA- 120

Abrego 008337

```
 1        Q    And how many times did he do that?

 2        A    The first time?

 3        Q    Yes.

 4        A    20 to 25.

 5        Q    If you could demonstrate with your hand how

 6   hard was each punch?

 7        A    About like that hard, a little bit harder.

 8        Q    Now, you said the second time he only punched

 9   you in the chest?

10        A    Right.

11        Q    Was he talking to you while he was punching

12   you in the chest?  Was there questions along that?  Or

13   how was it that he was just punching you in the chest?

14        A    He was punching me in the chest.  He wanted

15   me to tell him what I had read off the statements.

16        Q    Was doing both at the same time?  Was he

17   punching you and saying tell me this?

18        A    He was really angry.

19        Q    Okay.  Was he using both hands or was it with

20   one hand?

21        A    Using both hands, left hand, right.

22        Q    Now, you saw the state's attorney.  If you

23   told the state's attorney, do you believe that she

24   could have stopped Wojcik from beating you further once
```

AAAA- 121

1    she left?

2         A    No.

3         Q    And in fact, you knew that at some point she

4    would leave, right?

5         A    Right.

6         Q    And then you would be back into that little

7    room?

8              MR. REGNER:  Objection, argument.

9              THE WITNESS:  Yes.

10             THE COURT:  Sustained.

11   BY MR. EPSTEIN:

12        Q    Eruby, the statement that you signed, why did

13   you sign this statement?

14        A    I was tired of getting beat, tired of being

15   in that little room.  It was a little room.  Your

16   handcuffed to a wall.  I ain't moving around.

17        Q    Sir, you went to bond court on March 27th of

18   1999, right?

19        A    Yes, I did.

20        Q    And you were arrested on March 24th of 1999,

21   right?

22        A    Yes.

23        Q    So, you were in that room for almost three

24   days?

                         AAAA- 122

1      A    Three whole days.  About three whole days.

2          MR. EPSTEIN:  No further questions, Judge.

3          THE COURT:  Recross?

4                RECROSS EXAMINATION

5                BY

6          MR. REGNER:

7      Q    Mr. Abrego, you gave this court-reported

8  statement at 6:15 on March 26th, 1999, right?

9      A    If that's what the paper said, yes.

10     Q    That would have been about 43 hours after you

11  first got to the police station?

12     A    I am not that good with math.  Yes.

13         MR. REGNER:  Thank you.

14         THE COURT:  Redirect?

15         MR. EPSTEIN:  Judge, nothing based on that.

16         THE COURT:  All right.  You could step down,

17  Mr. Abrego, and rejoin you were lawyer.

18             Next witness?

19         MR. EPSTEIN:  Judge, at this time, the

20  defense and the Cook County State's Attorney have

21  entered into an agreement, a stipulation as to what a

22  particular witness would testify to.

23         THE COURT:  All right.  Publish that

24  stipulation.

AAAA- 123