**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ERUBY ABREGO, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 23-cv-1740 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| REYNALDO GUEVARA, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ | ) | |

**<u>MEMORANDUM OPINION & ORDER</u>**

Eruby Abrego spent two decades in prison for murder before the State of Illinois dismissed the charges against him. Abrego regained his freedom, but he could not regain his lost time. So he sued.

Abrego filed suit against the police officers and a prosecutor involved in his criminal case. The complaint largely involves a confession that he gave shortly after his arrest. Abrego alleges that some defendants physically abused him until he gave a false confession.

Only one defendant, the prosecutor, filed a motion to dismiss. She seeks dismissal based on prosecutorial immunity and qualified immunity.

The complaint alleges that the prosecutor engaged in malfeasance when she played a role in obtaining Abrego's statement. The complaint alleges that the prosecutor was acting as an investigator, not an advocate, at that time. So, under controlling case law, the prosecutor is not entitled to absolute immunity. But the prosecutor's argument for qualified immunity on one of the claims fares better.

For the reasons stated below, the Court grants in part and denies in part the prosecutor's motion to dismiss.

**Background**

At the motion-to-dismiss stage, the Court must accept as true the complaint's well-pleaded allegations. *See Lett v. City of Chicago*, 946 F.3d 398, 399 (7th Cir. 2020). The Court "offer[s] no opinion on the ultimate merits because further development of the record may cast the facts in a light different from the complaint." *See Savory v. Cannon*, 947 F.3d 409, 412 (7th Cir. 2020).

Eruby Abrego is one of many former criminal defendants who have brought claims relating to former Chicago Police Detective Reynaldo Guevara. Abrego "is one of at least 39 men and women exonerated after being convicted on murder charges arising in corrupt homicide investigations conducted by Defendant Guevara and his fellow Area Five detectives and supervisors." *See* Am. Cplt., at ¶ 10 (Dckt. No. 66).

Guevara's name might ring a bell with anyone who keeps an eye on the docket in this district. Guevara is a defendant in a lot of cases. *See, e.g.*, *Flores v. Guevara*, No. 23-cv-1736 (N.D. Ill.); *Hernandez v. Guevara*, No. 23-cv-1737 (N.D. Ill.); *Lugo v. Guevara*, No. 23-cv-1738 (N.D. Ill.); *Davila v. Guevara*, No. 23-cv-1739 (N.D. Ill.); *Martinez v. Guevara*, No. 23-cv-1741 (N.D. Ill.); *Gecht v. Guevara*, No. 23-cv-1742 (N.D. Ill.); *Munoz v. Guevara*, No. 23-cv-3210 (N.D. Ill.); *Cruz v. Guevara*, No. 23-cv-4268 (N.D. Ill.); *Kwil v. Guevara*, No. 23-cv-4279 (N.D. Ill.); *Mulero v. Guevara*, No. 23-cv-4795 (N.D. Ill.); *Gonzalez v. Guevara*, No. 23-cv-14281 (N.D. Ill.); *Cain v. Guevara*, No. 23-cv-14282 (N.D. Ill.); *Andino v. Guevara*, No. 23-cv-14283 (N.D. Ill.); *Santiago v. Guevara*, No. 23-cv-14284 (N.D. Ill.). And counting.

But Guevara is not the focus of the motion to dismiss. Abrego named ten defendants in this lawsuit. *See* Am. Cplt., at ¶¶ 21, 25–27 (Dckt. No. 66). One of those defendants is Andreana Turano Michiels, a prosecutor. *Id.* at ¶ 25.

Turano served as a prosecutor with the Cook County State's Attorney's Office. *Id.* She is the only defendant who moved to dismiss Abrego's amended complaint. *See* Def.'s Mtn. to Dismiss (Dckt. No. 69). So the summary below will address the allegations relevant to her (only).

**The Crime.** The story began twenty-five years ago, in March 1999, on the Northwest side of Chicago. *See* Am. Cplt., at ¶ 29 (Dckt. No. 66).

Two men – Jose Garcia and Ramon Torres – sat in a parked car. *Id.* at ¶ 29. They talked to another man, Julio Lugo, who stood outside the car. *Id.* at ¶ 30. Lugo's 10-year-old cousin stood there, too. *Id.*

Gang slogans and gunshots interrupted the conversation. *Id.* at ¶ 31. A man across the street "shouted" the slogans. *Id.* Then he opened fire with a handgun at the group of four. *Id.*

One of the bullets hit Garcia in the head, and killed him. *Id.* at ¶¶ 32, 36.

Torres got lucky. He was sitting in the driver's seat. *Id.* at ¶ 33. He ducked and drove away. *Id.* Lugo survived, too. But he was "hit once in the shoulder and once in the buttock" as he shielded his 10-year-old cousin. *Id.* at ¶ 34.

**The Initial Investigation.** Police officers believed that the shooting was gang related. *Id.* at ¶ 39. Lugo – the man standing outside the car – was a member of the Latin Kings. *Id.* at ¶ 38. And the shooter had yelled "King killer" before he opened fire. *Id.* at ¶ 39.

The shooter also yelled "OA love." *Id.* Putting those clues together, the police suspected that a member of the Orchestra Albany gang – a Latin Kings rival – was to blame. *Id.*

At some point, officers learned that Lugo had driven around with two other Latin Kings before the shooting. *Id.* at ¶ 40. During the drive, the Latin Kings confronted a gold Chevy. *Id.*

The Chevy carried Orchestra Albany members. *Id.* The OAs pulled over, shouted gang slogans, and threw bottles at the Latin Kings. *Id.*

The police followed that lead. *Id.* at ¶ 41. They thought that one of the OAs in the gold Chevy might be the shooter. *Id.* So, the officers canvassed the area, and looked for gold cars. *Id.* at ¶ 42.

They found one. *Id.* The car belonged to Juan Parra. *Id.* And the officers thought that Parra was an OA. *Id.*

**Juan Parra.** The officers arrested Parra at about 1:30 in the morning. *Id.* at ¶ 45. They held him overnight. *Id.* at ¶ 46. According to the complaint, the officers "fabricated" a statement the next morning and "forced" Parra to adopt it. *Id.* at ¶ 47.

The "coerced and manufactured" statement "falsely" introduced Plaintiff Eruby Abrego's name into the investigation. *Id.* at ¶ 48. Basically, the police forced Parra to point fingers at Abrego.

Specifically, Parra's statement recounted that Parra, Abrego, Jeremiah Cain, and another person drove into Latin King territory. *Id.* at ¶ 49. They saw a car with Latin Kings inside, and they chased it on foot. *Id.* The Latin Kings got away. *Id.*

According to the statement, Parra and some of the others returned to their car. *Id.* at ¶ 49. But Abrego did not. *Id.* So, Parra waited. *Id.* At that point, Parra heard "several shots." *Id.* And then he saw Abrego running back toward the car, carrying a gun. *Id.*

**Jeremiah Cain.** Parra's fabricated statement also put Jeremiah Cain's name into the mix. *Id.* at ¶ 50. The officers arrested him, and they searched his bedroom. *Id.* at ¶¶ 53–54. The search turned up a handgun – the same weapon used in the shooting. *Id.* at ¶¶ 54–55.

4

The officers questioned Cain. *Id.* at ¶ 56. Cain answered their questions, but his version of events didn't line up with Parra's. *Id.* Instead, Cain's story "contradicted" Parra's story. Unlike Parra, Cain "did not implicate" Abrego. *Id.*

In other words, the manufactured confession from Parra pointed to Abrego, but Cain did not. The conflict posed a problem. The officers knew that both statements "could not be true." *Id.* at ¶ 57.

According to the complaint, the officers didn't try to untangle the knot with honest police work. *Id.* Instead, they "doubled down." *Id.* They went full throttle on putting Abrego's name into Cain's mouth. *Id.* at ¶¶ 57–58.

The officers used force to flip Cain's story. *Id.* at ¶ 58. They beat Cain, and they told him what to say. *Id.* at ¶ 59.

After the beating, Cain told a new story. *Id.* at ¶ 60. In the new version, Cain gave the gun to Abrego. *Id.* Abrego went looking for the Latin Kings' car, while the others stayed behind. *Id.* Then Cain heard gunshots. *Id.* When Abrego returned, he gave the gun back to Cain. *Id.*

***Eruby Abrego's Arrest.*** Officers arrested Abrego two days after the shooting. *Id.* at ¶ 64. They took him to the Area Five Detective Division, and put him in a small interrogation room. *Id.* at ¶¶ 68, 71, 95. "They chained him to the wall." *Id.* at ¶ 72. And then they left him alone. *Id.* at ¶ 73.

The officers returned about an hour later. *Id.* at ¶¶ 73–74. They asked Abrego if he was involved in the shooting. *Id.* at ¶ 74. Abrego responded "truthfully," saying that he had "nothing to do with the crime." *Id.*

Abrego said the same thing throughout the early stages of the interrogation. *Id.* at ¶ 75. He "continually maintained his innocence." *Id.* He told the officers that he didn't know anything about the shooting. *Id.*

The officers didn't accept Abrego's word. *Id.* at ¶ 76. Instead, they "initiated a coercive interrogation." *Id.* at ¶ 77. They "physically and psychologically" abused him. *Id.*

One officer started beating Abrego after he said he was innocent. *Id.* at ¶ 79. The officer hit Abrego about 20 times – in his ribs, back, and chest. *Id.* Then the officer left the room. *Id.*

Abrego sat by himself in the room for a few more hours. *Id.* at ¶ 80. He didn't have food. *Id.* He didn't have water. *Id.* He didn't have access to a restroom. *Id.* And he didn't have a chance to speak with a lawyer – even though he asked for one. *Id.*

The officers left Abrego in the room overnight. *Id.* at ¶ 83. Abrego "cried out" during the night. *Id.* at ¶ 84. He needed to use the bathroom. *Id.* But the officers did not let him leave the room. *Id.* Abrego had no choice. *Id.* He urinated in the interrogation room. *Id.*

One of the officers saw the urine when he returned. *Id.* at ¶ 85. Angered, he hit Abrego another 20 times. *Id.* at ¶ 86. He left the room once more, leaving Abrego behind again. *Id.*

At some point early in the morning, the officers filtered back into the room. *Id.* at ¶ 88. Abrego was not well. *Id.* at ¶ 89. He was "in pain" and felt like he had to throw up. *Id.* The officers took Abrego to the bathroom, where he got sick. *Id.* at ¶ 91. His vomit was bloody. *Id.* Abrego showed the officers the blood, and asked to go to the hospital. *Id.*

In effect, the officers told Abrego that they would take him wherever he wanted to go, if Abrego told them what they wanted to hear. *Id.* at ¶ 92. Abrego started to feel helpless. *Id*. at ¶ 93. He was scared for his life, and he feared more "torture." *Id.* at ¶ 94.

6

Abrego's "will was overborne." *Id.* He agreed to give a statement to Defendant Andreana Turano, a prosecutor with the Cook County State's Attorney's Office. *Id.* at ¶ 94. Abrego "falsely confessed to committing the shooting." *Id.*

**Andreana Turano.** Turano was at the Area Five Detective Division during Abrego's interrogation. *Id.* at ¶ 95.

According to the complaint, Turano "actively participated as an investigator with the Police Officer Defendants in the interrogation and drafting of Plaintiff's false statement incriminating himself, which he was forced to sign." *Id.* Turano recited the officers' version of events, and asked Abrego "to confirm" the story. *Id.* at ¶ 97.

The complaint is a bit fuzzy on what, exactly, Turano did. Maybe Turano personally participated in the interrogation *and* in the preparation of the statement.

Or maybe the police officers interrogated Abrego, without Turano in the room. And then, Turano met with Abrego and helped to prepare a statement for him to sign, based on what Abrego purportedly told the officers during the interrogation. That's probably the best reading of the complaint. In their briefs, no party suggests that Turano participated in the violence.

At the time, it was "obvious" to Turano that the officers "severely abused" Abrego. *Id.* at ¶ 98. His body was marred by bruises – including on his arms. *Id.* "His underwear was soiled because he had urinated on himself while detained at night." *Id.* And there "were visible cuts on his chest." *Id.*

Turano could see the injuries. *Id.* at ¶ 99. They showed up on his skin. *Id.* But she "extract[ed]" the false statement from him anyway. *Id.*

7

***The State Case.*** The state charged Abrego in the Circuit Court of Cook County with first-degree murder and aggravated battery with a firearm. *Id.* at ¶ 120. The case went to trial, and the state used Abrego's statement against him. *Id.* at ¶ 121.

The state didn't have physical evidence linking Abrego to the crime. *Id.* at ¶ 122. Indeed, a fingerprint found on the gun was *not* Abrego's fingerprint. *Id.* Instead, the state relied on Abrego's false confession and the fabricated statements, among other things. *Id.* at ¶ 121.

Abrego took the stand. *Id.* at ¶ 123. He told the jury that he was not involved in the shooting. *Id.* And he told the jury that he was tortured. *Id.*

The State "mocked" Abrego's testimony during its closing argument. *Id.* at ¶ 124. It scoffed at the idea that the officers would conspire to "get" Abrego. *Id.* It called Abrego's testimony "hogwash." *Id.*

The jury found Abrego guilty. *Id.* ¶ 126. He was sentenced to 90 years in prison. *Id.*

***The Exoneration.*** Abrego served one-quarter of his almost century-long sentence. *Id.* at ¶ 130. He spent 23 years in prison. *Id.* Time passed, but Abrego's position stayed the same. *Id.* at ¶ 132. He maintained his innocence. *Id.*

The complaint leaves out details about what led to Abrego's exoneration. *Id.* at ¶¶ 132–34. But in July 2022, the Circuit Court of Cook County vacated Abrego's conviction. *Id.* at ¶ 133.

The State entered a motion of *nolle prosequi* and dismissed all charges. *Id.* A *nolle prosequi* is "the formal entry of record of a prosecuting attorney of his or her unwillingness to prosecute a case." *See People v. Artis*, 902 N.E.2d 677, 685 (Ill. 2009). At that point, Abrego had spent "half of his life" "fighting the false charges." *See* Am. Cplt., at ¶ 134 (Dckt. No. 66).

One month later, prosecutors moved to vacate the convictions of eight other defendants. *Id.* at ¶ 14. They concluded that the "convictions obtained" by Guevara could not "stand consistent with due process." *Id.*[1]

***Today's Lawsuit.*** After his release, Abrego filed suit against ASA Turano, seven officers, the City of Chicago, and Cook County. *Id.* at ¶¶ 21, 25–27. He brought three federal claims against Turano, plus a few state claims.

The first federal claim against Turano is for coercing a false confession in violation of the Fifth and Fourteenth Amendments. *Id.* at ¶¶ 182–90 (Count II).

The second federal claim against Turano is for malicious prosecution and unlawful detention. *Id.* at ¶¶ 191–96 (Count III). And the third claim is for failure to intervene. *Id.* at ¶¶ 197–202 (Count IV).

The rest of the claims against Turano are state law claims. Abrego brings claims for malicious prosecution, intentional infliction of emotional distress, and "willful and wanton conduct." *Id.* at ¶¶ 222–34 (Count VII, Count VIII, and Count IX).

Turano moved to dismiss the claims under Federal Rule of Civil Procedure 12(b)(6). *See* Def.'s Mtn. to Dismiss (Dckt. No. 69).

### Legal Standard

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not the merits of the case. *See* Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a motion to dismiss, the Court must accept as true all well-pleaded facts in the complaint and draw all reasonable inferences in the plaintiff's favor. *See*

---

[1] Abrego received a certificate of innocence from the State of Illinois after this lawsuit was filed. *See* Nadia Alfadel Coloma, *Law School Students Help Achieve Three Significant Victories for Exoneration Clinic*, Univ. of Chi. L. Sch. (May 1, 2024), https://www.law.uchicago.edu/news/law-school-students-help-achieve-three-significant-victories-exoneration-clinic.

*AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011).

To survive, the complaint must give the defendant fair notice of the basis for the claim, and it must be facially plausible. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *See Iqbal*, 556 U.S. at 678.

## Analysis

Turano moves to dismiss on three grounds. *See* Def.'s Mem., at 2 (Dckt. No. 70). First, she invokes absolute immunity. *Id.* Second, she points to qualified immunity. *Id.* Finally, she argues that Illinois law does not recognize a cause of action for one of the state law claims. *Id.*

The Court will take each argument in turn.

## I.   Absolute Immunity.

Prosecutors enjoy absolute immunity from federal tort liability for their work as prosecutors. *See Imbler v. Pachtman*, 424 U.S. 409, 424 (1976); *Greenpoint Tactical Income Fund LLC v. Pettigrew*, 38 F.4th 555, 565 (7th Cir. 2022). But the word "absolute" does not mean "unlimited." A prosecutor cannot escape liability for anything and everything that she does. The doctrine has limits.

The immunity "follows the work done by a prosecutor as a prosecutor; it does not necessarily apply to every official action by a person who holds office as a prosecutor." *See Pettigrew*, 38 F.4th at 565 (emphasis added). Immunity goes with the *work*, not with the *person*. In other words, the title on a prosecutor's business card doesn't decide whether she is entitled to absolute immunity. Instead, a "functional test" answers the question. *Id.*

A court considers the "nature" of the "function performed," not the "identity of the actor who performed it." *See Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993) (citation omitted); *see also Pettigrew*, 38 F.4th at 565. "The question is whether the prosecutor was acting as an advocate in the challenged actions or was instead acting in some other capacity, such as investigator or administrator." *See Pettigrew*, 38 F.4th at 565.

The case law is full of examples of where courts draw the line. Basically, courts separate prosecutorial acts from non-prosecutorial acts. *Id.* Start with the prosecutorial side of the line.

Sometimes it is easy to figure out that a prosecutor is wearing a prosecutor's hat. For example, a prosecutor acts like a prosecutor when she files motions in court. *See Tobey v. Chibucos*, 890 F.3d 634, 649 (7th Cir. 2018). A prosecutor also acts as a prosecutor when she speaks to a grand jury. *See Bianchi v. McQueen*, 818 F.3d 309, 318 (7th Cir. 2016). The same is true when she charges a criminal defendant. *See Brunson v. Murray*, 843 F.3d 698, 704 (7th Cir. 2016). And when she asks a court to delay a trial, too. *See Katz-Crank v. Haskett*, 843 F.3d 641, 647 (7th Cir. 2016).

A prosecutor is entitled to absolute immunity when her acts are "intimately associated with the judicial phase of the criminal process." *See Lewis v. Mills*, 677 F.3d 324, 330 (7th Cir. 2012) (citation omitted). At the same time, absolute immunity isn't limited to things that happen inside a courtroom or a courthouse. *See Bianchi*, 818 F.3d at 318.

For example, a prosecutor acts as a prosecutor when she "prepar[es] for the initiation of judicial proceedings or for trial," in her "role as an advocate for the State." *See Buckley*, 509 U.S. at 273. Those actions include her "professional evaluation of the evidence assembled by the police and appropriate preparation for its presentation at trial or before a grand jury after a

decision to seek an indictment has been made." *Id*. It encompasses a prosecutor's "effort to control the presentation" of a witness's "testimony," too. *See Imbler*, 424 U.S. at 430 n.32.

"There is a difference between the advocate's role in evaluating evidence and interviewing witnesses as he prepares for trial, on the one hand, and the detective's role in searching for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested, on the other hand." *See Buckley*, 509 U.S. at 273.

Sometimes a prosecutor acts more like an investigator. Think Sherlock Holmes. Searching for clues and corroboration isn't "closely associated with the judicial process." *See Burns v. Reed*, 500 U.S. 478, 495 (1991); *see also Buckley*, 509 U.S. at 273. After all, detectives and police officers "normally" do those things. *See Buckley*, 509 U.S. at 273.

Case law is full of examples where a prosecutor seems to wear the hat of an investigator, not an advocate. A prosecutor might act like an investigator when she helps to procure statements from witnesses during an investigation. *See Pettigrew*, 38 F.4th at 566–67 (describing *Fields v. Wharrie*, 740 F.3d 1107 (7th Cir. 2014)). She acts like an investigator when she involves herself in the "earliest stages" of an investigation, before anyone has "sought" her "advice as a lawyer." *Id.* at 567 (describing *Whitlock v. Brueggemann*, 682 F.3d 567 (7th Cir. 2012)). A prosecutor also acts like an investigator when she swears to the truth of facts in a warrant application.[2] *Id.* (describing *Olson v. Champaign Cnty.*, 784 F.3d 1093 (7th Cir. 2015)).

---

[2] As an aside, the line between advocacy and fact-gathering can get pretty blurry, especially on the margins. Advocacy involves building a case, and building a case involves gathering facts. Fact gathering never goes away – even after a case is filed. In the discovery context, discovery is fact gathering, and a lawyer acts as an advocate when she gathers the facts. Taking a deposition is a good example. So is reaching out to a potential witness, or gathering documents. A good way for an advocate to lose a case is to stop trying to gather facts. Gathering facts is a bread-and-butter part of advocacy. But this Court takes the law as it finds it. And the law is that a prosecutor lacks absolute immunity when acting in the capacity of an investigator.

Another consideration is whether the case has crossed the threshold of probable cause. In the Supreme Court's words, a "prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested." *See Buckley*, 509 U.S. at 274; *see also Hill v. Coppleson*, 627 F.3d 601, 605 (7th Cir. 2010). So, a "prosecutor's actions before he has probable cause to have anyone arrested may be investigative." *See Pettigrew*, 38 F.4th at 565–66 (cleaned up).

The existence of probable cause is telling, but it is not dispositive. A prosecutor's acts *after* a probable cause determination still might be beyond the scope of her role, and bring her outside the scope of absolute immunity. *See Buckley*, 509 U.S. at 274 n.5; *see also Hill*, 627 F.3d at 605 (noting that probable cause plays a "part" in the immunity inquiry).

That body of law provides the backdrop for the claims made by Abrego. When read in Abrego's favor (as the Court must), the complaint does not portray Turano as a prosecutor acting as a prosecutor.

The overarching story is *not* that Turano simply showed up to scribe Abrego's statement. The allegation is *not* that the officers had wrapped up their investigation, and that Turano was simply there to "control" the statement's "presentation" in anticipation of trial. *Cf. Imbler*, 424 U.S. at 430 n.32. Instead, the story is that Turano had a hand in concocting Abrego's false confession from the very beginning.

For example, Abrego alleges that Turano "actively participated" with the officers in his "interrogation." *See* Am. Cplt., at ¶ 95 (Dckt. No. 66). Abrego alleges that she was "present" at the Area Five Detective Division while the interrogation was "ongoing." *Id.*

Abrego also alleges that Turano "actively participated" in "drafting" his false statement. *Id.* Turano "recit[ed]" the officers' version of events, and asked Abrego to "confirm" it. *Id.* at

13

¶ 97.  In other words, Abrego accuses Turano of "manufactur[ing]" the false statement *alongside* the officers.  *Id.* at ¶ 100.  And he alleges that she did so while she could see bruises on his body from the abuse.  *Id.* at ¶ 98.

In sum, the complaint blames Turano for "conspiring" with the officers to drum up evidence that the State could use to *later* prosecute Abrego.  *Id.* at ¶ 25.  It essentially says that Turano participated in the "creation" of evidence.  *See Serrano v. Guevara*, 2020 WL 3000284, at *23 (N.D. Ill. 2020).

Those allegations put Turano on the "investigator" side of the line.  After all, initial fact-gathering is typically within an investigator's wheelhouse, to get to the bottom of what happened.  *Cf. Buckley*, 509 U.S. at 273.  It is not the type of thing "intimately associated" with the "*judicial* phase" of a criminal process.  *Id.* at 270 (citation omitted; emphasis added).  The judicial phase involves giving a "professional evaluation" of evidence that police officers have already "assembled," with an eye towards getting the facts before a grand jury, or making a charging decision.  *Id.* at 273 (emphasis added); *see also Crowder v. Barrett*, 2023 WL 3145312, at *3 (7th Cir. 2023).

At the end of the day, "a showing that a prosecutor investigated and fabricated evidence against a target would automatically defeat absolute prosecutorial immunity, even if that target was later brought to trial."  *See Lewis*, 677 F.3d at 331.  And here, Abrego alleges that Turano played an active part in fabricating his false confession.  *See* Am. Cplt., at ¶ 95 (Dckt. No. 66).

So, at this early stage, Turano is not entitled to absolute immunity.  *See, e.g.*, *Velez v. City of Chicago*, 2023 WL 6388231, at *18 (N.D. Ill. 2023) ("[A]bsolute immunity does not apply because a reasonable jury could infer that [the prosecutor] fabricated the statement and coerced [the witness].");  *Wilson v. Est. of Burge*, 667 F. Supp. 3d 785, 832 (N.D. Ill. 2023) ("[The

14

plaintiff] alleges that [the prosecutor] . . . conspired with Defendants to violate [the plaintiff's] constitutional rights until an involuntary (and false) statement was obtained. These allegations suggest that [the prosecutor] was acting in an investigatory, not prosecutorial, function, and therefore is not protected by absolute prosecutorial immunity.") (cleaned up); *Patrick v. City of Chicago*, 213 F. Supp. 3d 1033, 1051 (N.D. Ill. 2016) ("The ASAs claim that they are absolutely immune from Plaintiff's Section 1983 claims because they did nothing more than analyze evidence gathered by the Officer Defendants and memorialize the codefendants' confessions . . . . But the record contains evidence that the ASAs did more than analyze and memorialize . . . there are facts from which a jury could infer that the ASAs participated in coercive interrogations, that they fabricated the confessions, and that they reduced the confessions to writing so the codefendants could sign them. This behavior, if true, is incompatible with probable cause and the performance of core prosecutorial functions, and it therefore precludes a finding of absolute immunity."); *Orange v. Burge*, 2008 WL 4443280, at *10 (N.D. Ill. 2008) ("[The prosecutor] actively assisted in gathering the evidence that would later form the basis of the charges[.]"). Maybe the case will look different when the facts come out, but the Court must decide a motion to dismiss based strictly on the allegations.

Turano makes a few arguments in favor of absolute immunity, but they don't get her very far.

First, Turano points to two cases where district courts held that Assistant State's Attorneys "taking statements from suspects" were entitled to absolute prosecutorial immunity. *See* Def.'s Mem., at 10 (Dckt. No. 70) (citing *Kitchen v. Burge*, 781 F. Supp. 2d 721, 730 (N.D. Ill. 2011) and *Andrews v. Burge*, 660 F. Supp. 2d 868, 878 (N.D. Ill. 2009)). For example, in

*Andrews*, the prosecutor enjoyed immunity because he simply took "steps to see that the words of the" suspect were "properly preserved." *See Andrews*, 660 F. Supp. 2d at 878.

But here, Abrego alleged something more. According to the complaint, Turano "actively participated" in Abrego's "interrogation" and "drafting" his false statement, which he was "forced" to sign. *See* Am. Cplt., at ¶ 95 (Dckt. No. 66). An allegation that a prosecutor "fabricated evidence" against a target during an investigation "defeat[s]" absolute immunity. *Cf. Lewis*, 677 F.3d at 331.

Next, Turano leans on the existence of probable cause. She says that probable cause existed when she got involved, so she had her prosecutorial shoes on when she stepped on the scene. *See* Def.'s Mem., at 9 (Dckt. No. 70). Specifically, she says that probable cause existed based on the statements given by Parra and Cain. *Id.*

But Turano runs into a wrinkle. Abrego did not allege that Turano was even *aware* of those statements when she got involved. *See* Pl.'s Resp., at 14 (Dckt. No. 94); *see also* Am. Cplt., at ¶¶ 95–102 (Dckt. No. 66). So, this Court cannot read the complaint to allege that Turano's presence was merely to "approve or disapprove charges." The complaint does not simply allege that Turano showed up to compare Abrego's statement to the other statements. *Cf. Hunt v. Jaglowski*, 926 F.2d 689, 693 (7th Cir. 1991) (holding that the prosecutor was entitled to immunity when his function was "merely to review, approve or disapprove, and issue the charges the police were seeking").

Instead, this Court reads Abrego's complaint to allege that Turano was part of *concocting* the evidence that she could use to prosecute the case *later*, after she put on her prosecutor's hat. *Cf. Genzler v. Longanbach*, 410 F.3d 630, 639 (9th Cir. 2005) ("[W]e held that prosecutors who, soon *after* the arrest of a suspect, directed police to coerce a confession from that suspect were

not entitled to absolute immunity because their activity was more police-like than prosecutorial.") (emphasis added).

Put differently, Turano's argument puts too much weight on the timing of *when* probable cause existed. She focuses on the moment in time when probable cause existed. *See* Def.'s Mem., at 10 (Dckt. No. 70). Again, the existence of probable cause is telling, but it doesn't tell the full story. A prosecutor can act as an investigator after probable cause exists. *See Buckley*, 509 U.S. at 274 n.5.

Again, the focal point is the function of the specific acts in question. And here, once again, the allegations put Turano's role as an investigator on the table. *See Patrick*, 213 F. Supp. 3d at 1051.

Finally, Turano attacks the allegations on the merits (which is a non-starter). Turano takes issue with the notion that she knew that Abrego was abused before he gave a statement. *See* Def.'s Mem., at 11 (Dckt. No. 70). Specifically, she says that his allegations are "refuted" by his state trial testimony from years earlier. *Id.* To support her argument, Turano attached a transcript of the testimony to her brief. *See* Trial Transcript, at 76–138 of 138 (Dckt. No. 70).

That's not a viable argument at the motion-to-dismiss stage. This Court will not look beyond the complaint to evaluate the sufficiency of the complaint. *See Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010) (noting that the question in evaluating a complaint is "*could* these things have happened, not *did* they happen") (emphasis in original).

In sum, the complaint alleges sufficient facts to overcome the assertion of absolute immunity at the motion-to-dismiss stage. Maybe the facts will shake out differently, but for now, the complaint survives the assertion of prosecutorial immunity.[3]

---

[3] As the Court understands it, Turano's position is that her absolute immunity argument about the federal claims, and her absolute immunity argument about the state law claims, live and die together. *See* Def.'s

## II.    Qualified Immunity.

Next, Turano invokes qualified immunity on one of Abrego's claims, the failure to intervene claim.  *See* Def.'s Mem., at 11 (Dckt. No. 70).  Abrego alleges that Turano failed to stop the officers' constitutional violations.  *See* Am. Cplt., at ¶¶ 197–202 (Dckt. No. 66) (Count IV).

"Qualified immunity protects government officials from liability for damages unless they violate clearly established statutory or constitutional rights."  *See Garcia v. Posewitz*, 79 F.4th 874, 879 (7th Cir. 2023) (cleaned up).  "Once the defense is raised, the plaintiff bears the burden of defeating it by showing that (1) the defendant[] violated a constitutional right and (2) the constitutional right was clearly established at the time of the violation."  *Id.*

A plaintiff bears this burden even at the motion-to-dismiss stage.  *See Chasensky v. Walker*, 740 F.3d 1088, 1095 (7th Cir. 2014); *see also Baisi v. Burke*, 359 F. Supp. 3d 592, 597 (N.D. Ill. 2019).  At the same time, a motion to dismiss "is rarely the most suitable procedural setting to determine whether an official is qualifiedly immune."  *See Roldan v. Stroud*, 52 F.4th 335, 339 (7th Cir. 2022) (cleaned up).  "The reason is simple."  *Id.*  At the "outset of litigation," a court often can't "tell from a complaint whether qualified immunity applies."  *Id.*

On the other hand, the Seventh Circuit hasn't laid down a hard-and-fast rule prohibiting a court from "entertaining" the defense on a motion to dismiss.  *See Fosnight v. Jones*, 41 F.4th

---

Mem., at 13 (Dckt. No. 70) ("Illinois courts have followed the United States Supreme Court's pronouncement in *Imbler* on prosecutorial immunity."); *see also* Def.'s Reply, at 4–8 (Dckt. No. 97) (analyzing absolute immunity in one lump).  So, Turano is not entitled to absolute immunity across the board – for Abrego's federal claims, and his state law claims.  *Cf. Fields v. Wharrie*, 740 F.3d 1107, 1115 (7th Cir. 2014) ("[S]ince we've already held that [the defendant] is not entitled to absolute immunity from being sued on the federal claims against him, there is no basis for giving him absolute prosecutorial immunity from the state law claims for the same conduct alleged as a violation of Illinois tort law.").

916, 924 (7th Cir. 2022). Sometimes a complaint answers the qualified-immunity question then and there. *Id.*; *see also Chasensky*, 740 F.3d at 1098–99.

When a court can answer the question right away, there is no reason to wait. And there's a good reason *not* to wait. After all, qualified immunity is a defense from suit, including both liability and the burden of having to litigate in the first place. *See Pearson v. Callahan*, 555 U.S 223, 237 (2009).

Courts can decide motions to dismiss based on qualified immunity when the issue turns on whether the law was clearly established at a particular point in time. In that situation, the issue turns on a survey of precedent, not on the facts.

"A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *See Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam) (cleaned up). Put differently, a "right is clearly established when existing precedent has placed the statutory or constitutional question beyond debate." *See Howell v. Smith*, 853 F.3d 892, 897 (7th Cir. 2017) (cleaned up).

Pointing to a "broad general proposition" is not enough. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001), *receded from on other grounds by Pearson*, 555 U.S. at 236. A "right is clearly established only if it is clear that the officer's conduct in the particular circumstances before him is prohibited." *See Brumitt v. Smith*, 2024 WL 2269489, at *3 (7th Cir. 2024). Specificity matters. *See Taylor v. City of Milford*, 10 F.4th 800, 807 (7th Cir. 2021).

Turano argues that she is entitled to qualified immunity for the failure to intervene claim because there was "no clearly established duty for prosecutors to intervene" back in 1999. *See* Def.'s Mem., at 12 (Dckt. No. 70). So, Abrego "must point to a closely analogous case finding

the alleged violation unlawful." *See Reed v. Palmer*, 906 F.3d 540, 547 (7th Cir. 2018) (cleaned up).

The "seminal" Seventh Circuit case on failure to intervene claims is *Byrd v. Brishke*, 466 F.2d 6 (7th Cir. 1972). *See Saunders v. City of Chicago*, 2013 WL 6009933, at *10 (N.D. Ill. 2013). *Byrd* gave birth to failure to intervene claims in 1972.

*Byrd* talked about a police officer's duty to stop other police officers from violating the Constitution. "[O]ne who is given the badge of authority of a police officer may not ignore the duty imposed by his office and fail to stop other officers who summarily punish a third person in his presence or otherwise within his knowledge." *See Byrd*, 466 F.2d at 11.

In the decades that followed, the Seventh Circuit repeatedly recognized failure to intervene claims against police officers. *See, e.g.*, *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994) ("An officer who is present and fails to intervene to prevent other law enforcement officers from infringing the constitutional rights of citizens is liable under § 1983 if that officer had reason to know: (1) that excessive force was being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation has been committed by a law enforcement official; *and* the officer had a realistic opportunity to intervene to prevent the harm from occurring.") (emphasis in original); *Miller v. Smith*, 220 F.3d 491, 495 (7th Cir. 2000) ("[P]olice officers who have a realistic opportunity to step forward and prevent a fellow officer from violating a plaintiff's rights through the use of excessive force but fail to do so have been held liable."); *Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005) ("It is true that this court has recognized in the past that 'police officers who have a realistic opportunity to step forward and prevent a fellow officer from violating a plaintiff's right through the use of excessive force but fail to do so' may be held liable.") (citation omitted).

20

For years, district courts wondered whether a plaintiff could bring a failure to intervene claim against a *prosecutor*. In a few instances, courts in the Northern District of Illinois *declined* to recognize such a claim. *See, e.g.*, *Gordon v. Devine*, 2008 WL 4594354, at *17 (N.D. Ill. 2008) ("[N]either the Seventh Circuit, nor any Northern District of Illinois court, has recognized a failure to intervene claim against a prosecutor. Additionally, [the plaintiff] does not cite any cases from any court recognizing this claim."); *Andrews v. Burge*, 660 F. Supp. 2d 868, 876 n.6 (N.D. Ill. 2009) ("Judge Aspen was clearly correct in deciding that the duty to intervene applicable to police officers is not to be imposed on prosecutors."); *Hobbs v. Cappelluti*, 899 F. Supp. 2d 738, 773 (N.D. Ill. 2012) ("[The Plaintiff] . . . argues that because prosecutors have an ethical duty to ensure that justice is carried out in a constitutional and humane manner, they should be held accountable for failing to intervene in a constitutional violation. This court . . . declines to extend [failure to intervene claims] to defendant prosecutors[.]"); *see also Saunders v. City of Chicago*, 2013 WL 6009933, at *10 (N.D. Ill. 2013) (surveying this case law).

The Seventh Circuit turned the tide in its 2012 decision in *Whitlock v. Brueggemann*, 682 F.3d 567 (7th Cir. 2012). *Whitlock* was not a failure to intervene case. But when discussing an evidence fabrication claim, the Seventh Circuit explained that "a prosecutor whose investigatory conduct is the proximate cause of the due process violation that occurs when the false evidence is introduced at trial is held to the *same standard* of liability as a police officer who does the same thing." *See Whitlock*, 682 F.3d at 583 (emphasis added).

District courts picked up on the Seventh Circuit's sentence. After *Whitlock*, courts in the Northern District of Illinois started to "allow[] failure to intervene claims to proceed against prosecutors." *See Sherwood v. Village of Fox Lake*, 2024 WL 2209697, at *4 n.5 (N.D. Ill. 2024). As one court in *Whitlock*'s immediate aftermath saw things, it couldn't "foreclose the

21

possibility of extending failure to intervene liability to prosecutors." *See Saunders*, 2013 WL 6009933, at *10. The court based its reasoning "in large part" on *Whitlock* – which "suggests that prosecutors and police are subject to the same duties when acting in an investigatory capacity." *Id.*

District courts have since followed this new lead. *See, e.g.*, *Smith v. Burge*, 222 F. Supp. 3d 669, 686 (N.D. Ill. 2016); *Chatman v. City of Chicago*, 2015 WL 1090965, at *10 (N.D. Ill. 2015); *Harris v. City of Chicago*, 2015 WL 5445012, at *4 (N.D. Ill. 2015); *see also* Pl.'s Resp., at 18 (Dckt. No. 94) (citing these cases).

Abrego now leans hard on *Whitlock*. *See* Pl.'s Resp., at 18 (Dckt. No. 94). He argues that Turano was on notice that her conduct was unlawful, according to the established law at the time. *Id.* at 17–18.

*Whitlock* doesn't get Abrego very far. The question at hand is whether the "wrongfulness" of a prosecutor's conduct in failing to intervene was clearly established in 1999. *Cf. Taylor v. Ways*, 999 F.3d 478, 487, 491 (7th Cir. 2021). *Whitlock* came down in 2012. If anything, *Whitlock* shows that the law was not "clearly established" back in 1999.

For that reason, district courts widely hold that the law was not clearly established in 1999 that prosecutors acting as investigators had a duty to intervene in another officer's wrongdoing. *See Serrano v. Guevara*, 315 F. Supp. 3d 1026, 1039 (N.D. Ill. 2018) ("Plaintiffs rely on *Whitlock* to argue that prosecutors who act as investigators are subject to the same standards as officers, but *Whitlock* was not decided until 2012, so it had no impact on the notice available to prosecutors in 1993."); *see also Ezell v. City of Chicago*, 2024 WL 278829, at *14 (N.D. Ill. 2024) ("True, *Whitlock v. Brueggemann* established that a prosecutor acting as an investigator would be held to the same standard as a police officer. But this decision came out in

22

2012, so it had no impact on the notice available to prosecutors in 1995.") (cleaned up); *Wilson v. Est. of Burge*, 667 F. Supp. 3d 785, 834 (N.D. Ill. 2023); *Brown v. City of Chicago*, 633 F. Supp. 3d 1122, 1154–55 (N.D. Ill. 2022);[4] *cf. Moore v. Lauer*, 2024 WL 245188, at *7 (N.D. Ill. 2024) ("It is clearly established that a law enforcement officer must stop other law enforcement officers from infringing upon constitutional rights. But the same cannot be said when the facts involve a law enforcement officer and another public official.") (internal citation omitted).

Abrego invokes the narrow exception of *Hope v. Pelzer*, 536 U.S. 730 (2002). *See* Pl.'s Resp., at 18 (Dckt. No. 94). In *Hope*, the Supreme Court emphasized that an official "can still be on notice that their conduct violates established law even in novel factual circumstances." *See Hope*, 536 U.S. at 741.

Cases that fit into *Hope*'s analysis deal with "particularly egregious" facts. *See Taylor v. Riojas*, 592 U.S. 7, 9 (2020) (per curiam). The officer's conduct must be "so outrageous" that "no reasonable" officer would have believed that it was legal. *See Leiser v. Kloth*, 933 F.3d 696, 704 (7th Cir. 2019). In other words, *Hope*'s lane is narrow. It's "rare." *Id.*

Abrego devotes only one paragraph to *Hope*. *See* Pl.'s Resp., at 18–19 (Dckt. No. 94). Among other things, he says that "prosecutors are lawyers, after all. They know the rules, and their duty is clear." *Id.* But taken to its end, the argument's idea is that *every* failure-to-intervene case involving a prosecutor fits *Hope*'s reasoning.

*Hope* is "reserved for rare cases." *See Stockton v. Milwaukee County*, 44 F.4th 605, 620–21 (7th Cir. 2022). This case isn't one of them.

---

[4] This Court recognizes that the case law is not uniform. At least one court in this District has come out differently. *See Fulton v. Bartik*, 2024 WL 1242637, at *10 (N.D. Ill. 2024).

In sum, Abrego has not carried his burden to show that Turano's conduct violated clearly established law in 1999. So Turano is entitled to qualified immunity on the failure to intervene claim.

## III. Willful & Wanton Conduct.

Turano makes one final argument. She says that this Court should dismiss Abrego's "willful and wanton conduct" state law claim. *See* Def.'s Mem., at 14–15 (Dckt. No. 70); *see also* Am. Cplt., at ¶¶ 231–34 (Dckt. No. 66) (Count IX).

Willful and wanton conduct is not a "separate, independent tort" in Illinois. *See Jane Doe-3 v. McLean Cnty. Unit Dist. No. 5 Bd. of Dirs.*, 973 N.E.2d 880, 887 (Ill. 2012). Instead, it is an "aggravated form of negligence." *Id.*

So, "to recover damages based on willful and wanton conduct, a plaintiff must plead and prove the basic elements of a negligence claim – that the defendant owed a duty to the plaintiff, that the defendant breached that duty, and that the breach was a proximate cause of the plaintiff's injury." *Id.* Then, the plaintiff "must allege either a deliberate intention to harm or a conscious disregard for the plaintiff's welfare." *Id.*

Turano's argument boils down to three sentences. *See* Def.'s Mem., at 15 (Dckt. No. 70). In essence, she says that Abrego "erroneous[ly]" invoked a "standalone" willful and wanton conduct claim, even though standalone claims don't exist. *Id.*

This Court sees things differently. True, Abrego titled his claim "Willful and Wanton Conduct." *See* Am. Cplt., at 56 (Dckt. No. 66). But a claim's label doesn't count for much. *See Wolf v. Riverport Ins. Co.*, 2024 WL 2292834, at *3 (N.D. Ill. 2024).

The substance of Count IX looks like a negligence claim with an edge. Abrego alleged that Turano "had a duty" to Abrego. *See* Am. Cplt., at ¶ 232 (Dckt. No. 66). He alleged that

Turano breached the duty, by acting "willfully and wantonly." *Id.* at ¶ 233. And he alleged that the "misconduct" damaged him. *Id.* at ¶ 234. In other words, Abrego's complaint puts an aggravated negligence claim on the table – not a forbidden, standalone "willful and wanton conduct" claim.

Turano's reply brief expands the argument. Turano argues that Count IX "should be dismissed because there is no separate cause of action for willful and wanton conduct *and* Plaintiff has not adequately pled a claim of negligence." *See* Def.'s Reply, at 9 (Dckt. No. 97). Specifically, Turano argues that Abrego did not adequately plead an underlying negligence claim, because he did not plead "an identifiable duty recognized under Illinois law." *Id.* at 10.[5]

This Court won't go down that road. A party can't make a new argument in a reply brief. Reply briefs reply. They don't raise new arguments. *See Reis v. Robbins*, 2015 WL 846526, at *2 (S.D. Ind. 2015). Turano forfeited her argument about the adequacy of the allegations supporting Abrego's aggravated negligence claim. The claim survives.

### Conclusion

Turano's motion to dismiss is granted in part and denied in part. Turano is entitled to qualified immunity on the failure to intervene claim, so that claim is dismissed. But the rest of the claims against Turano otherwise survive.

Date: July 29, 2024

_____

Steven C. Seeger
United States District Judge

---

[5] Indeed, Abrego's response noted that Turano's brief did "not contain an argument contending that" Abrego "failed to plausibly plead some element of the claim." *See* Pl.'s Resp., at 20 (Dckt. No. 94). He argued that "any such argument is forfeited." *Id.* Turano's reply didn't meaningfully engage with Abrego's forfeiture point. *See* Def.'s Reply, at 9–10 (Dckt. No. 97). This Court reads the silence as an "implicit concession[]." *See River Grove Plaza Inc. v. Owners Ins. Co.*, 2022 WL 16782412, at *2 (N.D. Ill. 2022).