1    **TRANSCRIBED FROM DIGITAL RECORDING**

2                    IN THE UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF ILLINOIS
3                             EASTERN DIVISION

4    ERUBY ABREGO,                          )
                                            )
5                    Plaintiff,             )
                                            )
6                    vs.                    ) Case No. 23 C 1740
                                            )
7    REYNALDO GUEVARA, et al.,              )
                                            )
8                    Defendants.            )
     ----------------------------------------)
9    JEREMIAH CAIN,                         )
                                            ) Case No. 23 C 14282
10                   Plaintiff,             )
                                            )
11                   vs.                    )
                                            )
12   REYNALDO GUEVARA, et al.,              ) Chicago, Illinois
                                            ) July 9, 2025
13                   Defendants.            ) 9:59 A.M.

14                   TRANSCRIPT OF PROCEEDINGS - Hearing
        BEFORE THE HONORABLE GABRIEL A. FUENTES, Magistrate Judge
15
     APPEARANCES:
16
     For Plaintiff Abrego:       LOEVY & LOEVY
17                               311 North Aberdeen Street
                                 3rd Floor
18                               Chicago, Illinois  60607
                                 BY:  MS. RENEE SPENCE
19
     For Plaintiff Cain:         BONJEAN LAW GROUP, PLLC
20                               233 Broadway
                                 Suite 707
21                               New York, New York  10279
                                 BY:  MR. JOSHUA L. MORRISON
22
                          PAMELA S. WARREN, CSR, RPR
23                       Official Court Reporter - Retired
                            23869 N. High Ridge Drive
24                        Lake Zurich, Illinois   60047
                                 312.823.0001
25
     NOTE:  Please notify of correct speaker identification.

```
 1   APPEARANCES:  Continued

 2   For Defendant Guevara:    BORKAN & SCAHILL
                               20 South Clark Street
 3                             Suite 1700
                               Chicago, Illinois  60603
 4                             BY:  MS. MOLLY BOEKELOO

 5   For Defendant Officers:   THE SOTOS LAW FIRM, P.C.
                               141 West Jackson Boulevard
 6                             Suite 1240a
                               Chicago, Illinois  60604
 7                             BY:  MS. ELIZABETH REDDINGTON FLEMING

 8   For Defendant City:       ROCK FUSCO & CONNELLY LLC
                               333 West Wacker Drive
 9                             19th Floor
                               Chicago, Illinois  60606
10                             BY:  MS. THERESA BEROUSEK CARNEY

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    (Proceedings held in open court:)

2         THE CLERK:  23 C 1740, Abrego versus Guevara, et al.;

3    and 23 C 14282, Cain versus Guevara, et al., for motion

4    hearing.

5         THE COURT:  Okay.  Why don't you start with Abrego and

6    have counsel make their appearances for our record.

7         MS. SPENCE:  Do you want to start with the plaintiff

8    or --

9         THE COURT:  Plaintiff, go ahead.  Start.  Sure.

10        MS. SPENCE:  Good morning, your Honor.  Renee Spence

11   on behalf of plaintiff Abrego.

12        THE COURT:  Okay.  Thank you, Attorney Spence.

13        How about defense in Abrego.  But I think it might be

14   the same for Abrego and Cain.

15        MS. CARNEY:  It is the same for Abrego and Cain.

16   Theresa Carney on behalf of the City of Chicago.

17        THE COURT:  Okay.

18        MS. FLEMING:  Elizabeth Fleming on behalf of defendant

19   Officers Wojcik, Engel, Bogucki, Schalk, Halvorsen, and

20   Capatelli (phonetic).

21        THE COURT:  Okay.  Hold on a second.  Sometimes it is

22   difficult to keep track of the players without a scorecard.

23   And I like to have my pencils and scorecards ready.  If any of

24   you -- none of you remembers that expression, do you?

25        MS. CARNEY:  It is baseball.

1    THE COURT:  Who?

2    MS. CARNEY:  Oh.  I want to say Harry Caray, but I'm

3 going to be wrong.

4    THE COURT:  Pat Pieper.

5    MS. CARNEY:  I have no idea.

6    THE COURT:  He was the PA address announcer.  And at

7 1:20 P.M., because that's when all the games were played --

8    MS. CARNEY:  Yep.

9    THE COURT:  -- at that ancient time -- the earth was

10 actually a molten mass when I attended my first Cubs game.

11 That's the first thing he would say is, ladies and gentlemen,

12 get your pencils and scorecards ready.

13    So counsel for the officer defendants, I didn't see

14 your name in my notes and I couldn't quite hear your name well

15 enough.  Can you tell me again who you are?

16    MS. FLEMING:  Elizabeth Fleming.

17    THE COURT:  Okay.  Yeah.  I had you in front of me

18 before, and I'm sorry for not having the greatest memory.  I

19 remember Pat Pieper but not you.  How insulting is that.  Okay.

20 Ms. Fleming, thank you.

21    Who else do we have?

22    MS. BOEKELOO:  Molly Boekeloo on behalf of defendant

23 Guevara.

24    THE COURT:  Okay.  Good to see you.

25    So anybody else for defense in the two matters?

1    MS. SPENCE:  No, your Honor.

2    THE COURT:  And then do we have somebody on the phone

3  in the Cain matter, for plaintiff Cain?

4    MS. SPENCE:  He should be.

5    MR. MORRISON:  Yes, your Honor.  This is Josh Morrison

6  for Jeremiah Cain.

7    THE COURT:  Okay.  Anybody else or just you,

8  Mr. Morton [sic]?

9    MR. MORRISON:  I believe it is just me.

10    THE COURT:  Okay.  Great.

11    So we're here on this motion to compel the deposition

12  of witness Tovar.  And I guess, before we begin, I just wanted

13  to elaborate a little bit on the order that I entered setting

14  this up for today.  Obviously, I was a little concerned that it

15  took this amount of time for this issue to be presented to me

16  given the phase of discovery that we're in.

17    I have not had a chance to follow up with Judge

18  Seeger's chambers about my recommendation that you receive

19  until the end of August to complete discovery, only because we

20  had a day-long settlement conference yesterday that went very

21  long.  My plan is to reach out to him today and seek -- see

22  what he wants to do with that.  It is -- I think it is likely

23  that he'll give you until the end of August.

24    But what that meant to me is that we should spend a

25  minimum amount of time on motions that we could probably

1    resolve, even by summoning you all here and having a discussion

2    about it.

3            We also checked the rules, and it did strike us that

4    the burden for resisting this deposition really would rest with

5    the party that wishes to resist it.  And that's, I think, your

6    sign, defense, and --

7            MS. CARNEY:  Yes, your Honor.  And I -- you know,

8    plaintiff makes several comments about that in their motion

9    and --

10           THE COURT:  Do you disagree with that --

11           MS. CARNEY:  I don't disagree.

12           THE COURT:  -- preliminary principle?

13           MS. CARNEY:  Preliminarily, no, I do not disagree that

14   it would have been our burden to move for a protective order.

15           THE COURT:  Okay.

16           MS. CARNEY:  However, given this posture of the case,

17   if you recall, plaintiff uni- -- filed a motion to compel which

18   had a deficient 37.2 conferral certification in it, which you

19   denied based on that.

20           THE COURT:  Well --

21           MS. CARNEY:  That said --

22           THE COURT:  -- I don't know how deficient it was.  It

23   was just that it was so old -- that the motion got filed in

24   June and the last conference had happened three months earlier.

25   And my reaction was, come on, give them a call again.  Let's

1  get this resolved.  And of course it didn't.  But that's okay.

2  So -- but I cut you off.  Go ahead.

3      MS. CARNEY:  No.  It -- it was deficient for other

4  reasons that we didn't need to bring to your attention because

5  you had denied the motion and told us to confer again.

6      THE COURT:  Yeah.

7      MS. CARNEY:  We conferred again, and plaintiff went

8  ahead and filed based on your order their motion to compel.

9      From my point of view, the situation involving

10  Mr. Tovar is evolving because of his condition.

11      THE COURT:  Okay.

12      MS. CARNEY:  And we are learning --

13      THE COURT:  Let me hold you.  Hold that for a minute.

14      Given that it is evolving, that's something you're

15  going to tell me about?

16      MS. CARNEY:  Yes.

17      THE COURT:  I'm looking at a likely discovery cutoff

18  end of August.  I'm looking at probably some further evolving

19  information and other developments concerning witness Tovar.

20  And I feel like I at least want to chart out a path for what we

21  do next.

22      And I did review the law, including the Stanek case,

23  which I have a vague recollection might even be one of mine.

24  But I was a little concerned about the nature of the letter

25  that was submitted and that I asked to be filed and was filed

1    under seal and its sufficiency.  Because in my view, if a

2    witness has difficulty with competency, that's more of

3    a -- that's more of an admissibility at trial kind of matter as

4    opposed to a nondiscoverability situation.  Unless it turns out

5    that there is reliable information documented that the person

6    would actually be harmed.  But it didn't look to me like the

7    letter really established that.  It is very brief.

8           So given that you would have the burden on such a

9    thing, I wanted to have the officer defendants begin by telling

10   me why shouldn't I order Mr. Tovar's deposition to occur.

11          MS. CARNEY:  Yes, your Honor.  Thank you for giving me

12   the opportunity to discuss this --

13          THE COURT:  Sure.

14          MS. CARNEY:  -- in this format.

15          Mr. Tovar -- so the -- as I stated earlier, his

16   condition is evolving.  The letter was issued by his general

17   practitioner's office in June.

18          The reason that it is as brief as it is is because

19   this diagnosis is brand new.  Mr. Tovar was living alone in

20   Indiana when his nephew got a phone call from one of

21   Mr. Tovar's neighbors saying we found your uncle in the snow in

22   the middle of January.  He doesn't know where he is, and he

23   doesn't know who he is.

24          Mr. Tovar's nephew -- Mr. Tovar has no living

25   relatives outside of his nephew.  And his partner had passed.

1    And so Mr. Tovar's nephew got out to Indiana and found a very

2    dire situation, which was Mr. Tovar living in essentially

3    hoarder's conditions with no basic -- completely unable to care

4    for himself.

5          Mr. Tovar's nephew, being the only living relative,

6    took matters into his own hands, moved him back to Chicago, got

7    him into a facility, got power of attorney for his healthcare,

8    and started getting him back into regular visits with his

9    general practitioner.

10         At the time, Mr. Tovar had not seen his general

11   practitioner in over two years.  He -- of course, as we all

12   know with the medical system at this moment, getting

13   appointments is very difficult, and his general practitioner

14   had taken a leave.  So this Dr. Byers (phonetic), who wrote the

15   letter, is another practitioner within the practice but is not

16   his day-to-day practitioner.

17         By this -- when they go to the appointment, she did

18   this initial cognitive test and has recommended a brain scan as

19   well as an appointment with the memory and neurological center

20   out of Northwestern.

21         THE COURT:  Okay.

22         MS. CARNEY:  They were able to get a brain scan

23   scheduled for the end of the month, but they could not get in

24   to the neurological -- memory and neurological center until --

25   I think the next appointment is 10 months out.

1    THE COURT:  Okay.

2    MS. CARNEY:  I have spoken at length with his nephew,

3    who if this Court would like, would be happy to file an

4    affidavit, would be happy to come in and talk to this Court

5    about his uncle's condition.  But it is deteriorating and it

6    is -- it is a very, very sad situation.

7    While Mr. Tovar understands who he is, most days he

8    does not know where he is.  He does not know what year it is.

9    He does not know who the president is.  He has no -- as it

10   relates to his work at the police department, he does recall

11   that he was a police officer but he cannot tell you what

12   district he worked at for 40 years.  He cannot tell you the

13   name of his co-workers for the past 40 years.  He cannot tell

14   you that -- you know, what he did on a day-to-day basis.

15   THE COURT:  Did you ask him if he remembered this

16   polygraph exercise with witness Parra?

17   MS. CARNEY:  I did not go into those specifics with

18   his nephew.  But I did ask him specifically if we were to say,

19   you conducted this polygraph examination 30 years -- you know,

20   here are your papers -- here are your papers, does this help?

21   He said he would have no recollection of the fact that he even

22   met this man.

23   THE COURT:  So the nephew has a nonmedical

24   layperson's --

25   MS. CARNEY:  Correct.

1          THE COURT:  -- firsthand understanding of interactions

2     with witness Tovar.

3          MS. CARNEY:  Correct.  And he is working

4     directly -- him and I are -- sorry, your Honor.

5          THE COURT:  That's okay.

6          MS. CARNEY:  Apparently I got a little nervous there.

7          THE COURT:  I always try to remember to set the pen

8     down at the podium because otherwise I found myself compelled

9     to push a button, to do all kinds of -- and it became a

10    distraction.  And some very good --

11         MS. CARNEY:  I thought I would have to take notes,

12    so...

13         THE COURT:  Yeah.  Some very good partner that I

14    worked with said, no, just set -- keep it with you if you need

15    to write something, but don't have it in your hand.  Set it

16    down.

17         MS. CARNEY:  You would think that I am a baby

18    attorney, that I don't know how to handle myself here.  Sorry.

19         THE COURT:  No, you do.  I didn't mean to imply

20    otherwise.

21         The other thing they taught me was to -- it is from

22    ice skating.  If you have ever skated, one of the first things

23    you're taught is to put your feet in a V position so you can

24    push off the inside of those blades.  And it is a -- you

25    immediately maintain better balance.  And I found -- and this

1    partner who told me this said, if I can stand in a V position,

2    I didn't float around as much.

3            MS. CARNEY:  That you didn't --

4            THE COURT:  Yeah.  It helped me kind of anchor myself.

5            MS. CARNEY:  Yeah.

6            THE COURT:  Even to the point where I learned

7    my -- the underside of my left hand -- I'm left handed -- I

8    would put underneath the podium maybe to anchor myself a little

9    bit.  Anyway, this is an aside.

10           But what you described is very helpful.  The doctor on

11   leave is on leave for how long?

12           MS. CARNEY:  So that's the next step that we're trying

13   to figure out.  I talked to Mr. Tovar's nephew yesterday, and

14   his -- our hope was that we could get a more fulsome letter

15   from Dr. Byers about his condition that outlines some of the

16   day-to-day struggles that he has and outlines more of the

17   cognitive impairment and dement- -- and specifics about the

18   diagnosis of dementia.

19           Dr. Byers is consulting with their legal department

20   about what kind of letter she can provide.

21           In the meantime, there is thought that his day-to-day

22   general practitioner will be returning and that his care will

23   be transferred back to him.

24           In the meantime, the full recommendation from the

25   practice is this brain scan, as well as getting him into the

1   memory clinic at Northwestern.  And that isn't going to change

2   regardless of which doctor it is.

3            THE COURT:  Yeah.

4            MS. CARNEY:  But those things take time.

5            THE COURT:  So, let's see.  The Monell discovery

6   aspect of the case has not really been scheduled yet.  My

7   personal preference is not to bifurcate those because we wind

8   up with a situation where we take a long time to complete fact,

9   and we don't really know how long it will take to

10  complete -- to Monell, if we ever do.

11           And I feel like that's a little bit where we're at

12  now.  I will have to see what you agree on.  There was some

13  indication in the report that the parties might not have to do

14  that much.  I don't want to misstate it.  But we don't really

15  know how much longer we'll have for Monell and expert.  That's

16  not really determined.

17           And we have got a 10-month window now for his memory

18  clinic appointment.  So I'm mildly concerned that he could even

19  be completed, you know, within a reasonable time in this 2023

20  case.  If we want to move cases along -- Rule 1 does suggest

21  that we need to move cases along.  So those -- that's a

22  question I will need to resolve.

23           But the other question I had for you is brain scan end

24  of July scheduled?

25           MS. CARNEY:  Yes.  I believe that it is scheduled for

1    July 30th is the brain scan.

2           THE COURT:  Okay.  And the doctor -- who is the

3    responsible physician concerning the brain scan?  Is it Byers

4    or is it someone else?

5           MS. CARNEY:  So Dr. Byers ordered the brain scan.  I

6    cannot recall right -- standing here right now what his

7    (unintelligible) -- like who his original general practitioner

8    was.

9           THE COURT:  Yeah.

10          MS. CARNEY:  I could get that information from his

11   nephew.

12          THE COURT:  Okay.  Who is Dr. Byers in the world of

13   neurology and cognition at Northwestern?

14          MS. CARNEY:  I don't believe --

15          THE COURT:  Department head?  Who is she, do you know?

16          MS. CARNEY:  I don't.  I believe she is --

17          THE COURT:  Okay.

18          MS. CARNEY:  -- not just a general -- she is the

19   general prac- -- in the general practice --

20          THE COURT:  Okay.

21          MS. CARNEY:  -- which is why they have recommended --

22          THE COURT:  All right.

23          MS. CARNEY:  -- that he get into the neurology clinic.

24          THE COURT:  But she is a treating physician?

25          MS. CARNEY:  Correct.

1          THE COURT:  Right now his treating physician.

2          MS. CARNEY:  Correct.

3          THE COURT:  The person on leave, by being on leave not

4     much help to us.

5          MS. CARNEY:  Correct.

6          THE COURT:  So when you're on leave in a case like

7     this, it is almost like you don't exist because we need answers

8     soon.

9           So, okay.  And the nephew -- so Byers is

10    available -- that's the question, Byers's availability, Byers's

11    availability for deposition.  Getting a medical person to be

12    available for a deposition can be difficult.  Has that been

13    discussed with her?

14         MS. CARNEY:  It has not been discussed with her.  I am

15    working through his nephew -- her -- his nephew right now as it

16    relates to contact with her.  We have tried to set up a Zoom

17    call where I can be on the call with them so that we can

18    discuss things more fully.  It just hasn't -- with the holiday

19    weekend last weekend --

20         THE COURT:  Yeah.

21         MS. CARNEY:  -- we weren't able to get that

22    accomplished.

23         THE COURT:  Okay.  Nephew's availability to supply an

24    affidavit or be deposed --

25         MS. CARNEY:  He is --

1        THE COURT:  -- we're good.

2        MS. CARNEY:  He has been very forthcoming with me and

3    very -- and available when I need him.  We discussed briefly

4    yesterday whether or not he would be comfortable with providing

5    an affidavit, and he said that at this point he will do an

6    affidavit, he will come in and testify, he'll do what he needs

7    to do.

8        THE COURT:  Okay.

9        MS. CARNEY:  Obviously, there -- initially there were

10   a lot of concerns about airing -- you know, allowing this man

11   to have some dignity as it relates to his diagnosis and not

12   having this, you know, on the public record and out -- in this

13   forum.

14       But his uncle -- or his nephew is now very concerned

15   about his health and well being and is willing to -- and has

16   given me the green light to say what I said today and is

17   willing to sign an affidavit.

18       THE COURT:  Okay.  So all that's very helpful.

19       Anything else that you wish to add at this time,

20   Ms. Carney, Attorney Carney?

21       MS. CARNEY:  I don't think so at this point.  I think

22   I -- the timeline is I think what is very important and, you

23   know, where we're at -- where he is at mentally and cognitively

24   and what his nephew is trying to do to keep his uncle in a safe

25   environment.

1    THE COURT:  Yeah.  Do you have a diagnosis you can

2  share that he has received?

3    MS. CARNEY:  He has been diagnosed with dementia.

4    THE COURT:  Dementia?

5    MS. CARNEY:  Yes.

6    THE COURT:  Okay.  Anything from you, Ms. Fleming?

7    MS. FLEMING:  No, your Honor.  Thank you.

8    THE COURT:  Okay.  Attorney Boekeloo, anything from

9  you?

10    MS. BOEKELOO:  No, thank you.

11    THE COURT:  All right.  Let me turn this over to

12  Attorney Spence.  And I have some initial thoughts based on

13  this, but I want to -- I want to hold them and hold any

14  conclusions until I have heard from you.

15    So what's your reaction to what's been proffered?  And

16  I will tell you, you don't really have to persuade me of the

17  importance to the case of what a recollection of Tovar, were it

18  retrievable, would be.  You don't really have to persuade me of

19  that.  And that's not really even been argued today.

20    But tell me what you -- what's your view on

21  compelling his deposition under the current scenario proffered.

22    MS. SPENCE:  My initial reaction is I feel a little

23  frustrated, your Honor, just because we have been working on

24  this since October, and today is the very first time that I

25  have heard any -- the majority of this information.

1      In the conferences that we have been having for

2   months, this is -- what we're trying to avoid is trying

3   to -- we're trying to avoid bringing these issues to your Honor

4   to see if we can resolve them.  And that is why, even at the

5   most recent conferences, we asked for medical records.  We

6   asked for some information, and we were flat -- the city flatly

7   refused.

8      And so in light of what Ms. Carney has

9   represented -- and again, these are just solely the city's

10  representations -- they have provided absolutely no

11  documentation about any of this.  For us to assess

12  independently, we are willing to take -- take a step back and

13  wait for the affidavit, see if we can depose the doctor.  And

14  that was our -- that was our ask in the most recent conference

15  that we could get the medical records, that we could have

16  access --

17          THE COURT:  Okay.

18          MS. SPENCE:  -- to the doctors.

19          THE COURT:  Okay.

20          MS. SPENCE:  So we're willing to do that.  It is not

21  our intent -- we are not trying to be unreasonable.  We don't

22  want to subject Mr. Tovar to anything that would be harmful to

23  him or cause any stress.

24          THE COURT:  Okay.

25          MS. SPENCE:  We're just trying to make sure that we

1    are covering our bases --

2          THE COURT:  All right.

3          MS. SPENCE:  -- and get the information that we can.

4          THE COURT:  Then let me share some of my reactions

5    with you then.  The first is that given that, according to your

6    own correspondence, as early as March 10 of this year you were

7    hearing from the city that he had medical or health issues.  I

8    appreciate you're trying to resolve things without having to

9    get court intervention, but that can be a red flag.

10         And now we have -- in terms of the timing, we're today

11   presented a little bit with the consequence of your not kind of

12   pushing that to the fore earlier.  And it appeared from the

13   proffer that the situation in March might not be what the

14   situation is today.  That there appeared to be some kind of

15   recent and significant worsening of his condition.

16         Accurate, Attorney Carney, or no?

17         MS. CARNEY:  I would disagree with that, your Honor,

18   in that it is not known what his condition was in March.  My

19   understanding actually is that --

20         THE COURT:  You were telling them there were health

21   issues.  So what did you know in March?

22         MS. CARNEY:  So that's what I was --

23         THE COURT:  Okay.

24         MS. CARNEY:  Mr. Tovar was represented by another

25   counsel, another outside counsel for the City of Chicago, and

1  he was given a deposition back in -- he gave a deposition to

2  Loevy & Loevy, plaintiff's law firm --

3          THE COURT:  Tovar did?

4          MS. CARNEY:  Yes.  -- back in September of last year.

5          MS. SPENCE:  October.

6          THE COURT:  In this case?

7          MS. CARNEY:  October of last year.

8          THE COURT:  In this case?

9          MS. CARNEY:  In a different --

10         THE COURT:  Different case.

11         MS. CARNEY:  In an unrelated case.

12         THE COURT:  So he was never asked about the polygraph

13  of Parra?

14         MS. CARNEY:  Correct.

15         THE COURT:  Okay.

16         MS. CARNEY:  But it is my understanding, at that

17  deposition, the attorney that represented him started to notice

18  some very serious cognitive issues.  And there were very

19  serious concerns about his testimony in that deposition.

20         I don't know what was communicated between that

21  attorney and his nephew.

22         THE COURT:  That's okay.  I'm just stopping you

23  because I thought what you said about the incident of getting

24  found in the snow and not knowing who he was, where he was,

25  what district he worked with, I thought that was fairly

1   recent --

2           MS. CARNEY:  That happened --

3           THE COURT:  -- meaning just this past winter?

4           MS. CARNEY:  That happened -- so this deposition goes

5   in October.  They are able to get him to sit for his deposition

6   in October.  And then the incident -- and there is a very

7   serious evidence of decline in October.

8           And then the incident where he gets lost happens in

9   January.

10          THE COURT:  Okay.

11          MS. CARNEY:  And that's when the nephew gets involved.

12          THE COURT:  Right.

13          MS. CARNEY:  And at that point it is clear that

14  cognitive failure had started.

15          THE COURT:  Yeah.

16          MS. CARNEY:  He just wasn't seeing a doctor.

17          THE COURT:  All right.  But my point is a little bit

18  the same, Attorney Spence, which is probably we needed to push

19  this -- you needed to push this sooner.  Certainly sooner to

20  the end of the discovery period.

21          And I know what it is like.  Sometimes it is hard to

22  get to everything.  But I think, you know, now the Court's got

23  a little bit of a fire drill situation.  And I appreciate that

24  you're frustrated.  But I don't know that there is a basis for

25  me to think that anything was really materially withheld from

1  you.

2      They told you, at least in January, that he was having

3  health issues.  If that's all they said -- I wish they would

4  have said more.  But I'm not really bothered by that because I

5  think you had enough to come to us sooner.

6      That said, I'm not prepared to just deny the motion

7  on that basis.  And what you have said was very helpful,

8  Attorney Spence, that you're willing to step back for the

9  moment, plaintiff is, willing to receive whatever affidavits

10  may be tendered; confer with counsel about a deposition of a

11  treating physician, if that's what you want; and possibly

12  obtain an affidavit or deposition testimony from the nephew.

13      I don't -- as your discovery supervisor, I am not

14  inclined to force you to accept counsel's representations as --

15  on faith.  That's not to say I doubt them.  I think she's made

16  a number of very specific representations that go way farther

17  than the Byers's letter.  And significantly farther in that

18  what counsel Carney has described, Attorney Spence, is a severe

19  enough set of circumstances that I worry that it takes us

20  beyond this person might not be competent enough to testify.

21  But we can still subject the person to a deposition.  I worry

22  that it begins to sound like could only be harmful if he is as

23  bad off as Attorney Carney has stated.

24      And I worry that with treatment still evolving, with

25  a brain scan set at the end of this month, that there will be

1  soon a better knowledge base and a greater ability for the

2  defense to provide something more concrete.

3       This letter of Dr. Byers is not sufficient.  But there

4  may be more in a month's time.  And so my thought is, I'm going

5  to deny the motion but without prejudice.  I'm going to allow

6  you to confer further.

7       I'm going to want a status report on -- let's see.

8  August 10th is a Sunday.  August 9th.  August 8th.  I will be

9  out of town at that time.  But if you can get it to me by noon

10  on Friday, August 8th, on what is going on, what progress did

11  you make in figuring out what his condition really is; and

12  would he be harmed; does the physician believe that he would or

13  could be harmed by being required to testify?

14       That gets us even farther than what anybody would

15  do -- as counsel for witness Tovar, is he currently

16  represented, Attorney Carney?

17       MS. CARNEY:  Yes, your Honor.  The City of Chicago

18  represents him.

19       THE COURT:  Oh, okay.

20       MS. CARNEY:  So I am his attorney.

21       THE COURT:  So Attorney Spence, think of that.  If you

22  are representing a witness in that situation, you might

23  normally prepare a witness for a deposition by spending a few

24  hours, half a day, sometimes a day, sometimes more than a day,

25  depending.  This strikes me as a pretty narrow set of questions

1   he would be asked.  What did these notes mean?  What does a

2   checkmark mean?  What's this, I can't read it, can you tell me?

3   And did you really examine this person?  And why did you

4   believe there was deception?  And is it phony baloney or not?

5   Because your position is it is phony baloney, to coin an

6   expression.

7          There is some preparation involved.  And for someone

8   with a significant cognitive decline, they will probably need a

9   little more time to prepare.

10          So I want to kind of leave the field wide open right

11  now, even to when this deposition happens, because I believe

12  that if Judge Seeger gives you till the end of August -- but if

13  I recommend that you be given additional time beyond that date

14  to do witness Tovar, that Judge Seeger will be okay with that,

15  I believe.  And I think we need to keep that flexibility open.

16          But what I would encourage you to consider, Attorney

17  Spence, is between now and August 8th, and in your conferences

18  with counsel, just consider whether you want to chase this.

19  You know, how much information, how much verification do you

20  really need?  Did you get enough to suggest that this is maybe

21  not worth doing?  Because we are talking about dragging someone

22  with probably a significant health condition into a deposition

23  room possibly to ask them a bunch of questions that they will

24  have no idea what the answers are.  And you know, I -- I don't

25  feel like that's a great exercise in proportionality under Rule

1    20.  I really don't.

2         But figure out what that pathway looks like.  And if

3    you still wish to depose, and you can't get agreement at that

4    point, I'll hear the motion again, but based on the new

5    information.  Because I don't really have enough to grant or

6    deny this today.

7         And I really assumed wrongly on reading Exhibit 1 that

8    we are kind of at the full state of knowledge on Tovar's

9    condition.  We're not.  There is more diagnostic work to be

10   done.

11        So let's be cognizant of his health conditions.

12   Attorney Spence, you have been great in acknowledging that, and

13   I appreciate it.  But I'm going to deny the motion now without

14   prejudice.

15        Status report due noon, August 8th.  And I think that

16   might be all we need to talk about today.

17        But first, Attorney Morton, anything you want to add

18   on behalf of Mr. Cain?

19        MR. MORRISON:  No, your Honor.  But we do join in

20   Attorney Spence's arguments and motion.

21        THE COURT:  Okay.  And I have a question for you,

22   Attorney Morton, and that is, the Abrego motion -- Abrego

23   brought this motion.  Abrego and Cain have very similar

24   allegations.  And I didn't really spend the time running down

25   in the complaint, Attorney Morton, whether Cain says that the

1   alleged fabrication of the polygraph result was also used to

2   his detriment to get Parra to implicate him.  It looked like

3   from Parra's statement that Parra did implicate Cain.

4           So do you essentially have the same view as Attorney

5   Spence that this affects your client too?

6           MR. MORRISON:  Yes, your Honor, exactly the same

7   thing.

8           THE COURT:  Okay.  I just want --

9           MR. MORRISON:  And for the record -- and for the

10  record, Judge, it is Morrison, M-O-R-R-I-S-O-N.

11          THE COURT:  Oh, I'm terribly sorry.  Hold on a minute.

12          MR. MORRISON:  That's okay.

13          THE COURT:  I heard Morton, but it is Morrison.  And

14  you're also not on my list.  Are you with Bonjean Law Group?

15          MR. MORRISON:  I am.

16          THE COURT:  Okay.  And I'm sorry.  What's your first

17  name?

18          MR. MORRISON:  Josh.

19          THE COURT:  Okay.  Gosh -- Josh.  I have got it now in

20  my notes.  We'll hopefully remember you better next time, as

21  well as Ms. Fleming remember you better than Pat Pieper.

22          Anything else you want to add, Attorney Morrison?

23          MR. MORRISON:  No, Judge.  Thank you so much.

24          THE COURT:  Okay.  So that's our ruling.  And I don't

25  know that there is anything else that was up today.  I don't

1    think there was.

2            Plaintiff?

3            MS. SPENCE:  Not from plaintiff, your Honor.

4            THE COURT:  Attorney Morrison?

5            MR. MORRISON:  No, Judge.  Thank you.

6            THE COURT:  Defense attorneys?

7            MS. CARNEY:  Nothing from the defense.

8            THE COURT:  Okay.  Adjourned.  Thank you, everyone --

9            MS. CARNEY:  Thank you so much.

10           THE COURT:  -- for your candor and forthrightness

11   today.  Very much appreciated.

12           MS. CARNEY:  Thank you, your Honor.

13       (Which concluded the proceedings.)

14                       CERTIFICATE

15           I certify that the foregoing is a correct transcript

16   from the digital recording of proceedings in the above-entitled

17   matter to the best of my ability, given the limitation of using

18   a digital-recording system.

19

20

21   */s/Pamela S. Warren*               July 30, 2025
     Official Court Reporter - Retired        Date
22   United States District Court
     Northern District of Illinois
23   Eastern Division

24

25